# EXHIBIT B

Filed 8/8/97

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

THE PEOPLE,

    Plaintiff and Respondent,

v.

LAMERLE RONNIE JOHNSON,

    Defendant and Appellant.

A073308

(San Mateo County
Super. Ct. No. SC31800-B)

    Lamerle Ronnie Johnson seeks to overturn his conviction of kidnapping for ransom, second degree robbery, and assault with a firearm. He asserts error based on the court's refusal to instruct on duress and necessity, the exclusion of evidence of the victim's prior violence against him, prosecutorial misconduct in closing argument that exploited the exclusion of that evidence, and the failure to stay a prison term. We affirm the judgment.

## BACKGROUND

### The Prosecution Evidence

    As Aasa Knowles left her Daly City apartment on Winchester Boulevard at approximately 10:30 a.m. on July 6, 1993, a man near her gate said hello. When she returned an hour later, the man was in an AMC Concord parked nearby. He was still there when she left at 2 p.m. and when she returned at 2:30 p.m.

    That afternoon, defendant contacted Ardie James Moreland. He arranged a meeting and told Moreland to bring guns. The two men met and, along with Lashon

Brown, drove to a restaurant in an AMC Concord. There, they discussed a plan to rob Knowles, on the theory that her boyfriend Ellis Foots, a drug dealer, would keep some of his cash at her apartment. They drove to Knowles's apartment, parked nearby, and waited.

When Foots arrived at Knowles's apartment around 7 p.m., they decided to rob him as well. Defendant and Moreland determined they should take Foots to various places where he kept cash and that they needed additional help. Defendant called Taryn Washington, telling him he was about to confront somebody who owed him money and asking Washington to back him up in case of a fight. Defendant picked Washington up, and they drove back to Winchester Boulevard, rejoining Moreland and a man known as Mike or "Pookie." Defendant proposed that they approach Foots, posing as police officers, and "arrest" him.

Around 9:30 that night, Knowles, Foots, and Foots's friend Thomas left Knowles's apartment. The same AMC Concord Knowles had seen earlier drove by, with the man she had seen now in the passenger seat. The car passed, then made a U-turn. At the same time, another car approached from the opposite direction and disgorged armed men. Pursued by one of the men, Knowles ran to her building and called the police.

Foots started running and threw a bag of cocaine over a fence. Yelling that they were police officers, Moreland and defendant ordered Foots to lie down on the ground. Foots complied. While defendant held a gun on Foots, Moreland restrained him using handcuffs defendant had given him.

Moreland put Foots into the back seat of the AMC Concord. Defendant told Moreland to "Get him out of there, away from the scene." Moreland and Washington drove Foots to the apartment of Marlon Bonds in Oakland. On the way, Moreland telephoned Bonds from the car. Pretending to be a police officer, Moreland told Bonds they were "bringing [Foots] in." Foots realized his abductors were not police when they drove past the Hall of Justice.

2

Meanwhile, a Daly City police officer responding to a call about the incident saw defendant walking away from the scene wearing clothing that matched the description of a possible suspect. When the officer asked defendant to stop, defendant became verbally abusive. Other officers then arrived and arrested defendant for obstructing and resisting an officer. He was taken to the Redwood City jail and released around 2 o'clock the next morning.

At Bonds's apartment, Moreland and Washington took Foots's wallet, gold chain, cellular phone, and keys. Moreland called Bonds at work and told him to bring some duct tape home. Bonds brought the tape and used it to blindfold Foots. He also removed the handcuffs and bound Foots's hands with rope. Foots's feet were also bound. When Foots tried to loosen the ropes, one of the men shot him in the arm with a stun gun and replaced the handcuffs.

Moreland began to get nervous when defendant did not page him as promised. Bonds was concerned because Foots had seen where he lived. They made a plan to kill Foots and drove to the Oakland hills to find a spot to dispose of his body. When they returned to the apartment, they decided to kill Foots if they did not hear from defendant within an hour. The plan became moot when Lashon Brown paged Moreland and told him defendant was in jail but would be released shortly. Moreland drove Washington back to San Francisco and returned to Bonds's apartment.

Defendant arrived at the apartment around 4:30 a.m. He and Moreland discussed how to get Foots's money. Defendant asked Foots how much money his people could come up with "for his safety." Foots told him he had $8,000 at his house in Oakland. Defendant went to the house but, seeing Foots's "soldiers" there, returned to Bonds's apartment without having gone inside.

Moreland and defendant decided to hold Foots for ransom. Early on the morning of July 7, they had Foots call his friend Louis Arterberry, known as "Po," to ask him to raise the ransom money. They told Foots they would kill him if their demands were not met. Arterberry called the police.

3

After Bonds left for work, defendant suggested to Moreland that, because he resembled Foots, Moreland could use Foots's credit cards to get cash and make purchases. From Foots, they got the "PIN" numbers, credit limits, and other information for the cards. Moreland and defendant flew to Los Angeles, where they used Foots's cards to obtain cash, jewelry, clothing, and other items. The next afternoon, while defendant was loading their purchases into a rented van, Moreland was arrested trying to use one of Foots's cards.

When defendant returned to Bonds's apartment that evening, Washington and Bonds were there with Foots. Defendant told them the "good news," that they were "getting money from Foots's people," and the "bad news," that Moreland "got busted in L.A." with Foots's credit card.

Washington made phone calls to arrange the ransom. Bonds and defendant told him what to say. The police provided Arterberry with a backpack equipped with a transmitter to be used to deliver the ransom money.

Bonds selected a vacant lot in Oakland for the drop site. On the evening of July 8, he and defendant went to pick up the ransom. Once they spotted the backpack, defendant retrieved it and ran back to the circling car. They returned to the apartment and, with Washington, began counting the money.

The transmitter failed to work, but Moreland had disclosed Foots's location to police in Los Angeles. Officers contacted the surveillance team, and Moreland gave directions to Bonds's apartment.

A tactical team arrived and forced open the apartment door. Ransom money was strewn about. Foots was handcuffed, bound, and blindfolded. Defendant, Bonds, and Washington were trying to hide in a bedroom closet. Loaded semiautomatic handguns were on the bed. A trail of money led from a pile on the bed to the closet. There was a stun gun in the living room. Foots had never seen defendant until his rescue.

The prosecution introduced additional evidence that is not involved in this appeal.

## The Defense Evidence

Defendant was the sole defense witness. He and Foots had had at least two prior disagreements, including one over defendant's dating Lashon Brown, Foots's ex-girlfriend. The day before the kidnapping, Foots had pointed a gun at defendant while defendant was in his car with his son. Defendant decided to confront Foots, "[t]o get physical . . . whop his butt." Defendant "was going to challenge Mr. Foots in the way he had challenged me, and let Mr. Foots know that if he continued to harass me or come at me in any fashion that I would return the same thing to him."

Brown told defendant where to find Foots and drove with him to Aasa Knowles's apartment. Defendant called Moreland, explained the problem, and asked for help. When Moreland asked whether they needed weapons, defendant said, " 'Man, we might,' and [Moreland] brought some."

Brown and defendant picked up Moreland and went to Knowles's apartment, but did not confront Foots when he arrived because defendant got nervous. Defendant decided he needed additional support and called Washington and Pookie. When Foots left the apartment, defendant and the others drove up to him and got out of the car. Defendant was armed with a .357 magnum. Because everything happened so fast, he did not challenge Foots to a fight. Defendant never told Moreland to handcuff Foots or to take him to Oakland. Moreland and Washington put Foots in the car and drove away; defendant did not know where they went.

After his first arrest, defendant called Brown and told her he was going to be released. He called Moreland and discovered he was at Bonds's apartment. When defendant arrived there at 4:30 or 5 a.m., Foots was bound and taped. Moreland told him they were holding Foots for ransom. Worried that Foots would retaliate, defendant got into an argument with Moreland. Bonds and two other men came in and told defendant they were going to kill Foots unless they received the money, and that defendant "could end up just as dead as" Foots. Defendant did not want to participate but was afraid the

others would kill him, and Foots, if he did not. He was also worried because the police had already linked him to the events of that night.

Defendant did not call the police because he thought they were already involved; Bonds was a member of the Oakland Police Department,[1] and the two men with him were wearing Oakland Police jackets. Defendant was "not going to call a cop on a cop" "[b]ecause they're dirty. You already got dirty ones there. Why call some more?" He also felt Bonds would find out and kill him if he called the police. That is also why he did not free Foots when, on two separate occasions, he was left alone with him at the apartment.

Defendant denied taking anything from Foots. He also denied going to Foots's home or to Los Angeles with Moreland. He left Bonds's apartment for Brown's house at 10:30 or 11 a.m. on July 7 and did not return until 6:30 the next evening.

Bonds told defendant he had to accompany Bonds to the ransom drop site "[b]ecause it was dark." As they were driving to the site, Bonds pulled over and spoke to a police officer in a parked police car.

### The Conviction

The jury found defendant guilty of kidnapping for ransom, second degree robbery, and assault with a firearm, and found true enhancements for personal use of a firearm in connection with the kidnapping and assault charges. It rejected the personal use enhancement to the robbery count. Defendant was sentenced to a life term for kidnapping, the aggravated term of five years for the kidnapping-related personal use enhancement, a consecutive three-year term for the assault, and an additional term of three years for the assault-related enhancement. The court stayed a three-year term for the robbery pursuant to Penal Code section 654.[2]

---

[1] Bonds was in fact a former Oakland police officer.
[2] Unless otherwise noted, all further statutory references are to the Penal Code.

DISCUSSION

**I. The Court Correctly Refused to Instruct the Jury on Duress and Necessity**

Based upon defendant's testimony that Moreland and Bonds planned to kill Foots and that defendant only went along with the ransom scheme because he was afraid Bonds would kill him and Foots if it failed, defense counsel asked the court to instruct the jury on the defenses of duress and necessity. The court properly refused to give the requested instructions on the ground that they were not supported by substantial evidence.

**A. Duress**

The defense of duress "negates an element of the crime charged—the intent or capacity to commit the crime—and the defendant need raise only a reasonable doubt that he acted in the exercise of his free will. [Citation.]" (*People v. Heath* (1989) 207 Cal.App.3d 892, 900.) To establish the defense, the defendant must show he acted under such threat or menace that he reasonably believed his life would be endangered if he refused. (*Ibid.*)

Key here is that the threat must be immediate, such that the person being threatened "has no time to formulate what is a reasonable and viable course of conduct nor to formulate criminal intent." (*People v. Heath, supra,* 207 Cal.App.3d at p. 900.) Thus, "a phantasmagoria of future harm," such as a death threat to be carried out at some undefined time, does not lessen one's culpability. (*People v. Otis* (1959) 174 Cal.App.2d 119, 125; *People v. Heath, supra,* at p. 900; *People v. Lewis* (1963) 222 Cal.App.2d 136, 141.)

Assuming the truth of his testimony (see *People v. Flannel* (1979) 25 Cal.3d 668, 684), defendant here demonstrated at best a fear of future harm. The record discloses no evidence that the alleged threat was imminent. Indeed, by defendant's own admission, it was purportedly to be carried out only if the ransom scheme ultimately failed and Foots was executed. The lack of immediacy is illustrated by the fact that, even after the alleged

7

threat, defendant left the apartment and did not return until the next day.³ Thus, based on defendant's own version of the facts, the evidence fails to support the immediacy element of duress.

### B. Necessity

Necessity, a defense distinct from duress, provides a justification when the situation is "of an emergency nature, threatening physical harm, and lacking an alternative, legal course of action. [Citation.] The defense involves a determination that the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged. [Citation.]" (*People v. Heath, supra*, 207 Cal.App.3d at pp. 900, 901.)

To invoke the necessity defense, the defendant bears the burden of proving, among other elements, that he did not substantially contribute to the creation of the emergency. (*People v. Slack* (1989) 210 Cal.App.3d 937, 940; *People v. Condley* (1977) 69 Cal.App.3d 999, 1008-1013; CALJIC No. 4.43.) Here, the evidence established that defendant planned and set in motion the confrontation with Foots. Defendant called in his friends for assistance and instructed Moreland to bring guns. Whether or not he initially intended to abduct Foots, rob him, or, as he claims, merely to fight him is immaterial. Because the armed confrontation of defendant's making substantially contributed to the creation of the emergency, the necessity defense was not available to him.⁴

There was no instructional error.

### II. The Exclusion of Evidence of Past Animosity Does Not Require Reversal

---

³ Defendant counters that, while the jury could have considered this fact in assessing his credibility, lack of credibility is not grounds for refusing an instruction. (*People v. Flannel, supra*, 25 Cal.3d at p. 684.) Completely apart from the question of his credibility, however, defendant's freedom to come and go shows the absence of any imminent threat to his life required for duress.

⁴ We therefore need not address the People's observation that the evidence also did not support the requirement that there be no reasonable alternatives to participating in the kidnapping, i.e., contacting the police or freeing Foots when the two were left alone in the apartment.

Defendant next contends the court erroneously excluded evidence of Foots's animosity and prior acts of violence towards him. While the ruling was erroneous, defendant was not prejudiced thereby.

In his videotaped statement to police, played to the jury as part of the prosecution's case-in-chief, defendant claimed Foots's gang had kidnapped him, shot his brother, and otherwise threatened him and his family. The prosecution moved *in limine* to preclude defendant from introducing evidence of such past acts. In opposition, defendant argued that evidence of the violent relationship between himself and Foots was relevant to his defense that his sole intent was to confront and fight Foots in retaliation. The court ruled that defendant could explain the statements in his confession but excluded as irrelevant evidence of prior contacts and animosity.[5]

The ruling was erroneous. Relevant evidence is that which has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Here, evidence that Foots had threatened and harassed defendant in the past would have some tendency to support defendant's contention that his motive was simply to "challenge Mr. Foots in the way he had challenged me, and let Mr. Foots know that if he continued to harass me or come at me in any fashion that I would return the same thing to him." (See *People v. Lopez* (1969) 1 Cal.App.3d 78, 85 ["Logically, the animosity which may have arisen between the two families as a result of defendant's fight with Garcia's brother . . . supplied the motive for defendant's behavior" in later fighting and stabbing Garcia].)

While the excluded evidence might thus have corroborated defendant's testimony that he intended only to "challenge" Foots, its exclusion was not prejudicial. (*People v. Cudjo* (1993) 6 Cal.4th 585, 610-611; *People v. Watson* (1956) 46 Cal.2d 818, 836.) The evidence, as detailed above, was overwhelming that defendant knowingly and intentionally participated in the ransom scheme after he arrived at Bonds's apartment. The jury was correctly instructed that, in a kidnap-for-ransom case, a defendant's intent at

9

the time of the initial seizure is irrelevant if the kidnapper seeks ransom during the period in which the victim is held or detained.[6] (*People v. Brown* (1947) 29 Cal.2d 555, 558; 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against the Person, § 547, p. 620.) Evidence bolstering defendant's testimony about his intent at the time of the initial confrontation was therefore of little significance.

On the other hand, the excluded evidence would have lent slim support for defendant's theory, even with respect to the initial confrontation. Assuming the truth of the proffered evidence, it is a tenuous connection to conclude from a history of past violent confrontations that defendant's plan for retaliation was limited to merely "challeng[ing] Mr. Foots in the way he had challenged me . . . ." The link is further weakened by defendant's videotaped statement that Foots's (or his gang's) past acts of violence included kidnapping defendant. Defendant's own statement raises the possibility he might seek to kidnap Foots as retaliation for the same crime. On this record, it is not reasonably probable the jury would have reached a different result absent the error.

### III. The Prosecutor's Misconduct Does Not Require Reversal

Defendant contends the court erred in denying his motion for a new trial based on prosecutorial misconduct.[7] While portions of the prosecutor's closing argument were improper, the misconduct does not require reversal.

During his argument, the prosecutor referred as follows to defendant's testimony about the various incidents of intimidation by Foots: "And finally . . . we come to the defense case . . . . What do you get? [¶] You get [defendant] . . . he talks about disputes

---

[5] We observe the court did not base its ruling on Evidence Code section 352.

[6] The court gave the following instruction: "In determining whether the defendant violated Penal Code section 209(a), it is unnecessary to determine whether the kidnap[p]er intended to commit extortion, or hold the victim for ransom at the time of the original seizure or carrying away. It is sufficient if the extortion, or holding of the victim for ransom was committed during the course of the abduction. Thus, whatever may have been the original motive of the kidnapping, if the kidnapper commits extortion, or seeks a ransom during the kidnapping, he 'holds or detains' his victim for ransom, or to commit extortion or robbery within the meaning of section 209(a)."

[7] Prosecutorial misconduct is one of the statutory grounds for granting a new trial. (§ 1181, subd. 5.)

going back to 1992 with Ellis Foots, with all these incidents at grandmother's house and drive-bys and intimidations, *but there is no evidence, again, that verifies any of this.* [¶] . . . [¶] And then he talks about how this incident . . . was that which broke the camel's back, the straw which broke the camel's back. [¶] He added to this -- now, it's not as he said in his videotape confession. It's not: Well, he pulled a gun on me. It's embellished to: Well, I had my son in the car, which was a nice touch. *But, again, never reported any evidence -- no incidents involving [defendant] are ever reported or corroborated in any way.*" (Italics added.)

This was manifestly improper. It should, but apparently does not, go without saying that a prosecutor may not seek to have evidence excluded and, when successful, argue to the jury that the defendant's failure to produce that evidence compromises his credibility. (*People* v. *Varona* (1983) 143 Cal.App.3d 566, 570; see *People* v. *Solomon* (1969) 1 Cal.App.3d 907, 911.) The prosecutor's tactics in thus exploiting the exclusionary ruling far exceed the limits of acceptable conduct. By indulging in such conduct, the prosecutor also put at risk an otherwise solid case.

The question remains whether the misconduct requires reversal. Defendant neither objected to the prosecutor's comments nor requested that the jury be admonished to disregard them. "Generally, a reviewing court will not review a claim of misconduct in the absence of an objection and request for admonishment at trial. 'To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.' [Citations.]" (*People* v. *Gionis* (1995) 9 Cal.4th 1196, 1215; *People* v. *Green* (1980) 27 Cal.3d 1, 34, partially overruled on other grounds in *People* v. *Guiton* (1993) 4 Cal.4th 1116, 1128-1129 and *People* v. *Hall* (1986) 41 Cal.3d 826, 834, fn. 3.)

Defendant urges that this court should nonetheless reach the merits of his motion for a new trial because the trial court denied the motion on the merits. Even were this court to overlook defendant's failure to object, however, the outcome would not change.

11

Prosecutorial misconduct requires reversal only when, on the whole record, it results in a miscarriage of justice. (*People* v. *Green, supra,* 27 Cal.3d at pp. 29, 34.) There was no miscarriage of justice here. The evidence against defendant was overwhelming. Moreover, as noted above, defendant's knowing participation in the kidnapping *after* the initial abduction rendered the prosecutor's comment of minimal relevance. On this record, it is unlikely that the prosecutor's unseemly overreaching contributed materially to the verdict. (See *id.* at p. 29.)

### IV. Section 654 Does Not Apply to the Assault Charge

As previously noted, defendant was sentenced to a life term for kidnapping, five years for the kidnapping-related personal use enhancement, a consecutive three-year term for the assault, and an additional three years for the assault-related enhancement. Contrary to defendant's contention, the court was not required to stay the assault term and related enhancement pursuant to section 654.

" 'Section 654 does not preclude multiple convictions but only multiple punishments for a single act or indivisible course of conduct. [Citation.]' [Citation.] 'The proscription against double punishment in section 654 is applicable where there is a course of conduct which . . . comprises an indivisible transaction punishable under more than one statute . . . . The divisibility of a course of conduct depends upon the intent and objective of the actor, and if all the offenses are incident to one objective, the defendant may be punished for any one of them but not for more than one.' [Citation.] 'The defendant's intent and objective are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support a finding the defendant formed a separate intent and objective for each offense for which he was sentenced. [Citation.]' [Citation.]" (*People* v. *Coleman* (1989) 48 Cal.3d 112, 162.)

Here, the trial court rejected defendant's argument that the initial, armed assault was part of the overall plan to kidnap and concluded it was a "separate act of violence." While the evidence could have supported a different conclusion, there is also evidence to support the court's finding. Moreland testified that defendant's intent at the time he

12

assaulted Foots with a gun was to rob Foots and Knowles; defendant testified he intended to challenge Foots in retaliation for prior confrontations. The court could thus reasonably have found that the intent to hold Foots for ransom developed only after the assault. We will not disturb its ruling.

## DISPOSITION

The judgment is affirmed.

_____
Corrigan, J.

We concur:

_____
Phelan, P.J.

_____
Walker, J.