# EXHIBIT E

INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

```
In the matter of the Life )
Term Parole Consideration )
Hearing of:                )      CDC Number J-92682
                           )
LAMERLE JOHNSON            )
                           )
_____)
```

MULE CREEK STATE PRISON

IONE, CALIFORNIA

MARCH 22, 2006

PANEL PRESENT:

Mr. Archie "Joe" Biggers, Presiding Commissioner
Ms. Noreen Blonien, Deputy Commissioner

OTHERS PRESENT:

Mr. Lamerle Johnson, Inmate
Mr. Larry Chlabek, Attorney for Inmate
Mr. Sean Gallagher, Deputy District Attorney
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

```
_____   No     See Review of Hearing
_____   Yes    Transcript Memorandum
_____
```

**Sue Gerdes, Peters Shorthand Reporting**

ii

# INDEX

PAGE

Proceedings........................................ 1

Case Factors...................................... 13

Pre-Commitment Factors............................ 27

Post-Commitment Factors........................... 34

Parole Plans...................................... 50

Closing Statements................................ 72

Recess............................................ 76

Decision.......................................... 77

Adjournment....................................... 85

Transcriber Certification......................... 86

--oOo--

1

1           **P R O C E E D I N G S**

2           **DEPUTY COMMISSIONER BLONIEN:**  We are on

3   record.

4           **PRESIDING COMMISSIONER BIGGERS:**  Okay

5   this is an Initial Parole Consideration Hearing

6   for Lamerle?

7           **INMATE JOHNSON:**  Lamerle.

8           **PRESIDING COMMISSIONER BIGGERS:**  Lamerle

9   Johnson CDC number J-92682.  Today's date is

10  March 22nd, 2006.  We are located at the Mule

11  Creek State Prison in Ione.  The inmate was

12  received -- somebody moved my sheet.  Let me

13  just get my -- I misplaced my sheet here.  The

14  inmate was received on January 26th, 1996 and

15  his life term started on 1/26/96 from the County

16  of San Mateo.  The inmate was received from San

17  Mateo County and the life term began as I said

18  before on 01/26/96 and the minimum eligible

19  parole date 12/15/2006.  Is that correct?

20          **DEPUTY COMMISSIONER BLONIEN:**  I'm sorry I

21  wasn't listening.

22          **PRESIDING COMMISSIONER BIGGERS:**  MAPD was

23  01/26 I think it should be --

24          **DEPUTY COMMISSIONER BLONIEN:**  MAPD is

25  12/15/06.

26          **PRESIDING COMMISSIONER BIGGERS:**  06 that

27  is in fact correct.  The controlling offense for

```
 1   which the inmate has been committed is violation
 2   of Penal Code 209 one count with extenuating
 3   circumstances were 12022.5 use of a firearm.
 4   The kidnap ransom and use of a firearm is the
 5   commitment offense and there was also a count of
 6   robbery second degree with is a violation of
 7   2125B of the Penal Code.  The case number is
 8   3C31800B.  The inmate was sentenced to life plus
 9   eleven years.  As I said before the minimum
10   eligibility date of 12/15/06.  Now this hearing
11   is being tape recorded and for the purpose of
12   voice identification each of us will state our
13   first and last names, spelling our last name.
14   When it is your turn Mr. Johnson I want you to
15   after you spell your last name give me your CDC
16   number.  Starting at my left, going to my left,
17   my name is Archie "Joe" Biggers I am a
18   Commissioner with the Board of Parole Hearings.
19        DEPUTY COMMISSIONER BLONIEN:  I am Noreen
20   Blonien B-L-O-N-I-E-N and I'm a Deputy
21   Commissioner.
22        DEPUTY DISTRICT ATTORNEY GALLAGHER:  Sean
23   Gallagher from the San Mateo District Attorney's
24   Office S-E-A-N G-A-L-L-A-G-H-E-R.
25        ATTORNEY CHLABEK:  My name is Larry
26   Chlabek C-H-L-A-B-E-K I am the Attorney for Mr.
27   Johnson.
```

3

1        **INMATE JOHNSON:**  My name is Lamerle

2    Johnson J-O-H-N-S-O-N CDC number J-92682.

3        **PRESIDING COMMISSIONER BIGGERS:**  And for

4    the record we have a correctional officer

5    present for security purposes only and will not

6    be participating in the hearing.  I'm not sure

7    if I didn't spell my last name but its B-I-G-G-

8    E-R-S okay.  In front of you there Mr. Johnson

9    there is an ADA statement would you please read

10    that for us.

11        **INMATE JOHNSON:**  Yes Sir.  The American's

12    with Disabilities Act, ADA, is a law to help

13    people with disabilities.  Disabilities are

14    problems that make it harder for some people to

15    see, hear, read, talk, walk, learn, think or

16    take care of themselves than it is for others.

17    Nobody can be kept out of public places or

18    activities because of a disability.  If you have

19    a disability you have the right to ask for help

20    to get ready for your BPT Hearing, get to the

21    hearing, talk, read forms and papers and

22    understand the hearing process.  BPT will look

23    at what you asked for to make sure that you have

24    a disability that is covered by the ADA and that

25    .you have asked for the right kind of help.  If

26    you do not get help or if you don't think you

27    got the kind of help you need ask for a BPT 1074

4

1   Grievance Form.  You can also get help to fill

2   it out.

3        PRESIDING COMMISSIONER BIGGERS:  Do you

4   understand what that means?

5        INMATE JOHNSON:  Yes Sir.

6        PRESIDING COMMISSIONER BIGGERS:  How

7   about telling me that in your own words.

8        INMATE JOHNSON:  Bottom line is that I

9   have a disability that I think I need assistance

10   with to get through this hearing that I can ask

11   for some assistance and it will be afforded to

12   me.

13        PRESIDING COMMISSIONER BIGGERS:  Okay,

14   now you signed a BPT form 1073 on July 20th 2005

15   indicating that you did not have a disability.

16   Is that still correct?

17        INMATE JOHNSON:  That is still correct.

18        PRESIDING COMMISSIONER BIGGERS:  Okay,

19   did you have any problems getting here today

20   other than being escorted?

21        INMATE JOHNSON:  No.

22        PRESIDING COMMISSIONER BIGGERS:  You did

23   not, you were able to walk on your own without

24   any problem?

25        INMATE JOHNSON:  I have no physical,

26   mental problems that will impair me through this

27   hearing.

5

1           **PRESIDING COMMISSIONER BIGGERS:**  Okay, I
2    see you wear glasses huh?

3           **INMATE JOHNSON:**  Yeah.

4           **PRESIDING COMMISSIONER BIGGERS:**  So you
5    don't need a magnifying glass or anything, you
6    can read with those?

7           **INMATE JOHNSON:**  I'm fine.

8           **PRESIDING COMMISSIONER BIGGERS:**  When you
9    went through your C File were you wearing those
10   glasses?

11          **INMATE JOHNSON:**  Yes.

12          **PRESIDING COMMISSIONER BIGGERS:**  Okay so
13   again, you already mentioned, you must know what
14   I'm going to ask you then if your already saying
15   that you don't have anything that is going to
16   keep me from going through this hearing.

17          **INMATE JOHNSON:**  Yeah.

18          **PRESIDING COMMISSIONER BIGGERS:**  No
19   physical, so you knew that was coming huh?

20          **INMATE JOHNSON:**  I kind of knew it was
21   coming.

22          **PRESIDING COMMISSIONER BIGGERS:**  Kind of
23   knew it was coming okay well I still need to ask
24   you for the record.  Do you suffer from any
25   disability that would prevent you from
26   participating in today's hearing?

27          **INMATE JOHNSON:**  No Sir.

6

1          **PRESIDING COMMISSIONER BIGGERS:**  Okay

2    thank you.   This hearing is being conducted

3    pursuant to Penal Code Section 3041 and 4042 and

4    the Rules and Regulations of the Board of Prison

5    Terms Governing Parole Consideration Hearings

6    for Life Inmates.  The purpose of today's

7    hearing is to consider the number and the nature

8    of the crimes that you were committed for, your

9    prior criminal and social history, and your

10   behavior in programming since your commitment.

11   We've had the opportunity to review your Central

12   File and you will be given the opportunity to

13   correct or clarify the record.  We will reach a

14   decision today and inform you whether or not we

15   find you suitable for parole and the reason for

16   our decision.  If you are found suitable for

17   parole the length of your confinement will be

18   explained to you.  Now before we go any further,

19   I want to advise you that we expect you to be

20   totally honest with us today.  This is your

21   Initial Hearing and if you don't get a date

22   today then this hearing will form the foundation

23   for all future hearings.  Any false statement

24   you make today could have an adverse affect on

25   your ability to get a date at a later time.  Do

26   you understand this?

27          **INMATE JOHNSON:**  Yes Sir.

1      **PRESIDING COMMISSIONER BIGGERS:**  Nothing

2   that happens here today will change the finding

3   of the court.  We are not here to re-try your

4   case, we are here to determine if you are

5   suitable for parole.  Do you understand this?

6      **INMATE JOHNSON:**  Yes Sir.

7      **PRESIDING COMMISSIONER BIGGERS:**  Today's

8   hearing will be conducted in two phases.  I will

9   discuss with you the crime you were committed

10   for, your prior criminal and social history.

11   The Deputy Commissioner will talk about your

12   parole plans, letters of support, and will

13   discuss the progress you've made since your

14   commitment, the counselor report as well as your

15   psychological evaluations.  Once that is

16   concluded the Commissioner and the District

17   Attorney and your Attorney will ask you

18   questions.  The questions from the District

19   Attorney will be asked through the panel and

20   your answer should be directed to the panel.

21   Before we recess for deliberations the District

22   Attorney, your Attorney, and you will all be

23   given the opportunity to make a final statement

24   regarding your suitability.  Followed by

25   statements from the victim's family which we

26   don't have.  We will then recess to deliberate

27   after which we will resume the hearing and

8

1    announce our decision.  The California Code of
2    Regulations states that regardless of time
3    served a life inmate shall be found unsuitable
4    for and denied parole if in the judgment of the
5    panel the inmate would pose an unreasonable risk
6    of danger to society if released from prison.
7    You have certain rights, those rights include
8    the right to a timely notice of the hearing and
9    the right to review your Central File which you
10   told me that you've already done is that
11   correct?
12        **INMATE JOHNSON:**  Correct.
13        **PRESIDING COMMISSIONER BIGGERS:**  And the
14   right to present relevant documents.  Do you
15   have any documents that you want to present
16   today, any additional documents?
17        **INMATE JOHNSON:**  Educational documents, I
18   filled out some paperwork in regards to getting
19   a Federal Grant if I am released in order to get
20   the financial documents --
21        **PRESIDING COMMISSIONER BIGGERS:**  Do you
22   have those documents that you give to your
23   attorney to give to me please.  Okay with that
24   in mind Mr. Chlabek do you feel that your
25   client's rights have been met?
26        **ATTORNEY CHLABEK:**  Thus far I believe
27   they have been yes.

9

1        **PRESIDING COMMISSIONER BIGGERS:**  Okay

2  thank you.  You have an additional right to be

3  heard by an impartial panel.  Do you have any

4  objection to the panel members?

5        **INMATE JOHNSON:**  No.

6        **PRESIDING COMMISSIONER BIGGERS:**  Defense

7  Attorney do you have any objections to the

8  panel?

9        **ATTORNEY CHLABEK:**  No.

10       **PRESIDING COMMISSIONER BIGGERS:**  You will

11  receive a written copy of our tentative decision

12  today.  The decision will become effective,

13  becomes effective within a 120 days.  A copy of

14  the decision and a copy of the transcript will

15  be sent to you and you will have 90 days from

16  the date to appeal it if you so desire.  Now the

17  board has eliminated it's appeal process.  If

18  you disagree with anything in today's hearing

19  you have a right to go directly to the court

20  with your complaint.  Do you understand that?

21       **INMATE JOHNSON:**  Yes Sir.

22       **PRESIDING COMMISSIONER BIGGERS:**  Okay you

23  are not required to admit your offense or

24  discuss your offense however the panel does

25  accept the findings of the court to be true.  Do

26  you understand that?

27       **INMATE JOHNSON:**  Yes.

10

1   **PRESIDING COMMISSIONER BIGGERS:** Okay, I

2 am going to pass over to your attorney and also

3 to the District Attorney exhibit one which will

4 outline the documents that we are going to be

5 using today to make sure that they have -- that

6 we are all on the same sheet of music.

7   **DEPUTY DISTRICT ATTORNEY GELLAGHER:** I

8 have all of those documents.

9   **ATTORNEY CHLABEK:** Yes I have them as

10 well.

11   **PRESIDING COMMISSIONER BIGGERS:** Okay

12 thank you.  Please mark that as exhibit one.

13 Deputy Commissioner, do we have any confidential

14 information and will it be used?

15   **DEPUTY COMMISSIONER BLONIEN:** We have

16 none.

17   **PRESIDING COMMISSIONER BIGGERS:** Okay,

18 again and I mentioned this earlier do we have

19 any additional documents?

20   **ATTORNEY CHLABEK:** I believe there aren't

21 any.

22   **PRESIDING COMMISSIONER BIGGERS:** Okay

23 will your client be talking to us today counsel?

24   **ATTORNEY CHLABEK:** Yes he will be talking

25 about on all topics including the crime.

26   **PRESIDING COMMISSIONER BIGGERS:** Okay,

27 all right.  If that's the case Mr. Johnson I

11

1  need you to raise your right hand as best as you

2  can.  Do you solemnly swear or affirm that the

3  testimony you give at this hearing will be the

4  truth and nothing but the truth?

5      INMATE JOHNSON:  Yes I swear to God.

6      PRESIDING COMMISSIONER BIGGERS:  Okay

7  thank you.  I will use the statement from the

8  correctional officers report which was received

9  from the, I am getting it from the correctional

10  officers report, from the correctional

11  counselors report --

12      ATTORNEY CHLABEK:  Excuse me, at this

13  time could I make an objection?

14      PRESIDING COMMISSIONER BIGGERS:  What is

15  the objection?

16      ATTORNEY CHLABEK:  Yes I would like to

17  object to the District Attorney opposing my

18  clients suitability for parole based upon the

19  fact that my client had an agreement for a term

20  of years from the District Attorney's Office

21  regarding on this case and it is my client's

22  belief that the District Attorney's Office

23  reneged on that deal and my client intends to

24  follow up with this objection with the rite to

25  try to make good his claim on that.

26      PRESIDING COMMISSIONER BIGGERS:  Okay

27  well, I'll take it under advisement but you see

12

1   bottom line is the DA doesn't have the authority

2   to us this is an administrative hearing on our

3   side to determine if you are suitable for

4   parole.  If you are questioning the amount of

5   time that you are serving on what they are going

6   to present to us to determine whether or not you

7   are unsuitable then that is something that you

8   have to take up with the District Attorney.

9        **INMATE JOHNSON:**  Yes Sir.

10        **PRESIDING COMMISSIONER BIGGERS:**  Do you

11   have a comment?

12        **INMATE JOHNSON:**  Yes I do.  I understand

13   that it's your job to decide whether or not I'm

14   suitable.  My only problem with the DA's office

15   and I don't know this particular DA here is that

16   they might not be impartial on bias based on

17   things that occurred during the course of that

18   plea agreement and so there is things, there is

19   things that I provided my counsel which cause me

20   to question whether or not they can give a

21   impartial recommendation.

22        **PRESIDING COMMISSIONER BIGGERS:**  Well I

23   will take that under advisement but as I said

24   before we are here to determine if you are

25   suitable and if I see, if I notice any type of

26   impartiality then I will over rule the District

27   Attorney.

13

1      **INMATE JOHNSON:**  Thank you Sir.

2      **PRESIDING COMMISSIONER BIGGERS:**  Okay as

3   I said before we are going to go over your

4   offense, your summary of your offense from the

5   correctional counselors report.  We took his

6   from the probation officers report.  July 3rd,

7   1993 Ellis Foots was kidnapped by defendant

8   Johnson.  Arte Moore and again let me spell that

9   Foots F-O-O-T-S was kidnapped by defendant

10  Johnson J-O-H-N-S-O-N, Arte Mooreland M-O-O-R-E-

11  L-A-N-D, Marlon Bonds B-O-N-D-S and Taran

12  Washington W-A-S-H-I-N-G-T-O-N.  A witness

13  identified Johnson as the person in possession

14  of the firearm.  On July 7th, 1993 the Daly City

15  Police Department received a call from the San

16  Leandro Police Department, pardon.

17      **INMATE JOHNSON:**  San Leandro.

18      **PRESIDING COMMISSIONER BIGGERS:**  San

19  Leandro, received a call from the victim's

20  sister.  She stated that people unknown to her

21  were planning on removing items from the

22  victim's safety deposit box.  The police later

23  learned that a man unidentified had received a

24  call from unknown people claiming that they had

25  the victim and requested thirty five thousand

26  dollars.  Police later learned the victim called

27  confirming he was being held for thirty five

14

1    thousand dollar ransom and asked do what ever

2    they want.  By July 8th, 1993 the victim's

3    mother had raised approximately twenty five

4    thousand and the police detectives made the

5    money drop as directed.  During this time one of

6    the defendants had used the victim's credit card

7    on a shopping spree in Los Angeles.  Defendant

8    Mooreland was taken into custody and among

9    questioning admitted to his involvement in the

10   kidnapping.  He provided information to police

11   that led to the arrest of the other kidnappers

12   and the rescue of the victim.  Police arrested

13   (indiscernible) contradictory information by all

14   of the defendants.  It appeared that the initial

15   event may have been a combination robbery and a

16   revenge scheme and then became a kidnap for

17   ransom.  It does appear that Johnson certainly

18   had a lead role in the case.  And again that was

19   a source document from the San Mateo County

20   Probation Officer's Report dated 01/1996 pages

21   four through seven.  Tell me what happened.

22          **INMATE JOHNSON:**  I had a problem with Mr.

23   Foots.  Initially it was supposed to be a

24   confrontation of sorts where like we were going

25   to confront him and it turned into a kidnap

26   ransom and I was guilty.

27          **PRESIDING COMMISSIONER BIGGERS:**  Okay

15

1    what kind of problem did you have with Mr.

2    Foots?

3         **INMATE JOHNSON:**  Mr. Foots and Mr. Foots

4    associates had been involved in like the

5    shooting of my brother, I have a twin brother

6    named Lamont Johnson and he was involved in a

7    shooting plus we had an ongoing sort of feud

8    over a woman named Leshawn Brown and a few days

9    prior to this kidnapping, the kidnapping

10   actually occurred on July the 6th.  A few days

11   prior to this Mr. Foots and some associates,

12   some of his associates saw me in Oakland and

13   they pulled weapons on me and they were

14   threatening me and stuff like that so I got in

15   touch with Leshawn Brown and found out where

16   Ellis was.  Initially I went over there by

17   myself and then I called in Mooreland and while

18   we were sitting there the plan kind of

19   escalated.  So okay it went from we were going

20   to first confront him, beat him up and then it

21   was going to turn into like a kidnap, beat him

22   up robbery and then it turned into a kidnap

23   ransom.

24        **PRESIDING COMMISSIONER BIGGERS:**  Okay,

25   who was the guy, who was actually the shot

26   caller in all of this?

27        **INMATE JOHNSON:**  I was the person who

16

1  called everybody, I started this, I initiated

2  this.

3       PRESIDING COMMISSIONER BIGGERS:  You

4  initiated the whole process?

5       INMATE JOHNSON:  I initiated the process.

6       PRESIDING COMMISSIONER BIGGERS:  You said

7  that you had a problem with Mr. Foots.  Why

8  didn't you just go and confront him by yourself?

9       INMATE JOHNSON:  Mr. Foots was a drug

10  dealer.  He used to -- he was one of those guys

11  who would roll with his friends and stuff like

12  that so he usually ran with a pack so at that

13  time I thought that I knew I needed somebody

14  with me.

15       PRESIDING COMMISSIONER BIGGERS:  Okay

16  well it seems he was a drug dealer, did you ever

17  buy drugs from him?

18       INMATE JOHNSON:  No.

19       PRESIDING COMMISSIONER BIGGERS:  Okay how

20  did you determine he was a drug dealer?

21       INMATE JOHNSON:  I knew he was a drug

22  dealer from living in the neighborhood, being

23  around the neighborhood just people that my

24  brother was involved with.

25       PRESIDING COMMISSIONER BIGGERS:  You said

26  that he shot your brother.

27       INMATE JOHNSON:  His associate shot my

17

1   brother, his people of his what you would call a

2   click.

3          PRESIDING COMMISSIONER BIGGERS:  Well if

4   that was the case why would you go out for Mr.

5   Foots if you were sure that he was not the one

6   .that pulled the trigger on your brother?

7          INMATE JOHNSON:  It wasn't just, I guess

8   it wasn't, I won't say it was gang banging or

9   anything like that but it was like his

10  associates had shot my brother in February of

11  1993 by brother testified in a Contra Costa

12  Court House in Richmond against Mr. Foots

13  associates.  While we were at the court house

14  there was some threats passed.  I was with my

15  brother sitting over there by the DA's Office

16  and they were "were going to get you sucker" you

17  know and a bunch of different names were called

18  and stuff like that and so when they saw me then

19  this was later on back in July.  I mean I had

20  heard rumors and stuff like that they were

21  saying well we see you and something is going to

22  happen to you, something is going to happen to

23  your brother, your brother's a snitch and all

24  this other stuff and when they saw me over there

25  at the -- over in Oakland they confronted me.

26         PRESIDING COMMISSIONER BIGGERS:  So it

27  was never proven that they were responsible for

18

1  your brothers debt, you are just assuming based

2  on the --

3      **INMATE JOHNSON:**  His associates were

4  convicted of -- they actually (indiscernible).

5      **PRESIDING COMMISSIONER BIGGERS:**  All

6  right then.  But again just because Mr. Foots

7  was associated with them do you think that he

8  had anything to do with the killing of your

9  brother?

10     **INMATE JOHNSON:**  Honestly yeah I do, he

11 had something to do with it.

12     **PRESIDING COMMISSIONER BIGGERS:**  Okay you

13 indicated here in your version, let me find out

14 where I put this again, let's talk about while

15 I'm looking for this, let's talk about how the

16 actual kidnapping took place.  What is your

17 version of that?

18     **INMATE JOHNSON:**  What happened was I

19 called James Mooreland and he came over and

20 after that we decided we needed some more help

21 and then I picked up the phone and called Taran

22 and then I called a guy named Mike.  We drove up

23 on him, when he came up, jumped out, screamed

24 police and waved guns.  Got control of him, he

25 was put in the car with Mooreland, James and

26 they drove off.  The plan was for him to drive

27 around the corner to this park that is around

19

1    the corner from where the kidnapping took place

2    but that went awry and he ended up getting on

3    the freeway.  That's when, when he was on the

4    freeway and was driving he called Marlon Bonds

5    and they decided to take Mr. Foots to Bonds'

6    house.  I ended up getting arrested that night

7    right there at the scene, near the scene and I

8    ended up going to County Jail so initially I

9    didn't know what had happened, I didn't know if

10   they took him around the corner, beat him up,

11   took something from him or what and it wasn't

12   until I got out of custody, when I was released

13   from custody on OR that I find out that he was

14   in Mr. Foots was taken to Oakland California.

15   When we got to Oakland, I went to Oakland

16   afterwards and it was at the house that I found

17   out that a ransom had been discussed because Mr.

18   Foots was going to be killed because he had seen

19   Mr. Bonds' house.

20        **PRESIDING COMMISSIONER BIGGERS:**  So when

21   you were planning all of this, you said earlier

22   to me that it turned out to be kidnap for

23   ransom, what you just said there, was not

24   indicating is was prior so what I heard from you

25   earlier was that it was prior.

26        **INMATE JOHNSON:**  Initially the kidnap

27   ransom was not part of the plot but what I was

20

1  saying earlier was that more came to it, it

2  turned into that.  Like initially it wasn't a

3  kidnap period, it wasn't a robbery.  Initially

4  it was just a confrontation but once I got other

5  people involved in it there was discussion and

6  stuff like that, people wanted benefits from it

7  and me not being right there state of mind it

8  was like okay just help me do this.

9       PRESIDING COMMISSIONER BIGGERS:  Okay

10  well but again if it was discussed prior to the

11  actual incident taking place.

12       INMATE JOHNSON:  The ransom was not

13  discussed prior to the actual incident taking

14  place.  Kidnap robbery was discussed prior.

15       PRESIDING COMMISSIONER BIGGERS:  Kidnap

16  robbery okay.

17       INMATE JOHNSON:  Yes.

18       PRESIDING COMMISSIONER BIGGERS:  You

19  know, you think that your victim carried a large

20  sum of money around with him?

21       INMATE JOHNSON:  Initially when it was

22  just like a kidnap robbery it wasn't about like

23  a large sum of money, it was like okay we going

24  to take this dude around the corner to the park,

25  he might have some money on him, he might have

26  some drugs on him, those things were discussed

27  when we were sitting in the vehicle planning the

21

1    thing.  It was basically okay I am going to

2    intimidate you, I am going to get across to you

3    that I'm not a punk, I'm not someone that you

4    mess with and the nature of doing your friends

5    mess with people.  That is what it was initially

6    about.

7         **PRESIDING COMMISSIONER BIGGERS:**  But you

8    said a few minutes ago that the people that you

9    got involved wanted to be compensated for it.

10        **INMATE JOHNSON:**  They wanted during the

11   course of the discussion was like man what can

12   we get something I mean what's up, can something

13   be gotten out of this so it was like he's a drug

14   dealer we can get something but it wasn't saying

15   well there was no idea that he would have

16   something on him or anything like that.  They

17   were going to do it regardless of what he had on

18   him but if he had something on him that

19   something was going to be taken from him.

20        **PRESIDING COMMISSIONER BIGGERS:**  Yeah but

21   you did in fact communicate that, that you

22   should be able to get something out it right, is

23   that what your telling me?

24        **INMATE JOHNSON:**  At some point in our

25   conversation yes.

26        **PRESIDING COMMISSIONER BIGGERS:**  And

27   again you were the shot caller, you were the one

22

1   that actually ?

2       **INMATE JOHNSON:**  I was the one who

3   initiated this.

4       **PRESIDING COMMISSIONER BIGGERS:**  The

5   process?

6       **INMATE JOHNSON:**  Yes.

7       **PRESIDING COMMISSIONER BIGGERS:**  And you

8   were present when the -- during the discussions

9   were made about get --

10      **INMATE JOHNSON:**  Robbing him.

11      **PRESIDING COMMISSIONER BIGGERS:**  Robbing

12  I guess and getting something from it.

13      **INMATE JOHNSON:**  Yes.

14      **PRESIDING COMMISSIONER BIGGERS:**  All

15  right.  Just wanted to make sure of that.  Were

16  you not involved in the trip to LA?

17      **INMATE JOHNSON:**  No.

18      **PRESIDING COMMISSIONER BIGGERS:**  You were

19  not.  Were you aware that they had taken some

20  credit cards?

21      **INMATE JOHNSON:**  Yes.

22      **PRESIDING COMMISSIONER BIGGERS:**  And

23  going to LA?

24      **INMATE JOHNSON:**  Yes.

25      **PRESIDING COMMISSIONER BIGGERS:**  Did you

26  do make any attempt to stop it?

27      **INMATE JOHNSON:**  No.

23

1          **PRESIDING COMMISSIONER BIGGERS:**  Why not?

2          **INMATE JOHNSON:**  I at that point in my

3    life I didn't care that Ellis Foots was taking

4    advantage of.  The one thing I did stop was,

5    there was a plan to kill Mr. Foots if a ransom

6    wasn't gotten once Mr. Bonds was involved whom I

7    did not call and involve and I argued vigorously

8    that he shouldn't be killed but as far his stuff

9    being taken, credit cards being used or

10   something like that, at that point I didn't

11   care.

12         **PRESIDING COMMISSIONER BIGGERS:**  How did

13   you know your co-defendants?

14         **INMATE JOHNSON:**  I knew Mr. Mooreland, I

15   had known Mr. Mooreland for years.  I met him

16   through a young lady by the name of Charney.  I

17   knew Mr. Washington through my little brother,

18   he went to school with my little brother and my

19   twin brother and one of my other brothers.  I

20   really didn't know Mr. Bonds, Mr. Bonds was Mr.

21   Mooreland's friend.

22         **PRESIDING COMMISSIONER BIGGERS:**  Had you

23   all ever talked about doing anything like this

24   before?

25         **INMATE JOHNSON:**  No.

26         **PRESIDING COMMISSIONER BIGGERS:**  Not even

27   going and taking care of -- what possessed you

24

1    to call them if you had not even though about

2    doing something like this before?

3         INMATE JOHNSON:  I knew Mr. Mooreland was

4    involved -- the first person I called was Mr.

5    Mooreland, I knew Mr. Mooreland was involved in

6    a lot of different activities and so like with

7    what I originally had in mind I knew that Mr.

8    Mooreland would assist me in something like

9    that.

10         PRESIDING COMMISSIONER BIGGERS:  But you

11    didn't have any inclination that they would go

12    to the extreme per say?

13         INMATE JOHNSON:  No I didn't think it

14    would go as far as it did.

15         PRESIDING COMMISSIONER BIGGERS:  Okay and

16    you guys pretended to be -- pretended to be

17    police officers that was quite of a plan.

18         INMATE JOHNSON:  We did, we did.

19         PRESIDING COMMISSIONER BIGGERS:  Where

20    did you get the uniforms?

21         INMATE JOHNSON:  We didn't have uniforms.

22         PRESIDING COMMISSIONER BIGGERS:  Okay so

23    you were plain clothes guys.

24         INMATE JOHNSON:  Yeah, we just jumped out

25    and just screamed police.

26         PRESIDING COMMISSIONER BIGGERS:  Police

27    okay, you all had weapons?

1          **INMATE JOHNSON:**  I had a weapon.

2          **PRESIDING COMMISSIONER BIGGERS:**  You had

3    a weapon, where did you get the weapon?

4          **INMATE JOHNSON:**  I don't even remember, I

5    had a few guns back then.

6          **PRESIDING COMMISSIONER BIGGERS:**  A few

7    guns back then, do you normally walk around with

8    your pistols?

9          **INMATE JOHNSON:**  At that time I was

10   walking around with pistols yes.

11         **PRESIDING COMMISSIONER BIGGERS:**  Okay

12   let's move into some of your personal history

13   here and talk a little bit about that.  Well let

14   me back up for a minute before I go into that,

15   you know I read this and I wanted to make sure I

16   indicate this in the record.  Your two crime

17   partners grabbed the victim and threw him in the

18   car and took off and then you were going -- they

19   were just going to take him to the park.  He

20   went to the house where the victim was being

21   held.  The owner of the house had said that he

22   (indiscernible) killing and then they decided on

23   a ransom then that's when all of you decided on

24   the ransom is that right?

25         **INMATE JOHNSON:**  That's correct.

26         **PRESIDING COMMISSIONER BIGGERS:**  Okay

27   well I thought earlier you told me that it was

26

1    just a robbery, you were not even talking about

2    ransom.

3         **INMATE JOHNSON:**  I was in custody for

4    like three hours.  When I got out of custody Mr.

5    Bonds -- Mr. Foots was already at Mr. Bonds'

6    house.

7         **PRESIDING COMMISSIONER BIGGERS:**  What I'm

8    saying -- what I'm reading in the file here that

9    you went over to the house where the victim was

10   being held and the owner said either I get paid

11   or I kill him.  You then reported that they --

12   all of you collectively decided all of the

13   ransoms and the victim would not get hurt.  Is

14   that right?

15        **INMATE JOHNSON:**  That's true.

16        **PRESIDING COMMISSIONER BIGGERS:**  And you

17   made sure that the victim was well taken care

18   of.  How did you say when the victim was well

19   taken care of, what did you do?

20        **INMATE JOHNSON:**  I mean he was fed, I

21   mean obviously he wasn't comfortable but you

22   know he wasn't mistreated and just a really a

23   really foul sense or anything.  He was fed,

24   using the bathroom and stuff like that.

25        **PRESIDING COMMISSIONER BIGGERS:**  Why

26   didn't you consider calling the police when the

27   guy indicated that if he didn't get paid he

27

1    would kill the victim?

2        **INMATE JOHNSON:** Mr. Bonds was an ex

3    Oakland Police Officer, we were in Oakland so I

4    wasn't really sure at that stage who all was

5    involved.

6        **PRESIDING COMMISSIONER BIGGERS:** But I

7    thought earlier we talked about you being the

8    shot caller so.

9        **INMATE JOHNSON:** Well I initiated the

10   process, I mean when you use that I think you

11   are over stating the word shot caller.

12       **PRESIDING COMMISSIONER BIGGERS:** Okay

13   they man that was behind the --

14       **INMATE JOHNSON:** I was behind the -- this

15   whole thing would have never happened had I not

16   picked up a phone and made a phone call so in

17   that I accept full responsibility. At some

18   point though it got out of control and I wasn't

19   per say the guy who was calling all the shots.

20   I couldn't go in and say okay now I am the guy

21   see in your home just let him go. That wasn't

22   an option. So it became somewhat of a

23   negotiated negotiation type thing to end it.

24       **PRESIDING COMMISSIONER BIGGERS:** Okay,

25   all right. Let's go into your family personal

26   history right now okay. Your parents were never

27   married, your mother became pregnant at the age

```
 1  of 16 when she was living in foster care?
 2      INMATE JOHNSON:  Yes.
 3      PRESIDING COMMISSIONER BIGGERS:  Okay
 4  after you were born you stayed with your
 5  grandmother until she was able to move out on
 6  her own.  Your mother stayed with your
 7  grandmother until she was able to move out on
 8  her own is that right?
 9      INMATE JOHNSON:  That's correct.
10      PRESIDING COMMISSIONER BIGGERS:  You
11  lived with your mother until the age three and
12  then he moved her to his grandparent's home.  So
13  you left your mother's home at age three and
14  went to move in your grandmother?
15      INMATE JOHNSON:  From what I'm told, I
16  was going back and forth.
17      PRESIDING COMMISSIONER BIGGERS:  Okay,
18  you were living there for about a year and then
19  he lived with his mother until age 16.  From the
20  age 16 he moved out -- until he moved out at the
21  age of 18 he lived with his grandparents and
22  father.  You moved out on your own at age 16 and
23  lived on Morris Brown University, you lived on a
24  campus.  Going to school for a year?
25      INMATE JOHNSON:  Yes.
26      PRESIDING COMMISSIONER BIGGERS:  Okay so
27  that means that you finished high school?
```

29

1          **INMATE JOHNSON:**  Yes.

2          **PRESIDING COMMISSIONER BIGGERS:**  Okay.

3  And you said that while you were in Junior High

4  School your mother started using crack cocaine.

5          **INMATE JOHNSON:**  Yes.

6          **PRESIDING COMMISSIONER BIGGERS:**  And

7  that's how and she started bringing home shady

8  characters into the home and that you were

9  physically abused when you were growing up,

10  that's what it says.

11          **INMATE JOHNSON:**  Yes.

12          **PRESIDING COMMISSIONER BIGGERS:**  Okay and

13  you also got teased by other kids because you

14  said your mother was a druggie.

15          **INMATE JOHNSON:**  Yes.

16          **PRESIDING COMMISSIONER BIGGERS:**  Okay,

17  you had a twin brother and two step sisters and

18  two step brothers.  Your brother that was shot,

19  did it kill him?

20          **INMATE JOHNSON:**  No.

21          **PRESIDING COMMISSIONER BIGGERS:**  Okay so

22  he survived that.

23          **INMATE JOHNSON:**  He survived.

24          **PRESIDING COMMISSIONER BIGGERS:**  Okay and

25  it says here that you have no contact with your

26  father, you currently have contact with you

27  mother's grandmother and a step sister.  What

30

1    about your two step brothers and your twin

2    brother?

3         INMATE JOHNSON:  I mean I hear from them

4    through like my grandparents and stuff like

5    that.  I mean I hear from my father through my

6    grandparents and stuff like that but there is

7    not a lot of direct contact like writing every

8    month or anything like that.

9         PRESIDING COMMISSIONER BIGGERS:  What

10   about your brother that got shot, the one that

11   you took upon yourself to retaliate against

12   those individuals you thought had shot him?

13        INMATE JOHNSON:  This kidnapping wasn't

14   in retaliation for my brother's shooting.

15        PRESIDING COMMISSIONER BIGGERS:  But the

16   overall initial plot was to go over there and

17   you know, you took up for your brother that was

18   shot.

19        INMATE JOHNSON:  No, I think you

20   misunderstand.

21        PRESIDING COMMISSIONER BIGGERS:  Well

22   clarify it for me.

23        INMATE JOHNSON:  Okay so I didn't take up

24   this retaliation to confront by first directing,

25   I am just giving you the background history in

26   regards to what was going on.

27        PRESIDING COMMISSIONER BIGGERS:  Well I

1    thought earlier when we first got started you

2    indicated that you were -- you called these

3    people because you wanted to scare Mr. Foots?

4         **INMATE JOHNSON:**  I did.

5         **PRESIDING COMMISSIONER BIGGERS:**

6    Primarily because he had -- did I miss

7    something, I thought --

8         **DEPUTY COMMISSIONER BLONIEN:**  I am

9    confused to.

10        **PRESIDING COMMISSIONER BIGGERS:**  I'm

11   confused.

12        **INMATE JOHNSON:**  I'm not.

13        **PRESIDING COMMISSIONER BIGGERS:**  Why did

14   you start -- well I hope not, but why did you

15   target Mr. Foots?

16        **INMATE JOHNSON:**  I targeted Mr. Foots

17   because Mr. Foots had confronted me in July and

18   pulled guns on me and I was explaining to you

19   Mr. Foots was involved in the shooting of my

20   brother etcetera, I was giving you the

21   background in regards to the history between

22   Foots and myself.

23        **PRESIDING COMMISSIONER BIGGERS:**  Okay.

24        **INMATE JOHNSON:**  But I didn't wake up one

25   day on July 6th and said I am going to get Mr.

26   Foots based on his shooting my brother.  I

27   didn't wake up on July 6th, 1993 and say that I

32

1  am going to go kidnap Mr. Foots or anyway

2  assault him based on an assault that was made on

3  my brother in October of 1992.  That is not why

4  it happened.

5        PRESIDING COMMISSIONER BIGGERS:  Okay.

6        INMATE JOHNSON:  That was just the

7  history.

8        PRESIDING COMMISSIONER BIGGERS:  I

9  understand, I stand corrected.  Now my question

10  to you is if that is the case why did you not

11  call the police when Mr. Foots threatened you?

12        INMATE JOHNSON:  It was just a bad

13  decision, I should have picked up the phone, it

14  was a bad decision.

15        PRESIDING COMMISSIONER BIGGERS:  Okay,

16  all right and when your brother, when this --

17  after this took place did you get a chance to

18  talk to your brother, the one that had been

19  shot?

20        INMATE JOHNSON:  After this kidnapping

21  took place?

22        PRESIDING COMMISSIONER BIGGERS:  Yeah.

23        INMATE JOHNSON:  Yeah I talked to him.

24        PRESIDING COMMISSIONER BIGGERS:  Okay,

25  what did he think about all of that?

26        INMATE JOHNSON:  He was mad that his name

27  came up.  He was thinking that he was being told

33

1  on or put into an uncomfortable situation.   In

2  fact he even tried to make deals with San Mateo

3  County on other things in regards to this case

4  so he had a problem with it.

5     **PRESIDING COMMISSIONER BIGGERS:**  Okay,

6  now your father Mr. Johnson age 42 resides in

7  Pacifica.  Is he still there or do you know?

8     **INMATE JOHNSON:**  No he's in Vallejo.

9     **PRESIDING COMMISSIONER BIGGERS:**  Vallejo,

10  and I see here that you had some Mental Health

11  treatments at age 15 and that was probably to

12  deal with your abuse at the hands of your

13  mother.

14     **INMATE JOHNSON:**  Yeah, I talked with the

15  psychologist.

16     **PRESIDING COMMISSIONER BIGGERS:**  Okay and

17  you said now since you've been in there, your

18  mental health has been up and down and you point

19  that you are under a lot of stress and wonder if

20  your going to get killed in prison.

21     **INMATE JOHNSON:**  I have wondered that

22  yes.

23     **PRESIDING COMMISSIONER BIGGERS:**  Okay I

24  want to look at your priors here.  Your juvenile

25  record you have a -- you were involved in an

26  auto theft.

27     **INMATE JOHNSON:**  Yes.

1      **PRESIDING COMMISSIONER BIGGERS:**  Date was

2  unknown, there was a judicated locally with

3  incarcerated in Juvenile Hall, how long were you

4  in Juvenile Hall?

5      **INMATE JOHNSON:**  For three months.

6      **PRESIDING COMMISSIONER BIGGERS:**  Three

7  months, and they released you?

8      **INMATE JOHNSON:**  Yes.

9      **PRESIDING COMMISSIONER BIGGERS:**  And then

10  on 12/07/90 you had an arrest and conviction by

11  the Oakland Police for violation of PC 4961, for

12  receiving stolen property, grand theft of an

13  asset car.  You received a two year misdemeanor

14  probation.

15      **INMATE JOHNSON:**  Yes.

16      **PRESIDING COMMISSIONER BIGGERS:**  All

17  right I am going to turn everything over now to

18  the Deputy Commissioner and she will talk about

19  your post conviction factors.

20      **DEPUTY COMMISSIONER BLONIEN:**  Since this

21  is your Initial Hearing it's my job to go over

22  what you have been doing while you have been

23  incarcerated and talk to you about your parole

24  plans.  So you've had one other meeting with the

25  Deputy Commissioner and that was June of 2003

26  and it's called the Documentation Hearing and

27  the Deputy Commissioner recommended that you

1    upgrade vocationally, work on your AA if

2    possible, participate in self help if available

3    and remain disciplinary free.  Your current

4    custody level is close B and your classification

5    score is 28 and I think that' because you had an

6    escape in your history from the Juvenile Hall?

7            INMATE JOHNSON:  Boys Ranch.

8            DEPUTY COMMISSIONER BLONIEN:  Three

9    months you were there, you walked away?

10           INMATE JOHNSON:  Yeah.

11           DEPUTY COMMISSIONER BLONIEN:  So in order

12   to do this I read your correctional counselors

13   report by Counselor Heise H-E-I-S-E dated

14   January 5th, 2006, I read the psychiatric report

15   by Doctor Frank Weber dated 9/23/05 and I've

16   read your C File.  So you have only had one 115

17   and that was June 7th, 2001 involving mutual

18   combat.  What was that about, what happened?

19           INMATE JOHNSON:  I was in the chow hall

20   and we were having pizza that day and I was

21   talking and somehow, I don't know if I was

22   talking with my hands or something like that and

23   I had some sauce in my hand and went down on

24   persons and another inmate's shirt and he took

25   offense to that and I apologized several times

26   and he stood up and hit me and then I stood up

27   and I grabbed him and I tried to help hold him

1   and then he reached to swing at me again and I

2   hit him.

3          DEPUTY COMMISSIONER BLONIEN:  You also

4   have four 128's, the last one January 20th, 2002

5   for disrespect.  So you are extremely eloquent

6   in how 12.9 TAPES Score which knows you function

7   on a college level.  You have a paralegal

8   certificate?

9          INMATE JOHNSON:  Certification.

10         DEPUTY COMMISSIONER BLONIEN:

11  Certification, you have a chrono in here for

12  Alternatives College but I don't see any

13  completions or anything like that.

14         INMATE JOHNSON:  The only thing they

15  offered was we got to read, they would check out

16  books and stuff like that.  I wasn't like an

17  ongoing correspondence or like that, you had

18  access to different materials that had been

19  donated to the institution.  And I wanted to

20  back track, you said that when I went to my doc

21  hearing in 2003 they said continue with AA, it

22  wasn't AA it was CGA.

23         DEPUTY COMMISSIONER BLONIEN:  I thought

24  it was get your AA, your degree.

25         INMATE JOHNSON:  Oh my Associates Degree?

26         DEPUTY COMMISSIONER BLONIEN:  Yeah.

27         INMATE JOHNSON:  No I haven't had access

37

1  to get my Associates -- oh okay.

2       **DEPUTY COMMISSIONER BLONIEN:**  Because you

3  already had your paralegal certificate.

4       **INMATE JOHNSON:**  Yeah.

5       **DEPUTY COMMISSIONER BLONIEN:**  Your high

6  school diploma, he obviously saw that you were

7  bright and articulate and felt you should

8  continue your education.  So he wrote that down,

9  it's in your C File.

10      **INMATE JOHNSON:**  Oh okay, I never seen

11 that (indiscernible).

12      **DEPUTY COMMISSIONER BLONIEN:**  It's under

13 Board Decisions.

14      **INMATE JOHNSON:**  Okay.

15      **DEPUTY COMMISSIONER BLONIEN:**

16 Vocationally, I don't see where you -- I've seen

17 where your in and out of vocations but I don't

18 see any certification.  I saw your office

19 services, you were in electronics, you were in

20 computers but because you moved around a little

21 bit and you don't have any vocational

22 certificates.

23      **INMATE JOHNSON:**  That's not true, I have

24 -- I completed office services.

25      **DEPUTY COMMISSIONER BLONIEN:**  You did?

26      **INMATE JOHNSON:**  I completed it in July,

27 it should be somewhere in the C File.

1        **DEPUTY COMMISSIONER BLONIEN:**  Well, last

2  year?

3        **INMATE JOHNSON:**  Yes Ma'am.

4        **DEPUTY COMMISSIONER BLONIEN:**  Well I am

5  going to go over all these chronos, I don't see

6  one and I didn't see a certificate but that

7  doesn't mean that it's not in here.

8        **INMATE JOHNSON:**  Okay.

9        **DEPUTY COMMISSIONER BLONIEN:**  In terms of

10  therapy, you do participate in CGS which is?

11        **INMATE JOHNSON:**  They recently cancelled

12  CGA.

13        **DEPUTY COMMISSIONER BLONIEN:**  But?

14        **INMATE JOHNSON:**  But I have participated

15  in it, yes Ma'am.

16        **DEPUTY COMMISSIONER BLONIEN:**  And for how

17  long did you participate?

18        **INMATE JOHNSON:**  Off and on since 200 --

19  I think it was 2002.

20        **DEPUTY COMMISSIONER BLONIEN:**  And it's a

21  step program, a twelve step program.

22        **INMATE JOHNSON:**  It's a twelve step

23  program.

24        **DEPUTY COMMISSIONER BLONIEN:**  And do you

25  work through the steps?

26        **INMATE JOHNSON:**  I worked through the

27  steps, after awhile -- the first step is saying

39

1    that you, that your addicted to crime.  I found

2    that kind of difficult, I was just an idiot in

3    crime but the rest of it, it was like basically

4    spiritually based.  Teaching us to get in touch

5    with a higher power and you know just accept

6    your responsibility.

7            **DEPUTY COMMISSIONER BLONIEN:**  Are you

8    spiritually based?

9            **INMATE JOHNSON:**  Yes.

10           **DEPUTY COMMISSIONER BLONIEN:**  Do you

11   attend church services here?

12           **INMATE JOHNSON:**  Sometimes, sometimes,

13   I'm not a Christian, I'm not a Buddhist or

14   anything like that but I definitely believe in

15   God.

16           **DEPUTY COMMISSIONER BLONIEN:**  Your not a

17   Christian, your not a Buddhist so how would you

18   define yourself?

19           **INMATE JOHNSON:**  I believe that religion

20   separates and I believe that we all come from

21   God and so like I'm into like reading self help

22   books, I read the bible, I read the Koran, I've

23   studied different religious beliefs but in the

24   end I just believe we are all one.  If I get a

25   chance I would like to get into separation.

26           **DEPUTY COMMISSIONER BLONIEN:**  You have

27   several chronos.  You just completed, there is a

40

1   chrono 1/31/06 that you completed the Victim

2   Awareness Offender Program and you were

3   instrumental in requesting the program for Mule

4   Creek.  What did you learn?

5        INMATE JOHNSON:  It's a program that Matt

6   came up with originally for CYA and it's about

7   teaching you to get in touch with how the victim

8   felt, to sympathize with the victim, to

9   empathize with the victim, put yourself in that

10  person's shoes and say okay well, I mean cause

11  like let's say this crime right here, Ellis

12  Foots was a drug dealer, I don't know what he is

13  today but originally when I was arrested it was

14  real easy for me to minimize and say to myself

15  it was okay because he wasn't really that

16  important etcetera but as I have grown I've

17  learned something, you know what how would my

18  grandmother feel and although I didn't like him

19  I wouldn't want anybody to do that to me and it

20  wasn't okay that I did it.

21       DEPUTY COMMISSIONER BLONIEN:  I was

22  wondering as you were describing your treatment

23  of him, that you fed him and allowed him to go

24  to the bathroom but his eyes had duct tape on

25  them, his feet and hands were bound.

26       INMATE JOHNSON:  They were.

27       DEPUTY COMMISSIONER BLONIEN:  That wasn't

41

1  pretty good treatment I have to tell you, that

2  was terror for him.

3      INMATE JOHNSON:  And say like the

4  Victim's Awareness Program, that helped me to

5  like, like I okay I've said in the past where we

6  you know we didn't torture him or anything like

7  that but I was able to get in touch with the

8  reality that we terrorized him.

9      DEPUTY COMMISSIONER BLONIEN:  Which is

10  torture?

11      INMATE JOHNSON:  Yeah, that's right.

12      DEPUTY COMMISSIONER BLONIEN:  You

13  completed an eight hour anger management course

14  on October 14th, 2005.

15      INMATE JOHNSON:  Yes.

16      DEPUTY COMMISSIONER BLONIEN:  You

17  assisted with re-entry job search workshop, you

18  came to the workshop well prepared and

19  demonstrated a positive attitude toward both the

20  instructor and fellow participants, talks about

21  your participation in CGAA, CGA, and

22  participation in a special workshop on the

23  Importance of Recovery and the Dangers of

24  Relapse, this workshop was conducted to address

25  fundamental general principles that encompass

26  the need for change in practical application.  I

27  am reading from the chronos and not from your

42

1  counselors report because you know it's just a

2  liner to but in your particular situation on the

3  chronos it shows your personal involvement or

4  structuring or bringing the groups together and

5  your active articulate participation.  One thing

6  that I wanted to talk to you about is your work,

7  you've worked up in the EOP ward working with

8  the special needs inmates which isn't an easy

9  thing to do, you've worked as a clerk and when I

10  look at your job evaluations I was looking to

11  see how far back I would have to go because you

12  had all exceptional and then 2003 you must have

13  ran into a different supervisor or something

14  because all of a sudden you had satisfactory and

15  below in a few arenas, what happened there?

16         **INMATE JOHNSON:**  I broke my leg in 2003

17  and the supervisor was mad at me, I think she

18  was mad at me because I couldn't perform all of

19  the duties that I used to be able to perform and

20  she wanted to hire someone else but they were

21  basically saying that no they had to keep me and

22  it disallowed me to do less work thus I wasn't

23  able to do all of the things that I used to do

24  okay, go out and play baseball with guys,

25  basketball and you know like that job entails

26  running up and down the tiers, getting people

27  for the psychologist, stuff like that to talk

43

1    to.   So I was limited in what, limited in what I

2    could do.

3         **DEPUTY COMMISSIONER BLONIEN:**   It's a very

4    difficult position because you have to move

5    people that don't want to be moved sometimes and

6    talk them into doing things that they don't

7    necessarily want to do and keep peace in the

8    tier while you are doing it and before that time

9    you had all exceptional so I was wondering what

10   happened, I was also wondering what happened

11   with all your medical chronos so now you've told

12   me you broke your leg.   How did you break your

13   leg?

14        **INMATE JOHNSON:**   Playing basketball.

15        **DEPUTY COMMISSIONER BLONIEN:**   Going in

16   for a lay up?

17        **INMATE JOHNSON:**   You know what, I jumped

18   up and a guy -- I jumped up and I jumped up for

19   a rebound and a guy's foot was right there and

20   he came down on my ankle and popped it.

21        **DEPUTY COMMISSIONER BLONIEN:**   It happens

22   in professional also.   We're back on tape side

23   two.   You have also taken Advanced Parenting

24   Skills, you have children.

25        **INMATE JOHNSON:**   Yup.

26        **DEPUTY COMMISSIONER BLONIEN:**   How many?

27        **INMATE JOHNSON:**   Three.

44

1      **DEPUTY COMMISSIONER BLONIEN:** I read

2  somewhere five?

3      **INMATE JOHNSON:** I have step children too

4  but I no longer have contact.

5      **DEPUTY COMMISSIONER BLONIEN:** I saw you

6  had at one time three children that were all

7  three years old, were they triplets?

8      **INMATE JOHNSON:** No.

9      **DEPUTY COMMISSIONER BLONIEN:** No? Three

10  different moms?

11      **INMATE JOHNSON:** Different moms.

12      **DEPUTY COMMISSIONER BLONIEN:** All with

13  the same age child. Those were all three yours?

14      **INMATE JOHNSON:** Yeah, March 20th my

15  oldest just turned 14 two days ago.

16      **DEPUTY COMMISSIONER BLONIEN:** And are you

17  in contact with all three?

18      **INMATE JOHNSON:** No, just two of them.

19      **DEPUTY COMMISSIONER BLONIEN:** Two of them

20  and they write to you or do they come see you?

21      **INMATE JOHNSON:** They write to me, I've

22  seen them. My son lives in the Los Angeles area

23  so I don't get to see him that much. My

24  daughter stays in the bay area.

25      **DEPUTY COMMISSIONER BLONIEN:** And they

26  are doing well?

27      **INMATE JOHNSON:** They are doing great.

45

1          **DEPUTY COMMISSIONER BLONIEN:**  There in

2   school?

3          **INMATE JOHNSON:**  Going to school, asking

4   tough questions.

5          **DEPUTY COMMISSIONER BLONIEN:**  What is

6   your pay number?

7          **INMATE JOHNSON:**  I make I think twenty

8   four cents an hour.

9          **DEPUTY COMMISSIONER BLONIEN:**  So how much

10  a month is that?

11         **INMATE JOHNSON:**  Comes out to about

12  twenty seven dollars.

13         **DEPUTY COMMISSIONER BLONIEN:**  So that

14  really doesn't give you any opportunity to send

15  any money home.

16         **INMATE JOHNSON:**  No.

17         **DEPUTY COMMISSIONER BLONIEN:**  Because you

18  have to take care of your own personal needs.

19         **INMATE JOHNSON:**  Yes.

20         **DEPUTY COMMISSIONER BLONIEN:**  In the

21  institution.  You worked in a Juvenile Diversion

22  Program?

23         **INMATE JOHNSON:**  Yeah.

24         **DEPUTY COMMISSIONER BLONIEN:**  What was

25  that?

26         **INMATE JOHNSON:**  They had like a they --

27  back in I think it was either 2001 or 2002 and

1   they were going to start up, they started up

2   like a Scared Straight, Scared Straight Program

3   and we had like one group of children that came

4   through from the Amador area and just basically

5   tried to walk them around and show them what

6   prison was like and deter them from ever wanting

7   to come here.

8        **DEPUTY COMMISSIONER BLONIEN:**  They ask

9   you any good questions?

10        **INMATE JOHNSON:**  They asked me rough

11  questions.

12        **DEPUTY COMMISSIONER BLONIEN:**  Like what?

13        **INMATE JOHNSON:**  Why we did what we did,

14  what were we like when we were children, what do

15  we think our mistakes were.

16        **DEPUTY COMMISSIONER BLONIEN:**  And Mr.

17  Biggers asked you the question about your

18  brother you never really answered it, where is

19  he now?

20        **INMATE JOHNSON:**  Still out there doing

21  exactly the same thing he was doing when I got

22  arrested.

23        **DEPUTY COMMISSIONER BLONIEN:**  And looking

24  at -- you've been at several different prisons.

25  As I was reading it I was it,  your C File, I

26  was wondering who you were because your level of

27  programming is either way up here or way down

47

1    here, there is not a lot in between and here

2    this is a good prison for you.

3        **INMATE JOHNSON:**  This is a great prison.

4        **DEPUTY COMMISSIONER BLONIEN:**  You get to

5    program and they've allowed you to use your

6    initiative.  You were chair of the Men's

7    Advisory Counsel in SATF?

8        **INMATE JOHNSON:**  Yes.

9        **DEPUTY COMMISSIONER BLONIEN:**  And then I

10   saw you had one teacher whose -- who wrote that

11   you don't focus in class that you talk to much.

12       **INMATE JOHNSON:**  Electronics.

13       **DEPUTY COMMISSIONER BLONIEN:**  Yeah and so

14   I was just wondering who you are, you are

15   evolving.

16       **INMATE JOHNSON:**  Well I am growing up.

17       **INMATE JOHNSON:**  How old are you now?

18       **INMATE JOHNSON:**  Thirty four.

19       **DEPUTY COMMISSIONER BLONIEN:**  In looking

20   at your psych report the doctor notes that under

21   diagnostic impressions there is no mental

22   illness, that you do have an antisocial

23   personality disorder by history not in

24   actuality.  But you don't have any medical

25   conditions and you have a Global Assessment of

26   Function Score of 85 which a very high score

27   especially from this particular doctor, Doctor

48

1    Weber.  That means that not only do you function

2    extremely well in the institution but that in

3    the community you would be a highly functioning

4    individual.  That looking at your risk for

5    violence he noted that the nature of the crime

6    indicates that your judgment was impaired and

7    your problem solving skills were omitted, that

8    you have a history of criminal behavior and a

9    allegiance to a street code indicating the

10   antisocial orientation to life but by history of

11   physical abuse in your household, violence was

12   viewed as acceptable.  Then on the other side

13   you have successfully participated in education

14   and self help programs, that you've only had one

15   disciplinary infraction since being

16   incarcerated.  Unfortunately that one was for

17   mutual combat in 2002.  But witnesses testified

18   at your 115 that you tried to avoid that

19   confrontation and that indicates that you've

20   learned to control your behavior, that you've

21   maintained strong family bonds through out the

22   years of incarceration, that your remorse and

23   personal transformation appear to be genuine and

24   that you assist staff when ever possible, you

25   seem genuinely interested in the welfare of

26   others and based on the factors he indicates

27   that you have a low risk in the category for

49

1    violence if paroled and that he believes that
2    you would have little difficulty readjusting to
3    life outside of prison and that you wouldn't
4    need any treatment for either mental health or
5    substance abuse.  So have you kept up with the
6    world going by as you have been in here?
7         INMATE JOHNSON:  The news, yeah.
8         DEPUTY COMMISSIONER BLONIEN:  How often
9    do you get visits from your family?
10        INMATE JOHNSON:  My last visit was in
11   November of last year.  My sister went and got
12   my son and brought him up, I got to see him for
13   his birthday.
14        DEPUTY COMMISSIONER BLONIEN:  His
15   fourteenth birthday?
16        INMATE JOHNSON:  No, he's thirteen.
17        DEPUTY COMMISSIONER BLONIEN:  Thirteen.
18        INMATE JOHNSON:  Turned thirteen that
19   day.
20        DEPUTY COMMISSIONER BLONIEN:  Is there
21   anything else that you have been doing in the
22   institution that we haven't talked about that
23   you want to put on the record?
24        INMATE JOHNSON:  No, we're trying to get
25   the Victim Awareness -- we the Victim Awareness
26   Program was a pilot program that we started in
27   the computer class and we are trying to get it

50

1    to spread to the yard.  It was pretty successful

2    and we're trying to integrate it into the yard,

3    possibly all the yards, get it moved to other

4    prisons.

5         DEPUTY COMMISSIONER BLONIEN:  And in

6    talking about parole, where do you plan to

7    parole?

8         INMATE JOHNSON:  I can parole to my

9    brother's house and --

10        DEPUTY COMMISSIONER BLONIEN:  He lives?

11        INMATE JOHNSON:  He lives in Visalia and

12   he has a job for me in his restaurant.

13        DEPUTY COMMISSIONER BLONIEN:  What kind

14   of restaurant?

15        INMATE JOHNSON:  He owns kind of like a

16   Denny's or something like it, it's not a Denny's

17   but it's something along those lines.  Some

18   chain of restaurants that he bought into so it's

19   that type of restaurant and go to school.

20        DEPUTY COMMISSIONER BLONIEN:  And what

21   would you do for your job in a restaurant?

22        INMATE JOHNSON:  What ever he assigned

23   me.  He wanted my to be a Human Resource

24   Manager, I think I would need some more training

25   to do that but wash dishes, wait tables, what

26   ever he needed me to do.

27        DEPUTY COMMISSIONER BLONIEN:  So if you

51

1    can't go to his house what's your next plan?

2         INMATE JOHNSON:   The next plan is to go

3    either to my grandparent's house who live in San

4    Francisco and or go to my sister's house who

5    lives in Oakland.

6         DEPUTY COMMISSIONER BLONIEN:   And if you

7    continue --

8         INMATE JOHNSON:   I don't have any

9    employment plans for either residence but there

10   was a parole officer who came up here and he was

11   informing us about PAC, you know when a person

12   paroles and they go and PAC would advise them of

13   where the jobs are located and just some things

14   like that so I would be at a PAC meeting the

15   very next day and try to get a job.

16        DEPUTY COMMISSIONER BLONIEN:   So and the

17   skills that you would utilize are your office

18   skills?

19        INMATE JOHNSON:   Office skills, I have

20   learned computer skills.

21        DEPUTY COMMISSIONER BLONIEN:   That would

22   be incorporated in office skills.

23        INMATE JOHNSON:   Yeah, all office skills,

24   paralegal skills, possibly trying to apply for

25   getting a job with lawyers.   I would possibly

26   try -- I got a letter from a friend just last

27   night that talking about, he works in Juvenile

52

1   Hall in San Francisco and he was asking me if I

2   would be interested in coming up and

3   participating in workshops and trying to get

4   juveniles to work on lifestyle.

5        **DEPUTY COMMISSIONER BLONIEN:**  You have a

6   letter from your sister whose name is Melina?

7        **INMATE JOHNSON:**  Yes.

8        **DEPUTY COMMISSIONER BLONIEN:**  And she

9   thinks very highly of you and she seems like a

10   very righteous God fearing woman.

11        **INMATE JOHNSON:**  She is.

12        **DEPUTY COMMISSIONER BLONIEN:**  Well that's

13   what I was asking you about your religion

14   because she is going to involve you in faith

15   based endeavors to.  Have you talked to her

16   about that?

17        **INMATE JOHNSON:**  We have, you know what,

18   we've discussed like over the years like I've

19   studied like Christianity and I've studied with

20   the Muslims and just my own spiritual lines

21   period and I like -- you ever heard of Wayne

22   Dyers about the Wayne Dyers?

23        **DEPUTY COMMISSIONER BLONIEN:**  Not that I

24   have heard of him.

25        **INMATE JOHNSON:**  Okay so I like the way

26   he puts it, it's just -- for me it's just saying

27   okay we are all one, that's just my bottom line,

1  we just all one.

2      **DEPUTY COMMISSIONER BLONIEN:**  And you

3  have your own website?

4      **INMATE JOHNSON:**  Yes.

5      **DEPUTY COMMISSIONER BLONIEN:**  How do you

6  have your own website?

7      **INMATE JOHNSON:**  Someone is hosting the

8  website for me.

9      **DEPUTY COMMISSIONER BLONIEN:**  And they

10  pass information?

11      **INMATE JOHNSON:**  I give them the

12  information and it's called Realistic Reform dot

13  com and the objective of the website is to

14  possibly reform the Penal System and to get

15  assistance to start.  The idea is to get

16  programs in here that are more realistic and

17  geared to what actually setting people up to

18  succeed.  I've recognized a lot of problems in

19  the Penal System since I've been in it so it's

20  kind of like my way of making recommendations

21  and putting it on line.

22      **DEPUTY COMMISSIONER BLONIEN:**  Well she

23  lists all of your accomplishments including

24  creative writing projects, your website, your

25  religious studies.  She herself has been

26  employed with law enforcement, judicial branches

27  of government and she is very supportive of you

54

1   and once you get a parole date she will be there

2   with money, food, shelter, clothing, help you

3   with resocialization, the practicality of

4   obtaining ID's and drivers license and she will

5   be there for all of that for you and helping you

6   establish a career.

7        **INMATE JOHNSON:**  Yes.

8        **DEPUTY COMMISSIONER BLONIEN:**  Your

9   grandparents James and (indiscernible) Johnson

10  wrote a letter and they say that they fully

11  support you, that you can live in there house.

12  They'll help you while you get back on your

13  feet, they'll help you find a job and in any

14  other way that they can, they are there for you.

15  And then your brother, Deshaun the one who owns

16  the restaurant in Visalia says that he is there

17  for your continued support and that you can stay

18  at his house and will give you a job at his

19  restaurant, that he will take care of anything

20  he can.  The law is not set that it's up to the

21  Parole Board to what County you parole to when

22  you parole and it's a decision that when

23  suitability is granted they can let you go to

24  somewhere other than your county of commitment.

25  So that is good information for you to have

26  especially when your parole plan is stronger one

27  place than the other.  And you have a lot of

55

1   support.  Your family loves you and has stuck by

2   you and they believe in you.  That's more than I

3   would say 80% of the inmates out in the yard

4   have wouldn't you?

5       INMATE JOHNSON:  Unfortunately yes.

6       DEPUTY COMMISSIONER BLONIEN:  Yeah, we

7   also sent out 3042 notices to law enforcement

8   agencies, victim next of kin, and although we

9   didn't receive any letters we do have a

10  representative of the District Attorney's Office

11  here and he will be given the opportunity to

12  speak and ask questions at the appropriate time.

13      INMATE JOHNSON:  Okay.

14      DEPUTY COMMISSIONER BLONIEN:  So with

15  that I am going to return to the chair.

16      PRESIDING COMMISSIONER BIGGERS:  Mr.

17  Johnson I am still slightly confused as to the

18  incident.  I hate to just go back to it but

19  there are just some things that just don't seem

20  to make sense in the record.  Initially you told

21  me that when you all went out there and you

22  kidnapped Mr. Foots was he by himself?

23      INMATE JOHNSON:  No.

24      PRESIDING COMMISSIONER BIGGERS:  Who was

25  he with?

26      INMATE JOHNSON:  He was with a friend.

27      PRESIDING COMMISSIONER BIGGERS:  Do you

56

1    know who that friend was?

2        INMATE JOHNSON:  No, it's in the record.

3    I can't tell you off -- I don't recall.

4        PRESIDING COMMISSIONER BIGGERS:  Was it

5    two or three or one?

6        INMATE JOHNSON:  It was who was right

7    there when we drove up was his girlfriend was

8    there and his other friend was there, a male

9    friend.

10        PRESIDING COMMISSIONER BIGGERS:  Let me

11    just read what the record says here.  Shortly

12    before 10:00 A.M. Ellis Foots, Thomas Miller

13    Junior, and Aisha Knowles walked out to the

14    front security gate of 471 (indiscernible) as

15    planned as we talked about, came upon the trio

16    from the opposite end of the street and that

17    included Mr. Foots and all jumped out of there

18    respective vehicles armed with handguns.  You

19    told me there was only one gun.

20        INMATE JOHNSON:  No I said I had a gun.

21        PRESIDING COMMISSIONER BIGGERS:  Okay,

22    you yelled to Foots that you were San Diego

23    Police, Foots put the bag he was carrying, a

24    quantity of cocaine, you then confronted him and

25    ordered him to the ground and that the handcuffs

26    were provided by Mooreland.  And then you told

27    me that you did not go to LA with them, did you

57

1   ever go to LA?

2       INMATE JOHNSON:  No, Mr. Mooreland

3   alleged that I went to LA but I did not go to

4   LA.

5       PRESIDING COMMISSIONER BIGGERS:  You did

6   not go to LA.  All right.  And also it says here

7   and I'm sorry I missed this earlier but it says

8   that Mr. Bond who is a friend of yours?

9       INMATE JOHNSON:  No not a friend.

10      PRESIDING COMMISSIONER BIGGERS:  Well who

11  showed up with the two handguns that they said

12  you were carrying here?  Mike showed up at the

13  (indiscernible) to drop off two handguns that he

14  had been carrying for Mr. Johnson.  I wasn't

15  sure Mr. Johnson was running from the police or

16  if he had been apprehended.

17      INMATE JOHNSON:  I was in custody, Mike

18  is the one of the guys I called, I called Mr.

19  Mooreland, I called Mr. Washington and I called

20  Mike all of whom were at the scene where the

21  crime originally took place.  When I was taken

22  into custody Mike went to where James and them

23  had Mr. Foots, this was at Mr. Bonds' house.  He

24  dropped the guns off and left but the guns were

25  guns that were at the scene when the crime

26  occurred.

27      PRESIDING COMMISSIONER BIGGERS:  Okay so

58

1  you never went to LA, you never rented a van to

2  go to LA?

3          INMATE JOHNSON:  I did not go to LA.

4          PRESIDING COMMISSIONER BIGGERS:  Okay,

5  all right.  Is there anything else that I missed

6  in this, I see also that you wrote a -- you ever

7  been involved with selling drugs or anything?

8          INMATE JOHNSON:  I guess the best way to

9  describe my attitude towards drugs is my mother

10  was a crack addict, I have a real problems with

11  drugs, a real, real problem.  It does not -- I

12  just take real offense to drugs.

13          PRESIDING COMMISSIONER BIGGERS:  Did you

14  participate in an article that we presented in

15  San Francisco Examiner?

16          INMATE JOHNSON:  Yeah.

17          PRESIDING COMMISSIONER BIGGERS:  Did you

18  portray yourself as a 17 year old college bound

19  student working as an intern at a local TV

20  station?

21          INMATE JOHNSON:  Yes.

22          PRESIDING COMMISSIONER BIGGERS:  And that

23  you one time dealt crack cocaine?

24          INMATE JOHNSON:  Previously when I was

25  young and growing up I did, I was involved.

26          PRESIDING COMMISSIONER BIGGERS:  That's

27  what I'm asking, you said that you had a strong

59

1  problems.

2      INMATE JOHNSON:  I have a strong problem

3  with drugs.

4      PRESIDING COMMISSIONER BIGGERS:  Okay all

5  right.  And also and I don't know how I missed

6  this but at age 19 you applied for a California

7  Driver's License under an assumed name?

8      INMATE JOHNSON:  That was part of that

9  (indiscernible) case I call it.

10      PRESIDING COMMISSIONER BIGGERS:  And

11  posing as a credit card holder, and posing as a

12  credit card holder in order to have it delivered

13  to Evan White and a duplicate of the card at an

14  address in Oakland is that right?

15      INMATE JOHNSON:  Yes.

16      PRESIDING COMMISSIONER BIGGERS:  Okay,

17  you have any further questions from what I --

18      DEPUTY COMMISSIONER BLONIEN:  Yeah I do.

19  In reading the probation officers report you

20  told them that the reason that all of this went

21  down was because of your girlfriend.  You didn't

22  mention the incident in Oakland where a gun was

23  drawn on you but that you were having problems

24  with this girl who was your girlfriend.

25      INMATE JOHNSON:  Leshawn.

26      DEPUTY COMMISSIONER BLONIEN:  Leshawn?

27      INMATE JOHNSON:  I think that it is in

60

1    there somewhere that the gun incident took

2    place, somewhere in the file.  I don't know if

3    it was involved --

4          **DEPUTY COMMISSIONER BLONIEN:**  What about

5    Leshawn, was she contributory at least?

6          **INMATE JOHNSON:**  In this crime?

7          **INMATE JOHNSON:**  Yeah.

8          **DEPUTY COMMISSIONER BLONIEN:**  Because she

9    was your girlfriend and she was --

10          **INMATE JOHNSON:**  She was having -- she

11    was sleeping with both us so that was part of

12    why the ongoing feud too.  She wasn't helpful to

13    it.

14          **DEPUTY COMMISSIONER BLONIEN:**  And she's

15    not the mother of any of your children?

16          **INMATE JOHNSON:**  No.

17          **DEPUTY COMMISSIONER BLONIEN:**  And where

18    did she get the gun?

19          **INMATE JOHNSON:**  I bought -- my guns came

20    off -- I bought them off the streets, I didn't

21    walk into like a store and buy them like I told

22    them earlier, I had several guns.

23          **DEPUTY COMMISSIONER BLONIEN:**  And did you

24    always carry a gun?

25          **INMATE JOHNSON:**  In the period after my

26    brother was shot I always had a gun.

27          **DEPUTY COMMISSIONER BLONIEN:**  And when

61

1   you read your record it doesn't sound like you

2   had that much contact with law enforcement but

3   the detective who investigated the case seemed

4   to know you very well and says that you are

5   highly manipulative.

6        INMATE JOHNSON:  Investigated what case,

7   this case?

8        DEPUTY COMMISSIONER BLONIEN:  This case.

9        INMATE JOHNSON:  The Daly City thing, I

10  didn't know him.

11       DEPUTY COMMISSIONER BLONIEN:  No?

12       INMATE JOHNSON:  No, no prior contact,

13  never met him in my life.

14       DEPUTY COMMISSIONER BLONIEN:  Oh, maybe

15  when he questioned you, you weren't to

16  cooperative.

17       INMATE JOHNSON:  I wasn't, I admitted my

18  part.  I refused to tell on Leshawn and I

19  refused to tell on Mike, any of the people they

20  had apprehended.

21       DEPUTY COMMISSIONER BLONIEN:  This didn't

22  go to trial as a plea bargain right?

23       INMATE JOHNSON:  No it wasn't.  I ended

24  up going to trial.

25       DEPUTY COMMISSIONER BLONIEN:  You went to

26  trial?

27       INMATE JOHNSON:  I did go to trial.

62

1      **DEPUTY COMMISSIONER BLONIEN:**  And did the

2  victim testify?

3      **INMATE JOHNSON:**  Yeah he did.

4      **DEPUTY COMMISSIONER BLONIEN:**  That's all

5  I have.

6      **PRESIDING COMMISSIONER BIGGERS:**  Okay,

7  Mr. District Attorney.

8      **DEPUTY DISTRICT ATTORNEY GELLAGHER:**  All

9  right thank you.  Just a couple questions as

10  relates to the prior crime.  Would the board ask

11  the inmate if earlier today if he believes that

12  the full extent of his contact with Mr. Foots

13  was as explained to the board today?

14      **PRESIDING COMMISSIONER BIGGERS:**  You can

15  answer him.

16      **INMATE JOHNSON:**  Yeah.

17      **DEPUTY DISTRICT ATTORNEY GELLAGHER:**

18  Would the board ask the inmate if he recalled

19  offering a different version of the

20  justification for the kidnapping or contact with

21  Mr. Foots to the Police Department at the time

22  of his arrest?

23      **INMATE JOHNSON:**  Not in any significant

24  way no.

25      **DEPUTY DISTRICT ATTORNEY GELLAGHER:**

26  Would the board ask the inmate if he recalled

27  telling the police that Mr. Foots had been

63

1    involved in a kidnapping of the inmate where he

2    was abused and sexually abused and held for four

3    days?

4        INMATE JOHNSON:  That is in that

5    transcript yes.

6        PRESIDING COMMISSIONER BIGGERS:  Did you

7    make the statement?

8        INMATE JOHNSON:  I did make the

9    statement, the statement was not true.

10        PRESIDING COMMISSIONER BIGGERS:  In other

11    words you lied to the police?

12        INMATE JOHNSON:  I did lie.

13        PRESIDING COMMISSIONER BIGGERS:  Okay.

14        DEPUTY DISTRICT ATTORNEY GELLAGHER:  And

15    would the board ask the inmate if he recalled

16    that Mr. Mooreland and Mr. Bonds testified at

17    his jury trial?

18        INMATE JOHNSON:  Yeah and Mr. Washington

19    testified too, all three of my co-defendants

20    testified.

21        DEPUTY DISTRICT ATTORNEY GELLAGHER:  And

22    would the board ask the inmate if he recalled

23    Mr. Mooreland in fact did indicate at trial that

24    you had gone to Los Angeles with them?

25        INMATE JOHNSON:  He did say that in trial

26    yes he did.

27        DEPUTY DISTRICT ATTORNEY GELLAGHER:  And

64

1  would the board ask the inmate if the inmate

2  recalls from trial whether there was any other

3  evidence that he had been in Los Angeles meaning

4  airline tickets, hotel receipts?

5       **INMATE JOHNSON:**  There was actually no

6  evidence placing me in Los Angeles and in fact

7  one of the things that my lawyer -- I asked my

8  lawyer and I don't know if he passed it along to

9  the District Attorney's Office was that Mr.

10  Mooreland was using this credit card thing and

11  he was with someone else.  There was video and

12  stuff like that and the way that he was shopping

13  and stuff like that.  We tried to get the videos

14  to show that I was not the other person but the

15  videos were never forthcoming and I was never

16  charged with that ad Mr. Mooreland was.

17       **DEPUTY DISTRICT ATTORNEY GELLAGHER:**  Now

18  would the board ask the inmate if he recalls

19  being the conspirator who went to pick up the

20  ransom money when it was dropped?

21       **INMATE JOHNSON:**  I was one of the people

22  in the vehicle yes.

23       **PRESIDING COMMISSIONER BIGGERS:**  To us

24  please.

25       **INMATE JOHNSON:**  Oh excuse me, yes I was.

26       **DEPUTY DISTRICT ATTORNEY GELLAGHER:**  And

27  would the board ask the inmate who the other

65

1    persons were?

2              INMATE JOHNSON:  Marvin Bonds.

3              DEPUTY DISTRICT ATTORNEY GELLAGHER:  And

4    --

5              INMATE JOHNSON:  Excuse me, I don't know

6    if I should ask this.

7              PRESIDING COMMISSIONER BIGGERS:  You have

8    to ask me.

9              INMATE JOHNSON:  Okay.

10             PRESIDING COMMISSIONER BIGGERS:

11   Everything is done through the panel.

12             INMATE JOHNSON:  Okay, we were -- all of

13   us were involved but there were two of us who

14   left the house and went to pick up the ransom

15   money and that was me and Bonds, yes.

16             DEPUTY DISTRICT ATTORNEY GELLAGHER:  And

17   would the board ask the inmate if they then

18   returned to the apartment and were arrested

19   while in the apartment counting that ransom

20   money?

21             INMATE JOHNSON:  We were.

22             DEPUTY DISTRICT ATTORNEY GELLAGHER:

23   Would the board ask the inmate if he testified

24   at his jury trial that Mr. Bonds had threatened

25   your life, his life meaning your life, if you

26   didn't participate in the kidnapping for ransom?

27             INMATE JOHNSON:  Yeah, I did testify to

66

1   that.

2          **DEPUTY DISTRICT ATTORNEY GELLAGHER:**   And

3   would the board ask the inmate if that was true?

4          **PRESIDING COMMISSIONER BIGGERS:**   Was that

5   true?

6          **INMATE JOHNSON:**   Yes it is true in part

7   and let me explain why.  Mr. Bonds made it clear

8   that Mr. Foots was going to be killed, when I

9   showed up they told me and they confessed this

10  to the police officers the same night we got

11  arrested that when they didn't know where I was

12  they had went out and scouted a spot to dump his

13  body in so when I showed up it was made clear to

14  me from Mr. Bonds that they had already

15  contemplated killing Mr. Foots because Mr. Foots

16  had seen where Mr. Bonds lived and then after

17  that, that's when we sat down and said hey man

18  we'll do part of the ransom for dude and can

19  basically pay for you to be relocated and he

20  said look man this goes bad you know, he was

21  willing to not only kill Bonds but kill me and

22  kill anybody else who he felt was in his way.

23  Bonds was willing to kill, that's all.

24         **DEPUTY DISTRICT ATTORNEY GELLAGHER:**

25  Would the board ask the inmate if it is his

26  belief that he only went along with the

27  kidnapping scheme after Mr. Bonds had threatened

67

1    his life or was --

2        **INMATE JOHNSON:**  I planned to kidnapping

3    scheme but as far as the ransom scheme was gone

4    along because at that point it was made clear

5    that there had to be some compensation for him

6    to relocate and all that but the only thing that

7    I can say that, I was not okay with the killing

8    thing.  I was okay with everything else and I'm

9    not just, I'm not here to blame it on anyone

10    else, I took part in it.

11        **DEPUTY DISTRICT ATTORNEY GELLAGHER:**

12    Would the board ask the inmate if he was the one

13    who initially demanded a hundred thousand

14    dollars from the Foots?

15        **INMATE JOHNSON:**  I think that -- no I

16    never was the one who demanded a hundred

17    thousand dollars, it was like a plan.  We all

18    set down and it was like okay how much money

19    will we ask for and stuff like that but, and it

20    was discussed as far as how much money do you

21    think this guy has but I don't recall any

22    particular figures, I don't even recall the end

23    sum turned out to be thirty five thousand.

24        **DEPUTY DISTRICT ATTORNEY GELLAGHER:**

25    Would the board ask the inmate how long he

26    estimates that they were sitting in the van

27    across from the apartment before they saw Mr.

68

1   Foots and kidnapped him?

2       **INMATE JOHNSON:**  It wasn't a van it was a

3   car, I was there first when Leshawn told me

4   where he was and when he showed up with someone

5   else is when I called Arty Mooreland and then we

6   started calling other people because we thought

7   there might be some other people in the house.

8   So I went there initially at the scene of the

9   crime, I was the only one there.

10      **DEPUTY DISTRICT ATTORNEY GELLAGHER:**  And

11  so would the board ask the inmate about how long

12  he was there before --

13      **INMATE JOHNSON:**  Probably about an hour

14  and a half, two hours.

15      **DEPUTY DISTRICT ATTORNEY GELLAGHER:**  And

16  would the board ask the inmate if he in fact was

17  the one who went through the victim's wallet,

18  took out his credit cards and passed it around?

19      **INMATE JOHNSON:**  No, and the District

20  Attorney's Office has records that indicate that

21  that was done prior to me ever being released

22  from custody, prior to me ever knowing where Mr.

23  Foots was located.

24      **DEPUTY DISTRICT ATTORNEY GELLAGHER:**

25  Would the board ask the inmate if he in fact

26  went to Mr. Foots' house in an attempt to

27  retrieve money from inside the house, inside the

69

1   safe or somewhere else?

2        **INMATE JOHNSON:**  No.

3        **DEPUTY DISTRICT ATTORNEY GELLAGHER:**

4   Would the board ask the inmate if he knows if

5   anyone did that and who was it?

6        **INMATE JOHNSON:**  I am not sure that ever

7   even occurred.  I know that there was -- and I

8   don't know if it's from reading records or what

9   cause I've read these records myself.  There was

10  a discussion about like when his sister called

11  the police and said that someone was going

12  through his house, with counts or something like

13  that, there was some type of discussion about

14  someone going through his house or something

15  like that but I don't know if it ever happened.

16       **DEPUTY DISTRICT ATTORNEY GELLAGHER:**

17  Would the board ask the inmate if what he's

18  referring to, how he read the records has he

19  read the prosecutors statement of 12/3/01?

20       **INMATE JOHNSON:**  Mr., the person who

21  prosecuted the case?

22       **DEPUTY DISTRICT ATTORNEY GELLAGHER:**  Yes.

23       **INMATE JOHNSON:**  I've read it yes.

24       **DEPUTY DISTRICT ATTORNEY GELLAGHER:**  And

25  would the board ask the inmate if he believes

26  that it was an accurate statement of his

27  participation in this crime and any other crimes

70

1   that are referring?

2        **INMATE JOHNSON:**  You are referring to the

3   Russo case.

4        **PRESIDING COMMISSIONER BIGGERS:**  No to

5   the panel.

6        **INMATE JOHNSON:**  Oh excuse me, the

7   District Attorney is referring to Al Russo an

8   uncharged act and one of the questions you asked

9   me earlier was how I would know to call somebody

10  like Arty Mooreland, I knew Arty Mooreland was

11  involved in criminal activity and one of the

12  ways that this crime ended up morphed into what

13  it morphed into was ideas that I got from Mr.

14  Mooreland which now I know came from his being

15  involved in another case.

16       **DEPUTY DISTRICT ATTORNEY GELLAGHER:**  Okay

17  would the board ask the inmate if he believes

18  that the recitation in the prosecutor's

19  statement is as far as your committed crime

20  leaving Mr. Russo out of it, whether that is an

21  accurate statement of his participation?

22       **INMATE JOHNSON:**  I haven't read his -- I

23  haven't read that recently so I don't want to

24  say yeah and then there's something in there

25  that I disagree with.

26       **DEPUTY DISTRICT ATTORNEY GELLAGHER:**  And

27  would the board ask the inmate if he is denying

71

1    Mr. Mooreland and Mr. Bonds' testimony at the

2    inmate's trial where they implicated him in the

3    kidnapping of Mr. Russo, does he deny that?

4        INMATE JOHNSON:  Absolutely deny that and

5    I'd like to ask some things.

6        PRESIDING COMMISSIONER BIGGERS:  Just

7    answer the questions please.

8        DEPUTY DISTRICT ATTORNEY GELLAGHER:

9    Would the board ask the inmate if he recalls Mr.

10   Foots testifying at his trial that before the

11   tape was pulled off his eyes in Mr. Bonds'

12   apartment that he, Mr. Foots had never set eyes

13   on the inmate?

14       INMATE JOHNSON:  I do recall him saying

15   it.

16       DEPUTY DISTRICT ATTORNEY GELLAGHER:  And

17   would the board ask the inmate if that is a true

18   statement?

19       INMATE JOHNSON:  That was a lie.

20       DEPUTY DISTRICT ATTORNEY GELLAGHER:  I

21   think that's all I have thank you.

22       PRESIDING COMMISSIONER BIGGERS:  Thank

23   you.  Defense Counsel.

24       ATTORNEY CHLABEK:  No questions.

25       PRESIDING COMMISSIONER BIGGERS:  Okay Mr.

26   District Attorney would you like to close

27   please.

72

1          **DEPUTY DISTRICT ATTORNEY GELLAGHER:**  In

2    terms of the factors in the suitability for

3    release I think significantly the committing

4    crime exhibits a significant mental cruelty and

5    violence.  This victim was held for a

6    significant period of time, a number of days in

7    what must have been a horrendous conditions

8    constantly under the threat of death while this

9    inmate was actively participating and even based

10   on his version of the events was orchestrating

11   events in order to gain a significant amount of

12   money.  It was a serious crime that indicates a

13   great willingness to commit violence and

14   presents unreasonable risk to the community at

15   this point, at this juncture of the inmate's

16   program.  And I will submit.

17         **PRESIDING COMMISSIONER BIGGERS:**  Okay

18   thank you.  Defense Counsel.

19         **ATTORNEY CHLABEK:**  Yes we would ask the

20   Commissioners to find my client suitable for

21   parole and to grant him a date.  When my client

22   committed this crime he was 22, my client is now

23   34 years old.  He has greatly matured, he has

24   been incarcerated over ten years on this crime,

25   a long time to mature.  My client did quite well

26   in many respects on the outside prior to coming

27   into prison.  He got a high school diploma, he

1   got a scholarship to go to college for a year on

2   a sports scholarship, he worked, he worked in a

3   television station I believe in San Francisco, a

4   group home as a counselor at one point and he

5   also worked at Great America for two years on a

6   seasonal basis.  That indicates some initiative

7   there.  I think as my client TAPE Score is 12.9,

8   his GEL is 12.9, he's clearly a person who has

9   potential to do well in this world and he has

10  applied that here at the prison.  His criminal

11  history is short, there are just two charges

12  there.  My client has improved his education

13  here in the prison doing some alternative

14  college programming, he already has his high

15  school diploma so he wouldn't need to improve

16  there.  He does have some vocational for office

17  services and he's got a certificate there so he

18  could get employment in that area.  He's been

19  involved with the Criminal Gangs Anonymous for

20  looks like about four or five years, that's a

21  very good program.  He just completed the

22  Victim's Awareness Program which I believe is

23  part of Criminal Gangs Anonymous so he is doing

24  quite a lot in self help.  With respect to the

25  psych eval, the psych eval is extremely positive

26  I believe.  It says he is a low risk for

27  violence and that he would have little

74

1    difficulty adjusting back into the community at
2    this point.  My client -- the psych eval states
3    that my client has no need of substance abuse
4    counseling and that he has a GAF Score of 85
5    which is actually really quite well.  The fact
6    that my client does not have a drug and alcohol
7    problem is very significant with respect to
8    doing well on the outside.  That particular
9    problem brings a great many people back into the
10   system and the fact that he doesn't have any
11   problems in that area will substantially
12   minimize his possibility of coming back to
13   prison.  My client has an excellent record here
14   in prison in terms of work, these are long term
15   jobs that he's had, they are jobs that require
16   high functioning individuals and he has been
17   able to do that with exceptional category in
18   many instances.  There are several laudatory
19   chronos regarding work and participating in
20   programs here.  He's got family support on the
21   outside, he's got at least a couple of places to
22   live and at least one or two jobs lined up for
23   him.  My client is prepared very well to go on
24   the outside and my client if you ask him to be
25   found suitable and be given the opportunity to
26   get out on parole and with that we would submit
27   it.

75

1    **PRESIDING COMMISSIONER BIGGERS:**  Okay,
2    you now have the chance Mr. Johnson to tell us
3    why you feel you are suitable for parole.
4        **INMATE JOHNSON:**  I believe I am suitable
5    because I'm not the same person I was when
6    incarcerated.  I can't say that I lacked
7    opportunities prior to coming to prison because
8    I had opportunities.  I worked at KGO, I worked
9    in group homes, I was involved the Lakers' Boys
10   Club, I knew undoubtedly that what I did was
11   wrong and it took me coming here to grow up.  To
12   grow up in a fashion that I hadn't grown up
13   prior to coming to prison.  You know it took me
14   a long time to come to terms and say okay you
15   know this was a cruel crime, I did that.  Like
16   when the psychologist talked about allegiance to
17   a street code, I didn't even really recognize at
18   first that I had an allegiance to a street code.
19   I just took a lot of things for granted in
20   saying that certain things that was done was
21   okay and that in a sense is what made me think
22   that it was okay to confront Mr. Foots in the
23   fashion that I did.  And I can't undo it, I wish
24   I could but I can't.  I can't go back, there is
25   nothing I can do to undo it but I know today
26   that I would never ever break another law.  I
27   just wouldn't do it.  I wouldn't put me at risk,

76

1  I wouldn't put my children at risk, I wouldn't
2  put my sister in this type of pain, I wouldn't
3  put my grandparents in this type of pain.  I
4  wouldn't put myself before.  I believe that I
5  can be a great contribution to society and going
6  outside of here and sharing this experience with
7  people.  I've just sacrificed twelve and half
8  years of my life for something that didn't have
9  to happen.  I never had to pick up the phone and
10  call Mr. Mooreland.  Even sitting here
11  explaining it and going back and forth with you,
12  I mean like with him, with the District
13  Attorney, I mean how it happened, who is
14  innocent you know what was said and all that and
15  you know my bottom line is I did it you know.  I
16  have to accept responsibility, had I never
17  picked up the phone none of this would have
18  occurred.  So it doesn't matter who did what,
19  Lamerle Ryan Johnson has to own but I can tell
20  you that I can look you in the faces as a man,
21  as a human being and tell you I would never do
22  it again.  I am apologetic, I would just never
23  do this again.
24          **PRESIDING COMMISSIONER BIGGERS:**  Okay
25  thank you very much.  We will recess now.
26                  **R E C E S S**
27                  --oOo--

1      **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                **D E C I S I O N**

3      **DEPUTY COMMISSIONER BLONIEN:**  We're on

4  record.

5           **PRESIDING COMMISSIONER BIGGERS:**  We're

6  back on record.  The time is 4:15 P.M. in the

7  matter of Mr. Johnson.  The panel has reviewed

8  and let me just state for the record that all

9  persons that were here before are now back in

10  the room.  The panel has reviewed all the

11  information received from the public and relied

12  on the following circumstances in concluding

13  that the prisoner is not suitable for parole and

14  would pose an unreasonable risk of danger to

15  society or a threat to public safety if released

16  from prison.  This was the factors that we used,

17  first of all the offense was carried out in a

18  specially cruel and callous manner.  You

19  actually kidnapped somebody, the plan went

20  astray and you kidnapped and then you eventually

21  robbed this person you know you took something

22  from him, you went through his billfold.  You

23  took him, well maybe you didn't go through his

24  billfold, I'm sorry.  You kidnapped this

25  individual for a purpose and that purpose was

26  for -- later it turned out to be money.  You

27  **LAMERLE JOHNSON J-92682   DECISION PAGE 1 3/22/06**

78

1    took him to a spot, it's hard to rationalize why

2    you would do that to another individual and you

3    started off saying it was just going to be that

4    you were going to have you and your friends beat

5    him up because something he had done to you

6    before, I never got a clear picture of why this

7    even came about and I will talk about that a

8    little later because initially I got the

9    impression that you were saying you were doing

10   this because of something that had happened to

11   your brother and then it became something else

12   and again as I said I will talk about it a

13   little later but the mere fact that you called

14   some of your friends to go over there to attempt

15   to beat up or talk to this individual and

16   eventually became a kidnap for ransom is

17   extremely cruel and callous.  The offense was

18   carried out in a manner that demonstrated an

19   exceptionally callous disregard for human

20   suffering.  You tied this man up with duct tape

21   and you put it over his eyes, that's -- when you

22   pull duct tape off of somebody's face and

23   especially the eyes it takes skin and everything

24   else with it.  Again as I said before, it

25   started out being one thing and ended up being

26   another and as you said before and I just never

27   **LAMERLE JOHNSON J-92682   DECISION PAGE 2 3/22/06**

79

1    got a full understanding of the story as to why

2    it took place and how it all happened.  All of

3    this was -- excuse me?

4        **ATTORNEY CHLABEK:**  I was just clearing my

5    throat, I'm sorry.

6        **PRESIDING COMMISSIONER BIGGERS:**  Okay I'm

7    sorry, I wanted to see if you had any

8    objections.

9        **ATTORNEY CHLABEK:**  No, no, no.

10        **PRESIDING COMMISSIONER BIGGERS:**  Okay, we

11    drew these conclusions from the statement of

12    fact that was on the counselors report and the

13    probation officer's report.  We looked at your

14    priors, you had a couple priors as an adult and

15    you had one as a juvenile.  You failed to profit

16    from societies previous attempts to correct your

17    criminality, in fact when you went to juvenile

18    camp you walked away from there and that was

19    because, that auto theft that you had.  And put

20    you in a camp, you walked away from that,

21    couldn't determine whether you went back or not,

22    I'm sure you did.  But then on the adult side,

23    you were charged and found guilty of receiving

24    stolen property and for that you've received two

25    years adult probation.  The panel would like to

26    commend you for you know being a high school

27    **LAMERLE JOHNSON J-92682   DECISION PAGE 3 3/22/06**

- 80

1   graduate and all of the work that you are doing

2   here in the institution. You have very limited

3   chronos, the institution behavior has been very

4   good. You've had only one 128 and one serious

5   115 for mutual combat that we saw that was one

6   of these things where somebody else attacked

7   you, but at the same time you still have a 115.

8   So you should be commended for that, it's over a

9   12 year period and that is quite well. However,

10  you have that but it still doesn't overcome the

11  fact that there are some other things that we

12  think that you need to do in order to be

13  paroled. Your psychiatry report was favorable

14  but I got to tell you, I personally don't feel

15  that you were very honest with us today. We had

16  to drag things out of you, you know, you

17  wouldn't tell us your version of something, then

18  I would go back and the more I got into it I

19  could pull different things out of you. So I

20  didn't feel that you were as honest as you

21  possibly could be with us and I think that you

22  were holding back. You were just telling me

23  just what you thought I wanted to hear. Your

24  parole plans was not a total package as well.

25  You sat here and you could stay with your sister

26  or you could stay with your brother and when the

27  **LAMERLE JOHNSON J-92682  DECISION PAGE 4 3/22/06**

1    Deputy Commissioner asked you about your
2    employment plans well you said that you were
3    going to work with your brother in a restaurant
4    and you didn't know what type of restaurant it
5    was.  You said you thought it was something like
6    a Denny's okay.  If your going to be employed,
7    then we got further into the finding out about
8    the restaurant, what would you do there, well he
9    initially wanted me to be the Human Resources
10   person but I need further training, then you
11   said that I'll do dishwashing, I'll do anything
12   but then you need to find out what type and pin
13   down as to what job you are going to have.  We
14   also noted that the District Attorney from San
15   Mateo County in accordance with 3042 notices
16   communicated opposition to a finding of parole
17   suitability.  The other thing that the panel
18   looked at to was remorse, you know you said that
19   you didn't feel that -- you got remorse for the
20   victim in such a way but you could have stopped
21   this at any time you know.  This thing escalated
22   and I think that's what I am getting at.  It
23   started out being something entirely different
24   from what it was and at anytime you could have
25   stopped that, you could have stopped it if you
26   wanted to.  It did not have to escalate all the
27   **LAMERLE JOHNSON J-92682  DECISION PAGE 5 3/22/06**

82

```
 1   way up to a kidnap for ransom.  We also want to
 2   commend you for your work while you have been
 3   here in prison.  You got your certification for
 4   a paralegal, your office services vocational,
 5   office services certification is good, your work
 6   with the victim's in juvenile services program
 7   is excellent as well so we definitely want to
 8   commend you for that.  In a separate decision
 9   the panel finds that it's not reasonable to
10   expect that parole be granted at a hearing
11   during the following two years.  And that was
12   done primarily because again the offense was
13   committed in an especially cruel manner in that
14   you took your victim and you kept him for days.
15   Tied him up with duct tape, he was probably
16   fearing for his life not knowing what was going
17   to happen and then there was a gun there as
18   well.  The offense was carried out in a manner
19   which demonstrated exceptionally callous
20   disregard for human suffering, again bounding
21   somebody with duct tape over there eyes and it
22   just to me, to us rather, it showed that you --
23   he had to be suffering way enough to have
24   forgotten what was going on especially with the
25   duct tape around his eyes.  The motive for the
26   crime was inexplicable and very trivial in
27   LAMERLE JOHNSON J-92682  DECISION PAGE 6 3/22/06
```

83

1   relation to the offense, again, you could have

2   stopped it at any time.  It started out being

3   one thing and it escalated into something else

4   and if your intentions were to just over there

5   and confront the victim and you decided to

6   escalate it by inviting other people in and then

7   going all the way up to the money portion.  We

8   took into consideration your adult probation as

9   I mentioned earlier and your auto theft, another

10  reason for the multi year denial.  The panel

11  want to recommend that you do the following,

12  that you remain disciplinary free, that even

13  though you have a vocation in administrative

14  management we would like to see you obtain

15  another vocation so that in the event that you -

16  - the one that you have right now is primarily

17  administrative in nature and if it doesn't pan

18  out you will have something else that you can

19  fall back on.  We feel you should get some self

20  help to further assist you in understanding what

21  your commitment offense is or was.  I don't

22  really think that you understand the magnitude

23  of what you did by this kidnap for money, so you

24  need to take a look at that because I don't

25  think in here, just in the way that you talked

26  to us today, we didn't get a sense that you

27  **LAMERLE JOHNSON J-92682   DECISION PAGE 7 3/22/06**

84

1  really understood the nature of your crime, or

2  your commitment offense.  Yeah you said okay I

3  know what I did blah, blah, blah but do you know

4  what you did to the victim or how it impacted

5  that particular victim.  And your plan, we

6  talked a little bit about you going to LA, you

7  had testimony and the record there from your

8  crime partners who said yeah he did this and yes

9  he did that.  There was some inconstancies on

10  what took place, who was involved in the

11  conversations and we just feel that you need to

12  take a little self help, analyze and come to the

13  realization as to what actually took place.  Did

14  I miss anything Ma'am?

15        **DEPUTY COMMISSIONER BLONIEN:**  No I think

16  you hit everything.

17        **PRESIDING COMMISSIONER BIGGERS:**  Okay

18  well that concludes the hearing.

19        **INMATE JOHNSON:**  Can I respond to any of

20  that?

21        **ATTORNEY CHLABEK:**  No.

22  //

23  //

24  //

25  //

26  //

27  **LAMERLE JOHNSON J-92682  DECISION PAGE 8 3/22/06**

85

1          **PRESIDING COMMISSIONER BIGGERS:**   Good

2     luck to you Sir, I wish you the best of luck.

3     That will close the hearing.  It is now 16:25

4     P.M.

5                      --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23     **PAROLE DENIED TWO YEARS**

24     **THIS DECISION WILL BE FINAL ON:  07/20/2006**

25     **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26     **DATE, THE DECISION IS MODIFIED.**

27     **LAMERLE JOHNSON J-92682   DECISION PAGE 9 3/22/06**

86

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, SUE GERDES, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 85, and which

recording was duly recorded at MULE CREEK STATE

PRISON, IONE, CALIFORNIA, in the matter of the INITIAL

PAROLE CONSIDERATION HEARING OF LAMERLE JOHNSON, CDC

NO. J-92682, ON MARCH 22, 2006, and that the foregoing

pages constitute a true, complete, and accurate

transcription of the aforementioned tape to the best

of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated April 11, 2006, at Sacramento,

California.


*Sue Gerdes*
Sue Gerdes
TRANSCRIBER
**PETERS SHORTHAND REPORTING**