# EXHIBIT F

1

2

3

4

5

6

(ENDORSED)

FILED
SAN MATEO COUNTY

OCT 1 8 2006

Clerk of the Superior Court
By ___GRACE LACEY___
DEPUTY CLERK

7      IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

8           IN AND FOR THE COUNTY OF SAN MATEO

9

10   In re:

11      LA MERLE R. JOHNSON

12   On Habeas Corpus.

13

Case No. SC-31800B
         HC-1811

ORDER OF DENIAL

14

15      The Court has received and reviewed the Petition for Writ

16   of Habeas Corpus filed by Petitioner, La Merle R. Johnson, on

17   August 22, 2006. For the following reasons his writ petition is

     denied.

18

19                          BACKGROUND

20      The following facts are taken from the Unpublished Opinion

21   of the Court of Appeal for the First Appellate District

22   affirming Petitioner's conviction, filed in this action on

23   August 8, 1997.  On the afternoon of July 6, 1993, Petitioner

24   contacted co-defendant Ardie James Moreland ("Moreland"),

     arranged a meeting, and told Moreland to bring guns.

25

26      Petitioner, Moreland, and Lashon Brown ("Brown") drove to

27   a restaurant and discussed a plan to rob Aasa Knowles

     ("Knowles") on the theory that her boyfriend, Ellis Foots

28

1

1  ("Foots"), a drug dealer, would keep some of his cash at her

2  apartment.  The three drove to Knowles' apartment, parked

3  nearby, and waited.  When Foots arrived at Knowles apartment

4  around 7 p.m., the three decided to rob him as well.

5      Petitioner and Moreland determined that they should take

6  Foots to various places where he kept cash and that they needed

7  additional help.  Petitioner called, picked up, and returned

8  with co-defendant Taryn Washington ("Washington") joining

9  Moreland and a man known as Mike or "Pookie."  Petitioner

10 proposed that they approach Foots, posing as police officers,

11 and "arrest" him.

12     At about 9:30 p.m., as Foots, Knowles, and a man named

13 Thomas left Knowles's apartment, two cars approached them and

14 disgorged armed men. Knowles fled and called police.  Foots

15 started running and threw a bag of cocaine over a fence.

16 Yelling that they were police officers, Petitioner and Moreland

17 ordered Foot to lie down on the ground.  When Foots complied,

18 Petitioner held a gun on Foots while Moreland restrained Foots

19 using handcuffs Petitioner had given him. Moreland put Foots in

20 the back of one of the cars, and Petitioner told Moreland to

21 "Get him out of there, away from the scene."  Moreland and

22 Washington took Foots to the apartment of co-defendant Marion

23 Bonds ("Bonds") in Oakland.

24     Back in Daly City, a police officer responding to a call

25 about the incident saw defendant walking away from the scene

26 wearing clothing that matched the description of a possible

27 suspect.  When the officer asked defendant to stop, Defendant

28 became verbally abusive.  Other officers arrived and arrested

1  defendant for obstructing and resisting a police officer (PC §

2  148). Petitioner was taken to Redwood City Jail and released

3  around 2:00 a.m. the next morning.

4     Meanwhile at the Bond apartment in Oakland, Moreland and

5  Washington had taken Foot's wallet, gold chain, cellular phone,

6  and keys, used duct tape to blindfold Foots, removed the

7  handcuffs and bound Foots' hands and feet with ropes. When

8  Foots tried to loosen the ropes, one of the men shot him with a

9  stun gun and replaced the handcuffs. Moreland became nervous

10 when Petitioner did not page him as promised, made a plan to

11 kill Foots, drove into the Oakland hills to find a place to

12 dispose of the body, returned, and decided to kill Foots if

13 they did not hear from Petitioner within the hour.

14    Petitioner arrived at the Bond apartment in Oakland about

15 4:30 a.m. Petitioner and Moreland discussed how to get Foots'

16 money and asked Foots how much his people would pay "for his

17 safety." When Foots told them he had $8,000 in his house,

18 Petitioner drove to the house, but upon seeing Foots'

19 "soldiers" there, returned without having gone inside.

20    Petitioner and Moreland decided to hold Foots for ransom,

21 had Foots call his friend, Louis Aterberry ("Aterberry") to

22 raise ransom money, and told Foots they would kill him if their

23 ransom demand was not met.

24    Petitioner and Moreland decided that since Petitioner

25 resembled Foots, they could use Foots' credit cards to get cash

26 and make purchases. The obtained the "PIN" numbers, credit

27 limits, and other information from Foots, flew to Los Angeles,

28 and used Foots' cards to obtain cash, jewelry, clothing, and

3

1   other items.  The next morning, while Petitioner was loading

2   the purchases into a rented van, Moreland was arrested trying

3   to use one of Foots' credit cards.

4        Petitioner returned to Bonds' apartment.  Washington made

5   the telephone calls to arrange the ransom and Petitioner and

6   Bonds told Washington what to say.  On the evening of July 8,

7   Petitioner and Bonds went to pick up the ransom, Petitioner

8   retrieved the backpack containing the money, and then returned

9   to the apartment to count the money.

10      While in custody in Los Angeles, Moreland disclosed the

11  location of the Bond apartment.  A tactical team forced the

12  apartment door, found ransom money strewn about; found Foots,

13  still handcuffed, bound, and blindfolded with duct tape; found

14  loaded semiautomatic handguns; and found Petitioner, Bonds and

15  Washington trying to hide in a bedroom closet.  Foots was held

16  captive, bound and blindfolded from July 6, 1993 to July 8,

17  1993.

18      Prior to Trial, on December 23, 1994, the People brought a

19  motion to deem Petitioner's plea agreement breached.  The

20  People's motion and supporting declarations establish that

21  Petitioner entered into a plea agreement whereby Petitioner

22  would be permitted to plead to charges carrying a maximum

23  possible punishment of 17 years, eight months in prison, and in

24  exchange, Petitioner agreed to testify truthfully in the future

25  trials of People v. Porterfield and Knight.

26      In the motion to deem Petitioner's plea agreement

27  breached, the People asserted that at the Porterfield trial,

28  Petitioner changed his testimony mid-trial, stating that his

4

1   previous testimony was told to him by the District Attorney's
2   investigator and was false. Petitioner subsequently admitted
3   under oath that the story about false or planted testimony was
4   a lie. The Porterfield trial did not result in a conviction.
5   The court granted the People's motion and Petitioner's plea
6   agreement became null and void.

7       A jury found Petitioner guilty of kidnapping for ransom,
8   second degree robbery, and assault with a firearm, and found
9   true enhancements for personal use of a firearm in connection
10  with the kidnapping and assault charges. On January 19, 1996,
11  Petitioner was sentenced to life plus 11 years in prison. The
12  Court of Appeal affirmed Petitioner's conviction on August 8,
13  1997.

14      In the instant petition, Petitioner asserts (1) That it is
15  unconstitutional to deny parole based on facts that can never be
16  changed; (2) That Petitioner was told by several sources that he
17  would not be receiving a parole date at his initial hearing
18  because, contrary to the Penal Code § 3041(d) requirement that a
19  release date be set, the Board had an unspoken/underground policy
20  that inmates do not receive parole grants at their initial
21  hearings; (3) That the San Mateo District Attorney has a conflict
22  of interest when making parole suitability recommendations
23  because a prior Assistant District Attorney had threatened to
24  "fry Petitioner's ass" and revoke Petitioner's plea agreement if
25  the Assistant District Attorney failed to get a conviction based
26  in part on Petitioner's testimony in People v. Porterfield; and
27  (4) that the Parole Board was not justified in recommending that
28  petitioner (a) get self-help (b) stay discipline free, and (c)

1   learn a trade or in basing the decision to deny parole on the

2   cruel manner of the offense or Petitioner's perceived lack of

3   remorse.

4

5   **THE DECISION OF THE BOARD OF PRISON TERMS TO DENY PETITIONER A PAROLE RELEASE DATE WAS PROPER.**

6   A. Habeas Corpus Is An Appropriate Means of Challenging the

7   Denial of Parole.

8   A petition for writ of habeas corpus is proper to

9   challenge a denial of parole by the Board of Prison Terms.   (*In*

10  *re Sena* (2001) 94 Cal.App.4th 836, 840.)

11      Penal Code section 3040 gives the Board the power to
12      allow prisoners sentenced to indeterminate terms to go
        on parole outside the prison walls and enclosures. The
13      Legislature has specified that one year prior to the
        inmate's minimum eligible release date, a panel of at
14      least two commissioners of the Board shall meet with
        the inmate and shall normally set a parole release
15      date. (Pen. Code, § 3041, subd. (a).) However, the
        panel or the Board need not set a release date if "it
16      determines that the gravity of the current convicted
17      offense or offenses, or the timing and gravity of
        current or past convicted offense or offenses, is such
18      that consideration of the public safety requires a more
        lengthy period of incarceration for this individual,
19      and that a parole date, therefore, cannot be fixed at
20      this meeting." (Pen. Code, § 3041, subd. (b).)

21  (*In Re Morral* (2002) 102 Cal.App.4th 280, 289, see also *In Re*

22  *Dannenberg* (2005) 34 Cal.4th 1061, 1079.)

23  B. Criteria For Granting or Denial Of Parole And Standard of

24  Review.

25      "The factor statutorily required to be considered and the

26  overarching consideration is `public safety.' As stated in

27  subdivision (b) of Penal Code section 3041, the Board `shall

28  set a release date unless it determines that the gravity of the

1    current convicted offense or offenses, or the timing and
2    gravity or past convicted offense or offenses, is such that
3    *consideration of public safety* requires a more lengthy period
4    of incarceration for this individual." (*In re George Scott*
5    (2005) 133 Cal.App.4[th] 573, 591 [italics added by court].) Title
6    15 of the California Code of Regulations § 2402 provides:
7    "…regardless of the length of time served, a life prisoner
8    shall be found unsuitable for and denied parole if in the
9    judgment of the panel, the prisoner will pose an unreasonable
10    risk of danger to society if released from prison." (*In re*
11    *George Scott* (2005) 133 Cal.App.4[th] 573, 591 [quoting 15 Cal.
12    Code of Reg. § 2402].)

13        The standard of review for a Denial of Parole following a
14    parole hearing was established by the California Supreme Court
15    as follows: "Accordingly, we conclude that the judicial branch
16    is authorized to review the factual basis of a declaration of
17    the Board denying parole in order to ensure that the decision
18    comports with the requirements of due process of law, but that
19    in conducting such a review, the court may inquire only whether
20    some evidence in the record before the Board supports the
21    decision to deny parole, based on the factors specifically
22    specified by statute and regulation." (*In re Rosenkrantz* (2002)
23    29 Cal.4[th] 616, 658.)

24        C. The Board's Reliance On Petitioner's Callous Disregard For
25        The Victim When The Crime Was Committed, Plus His Current
26        Lack Of Sincerity and Remorse, Plus The Incomplete Nature of
27        His Work Plans Constitute Some Evidence Supporting The
28        Finding that Petitioner Posed A Risk to Public Safety.

1      Petitioner quotes Penal Code § 3041(b) for the proposition
2   that the Parole Board **shall** set a release date unless it
3   determines that the gravity of the current convicted offense or
4   past convicted offenses is such that consideration of the
5   public safety requires a more lengthy period of incarceration.
6   However, while this section mandates that a date be sent when
7   there is no perceived risk to public safety, it also precludes
8   the setting of a release date when release is perceived to
9   threaten public safety.  '[T]he gravity of the commitment
10  offense or offenses alone *may* be a sufficient basis for denying
11  a parole application, so long as the Board does not fail to
12  consider other relevant factors.'  (*In re Ramirez* (2001) 94
13  Cal.App.4th 549, 569 overruled on other grounds in *In re*
14  *Dannenberg* (2005) 34 Cal.4th 1061, 1100; citing *In Re Seabock*
15  (1983) 140 Cal.App.3d 29, 37-38.)

16      In *In re Dannenberg*(2005) 34 Cal.4th 1061, 1071, the
17  California Supreme Court held: "Accordingly, we conclude that
18  the Board, exercising its traditional broad discretion, may
19  protect public safety *in each discrete case* by considering the
20  dangerous implications of a life-maximum prisoner's crime
21  individually.  While the Board must point to factors beyond the
22  minimum elements of the crime for which the inmate was
23  committed, it need engage in no further comparative analysis
24  before concluding that the particular facts of the offense make
25  it unsafe at that time, to fix a date for the prisoner's
26  release." (Id.)

27      Petitioner quotes *Biggs v. Terhune* (9th Cir. 2003) 3134
28  F.3d 910, 917 for the proposition that "A continued reliance in

1   the future on an unchanging factor, the circumstances of the

2   offense and conduct prior to imprisonment, runs contrary to the

3   rehabilitative goals espoused by the prison system and could

4   result in a due process violation." (Id.)

5       In contrast to the situation in Biggs, however, the

6   transcript of the instant hearing, although missing a number of

7   pages, discloses that the Board didn't feel that Petitioner was

8   being particularly honest at the time of the hearing

9   (Transcript Page 80:13-23), a finding subject to change that

10  would tend to support the conclusion that Petitioner's release

11  presented a potential danger to society; that his Parole

12  employment plans were an incomplete package (Transcript Page

13  80:23-81:13), a factor subject to change that increases the

14  likelihood that Petitioner would return to criminal activity in

15  order to earn a suitable living; and that Petitioner did not

16  exhibit remorse (Transcript Page 81:17-82:1), a factor subject

17  to change that increases the likelihood that Petitioner will

18  commit further crimes. These mutable findings, in addition to

19  the findings regarding the nature of the offense itself,

20  constitute "some evidence" supporting the finding that the

21  parole of Petitioner "would pose an unreasonable risk of danger

22  to society or a threat to public safety."

23      D. Petitioner's Assertion Of An Underground Policy Not To

24         Grant Parole On The First Hearing Or That Petitioner Was

25         Advised In Advance That Parole Would Be Denied Is

26         Irrelevant Because The Instant Board Made Specific

27         Findings Justifying A Denial of Parole to Petitioner At

28         This Time.

1    Petitioner asserts that there exists an underground policy
2 in which parole is always denied at the first hearing and that
3 he was told in advance that his parole would be denied. There
4 is no evidence that this board made a decision to deny
5 Petitioner parole before reviewing the file or considering the
6 facts. The fact that other individuals predicted the outcome
7 of Petitioner's hearing suggests that the board followed
8 predictable guidelines. Even if one or more boards have acted
9 arbitrarily in other cases, such actions are irrelevant in the
10 instant case because the record reflects that the board made
11 multiple findings of fact, each of which are independently more
12 than sufficient to justify denial of parole.
13    Under Penal Code § 3041 and Title 15 of the California
14 Code of Reg. §2402, there is no presumption that a life inmate
15 is entitled to parole or that he/she is automatically suitable
16 for parole based on the amount of time served. (*In re Honesto*,
17 (2005) 139 Cal.App.4th 81, 92-93, see also *Dannenberg*, *supra*, 34
18 Cal.4th at 1093.) Here, the Board's decision was not an abuse of
19 discretion. The record of Petitioner's parole hearing indicates
20 that there was some evidence to support the Board's decision to
21 deny him parole and their statement of reasons for the denial
22 was adequate. The Board considered the relevant factors under
23 Title 15 of the California Code of Regulations §§ 2401, 2402
24 and 2281. Based on these factors including the gravity of the
25 commitment offense, Petitioner's institutional behavior, and
26 his psychological evaluations, the Board's decision to deny
27 Petitioner a parole release date was proper. (*Dannenberg*,
28 *supra*, 34 Cal.4th at 1094-1096.)

1    E. While The District Attorney Objected To Parole There Is

2    No Evidence Of An Unreasonable Bias Arising Out of The

3    Porterfield Trial.

4    Petitioner asserts that the San Mateo District Attorney

5 has a conflict of interest when making parole suitability

6 recommendations because a prior Assistant District Attorney had

7 threatened to "fry Petitioner's ass" and revoke Petitioner's

8 plea agreement if the Assistant District Attorney failed to get

9 a conviction in People v. Porterfield. While the District

10 Attorney did oppose Petitioner's parole, there is no evidence

11 that the opposition was a function of bias.

12    Petitioner has made several collateral attacks on his

13 conviction where the claim of error related to the

14 prosecution's rescission of the plea agreement, including two

15 prior habeas petitions filed in this court on July 30, 1999 and

16 March 29, 2000. Each petition was denied. It has long been

17 the rule that, absent a change in law or fact, courts will not

18 reconsider previously rejected claims. (*In re Clark* (1993) 5

19 Cal.4th 750, 767.)

20    F. There Is Some Evidence Demonstrating That The Board Did

21    Not Act Arbitrarily In Recommending That Petitioner (1)

22    Get Self Help; (2) Stay Discipline Free; (3) Learn A

23    Trade; (4) Perceiving That Petitioner Lacked Remorse; or

24    (5) Considering the Cruel Manner of Petitioner's Offense.

25    Petitioner takes exception to the fact that the Parole

26 Board recommended that he get self help, stay discipline free,

27 learn a trade, found him to lack remorse, or that the Board

28 considered the nature of his crime.

1   It is not clear what the Board based its recommendation

2   concerning self help because Pages 78—79 of the Decision are

3   missing from the Transcript.  Petitioner must (i) state fully

4   and with particularity the facts on which relief is sought  and

5   (ii) include copies of reasonably available documentary

6   evidence supporting the claim. (*People v. Duvall* (1995) 9

7   Cal.4th 464, 474.) Moreover, the logic of the recommendation

8   that a petitioner seeking parole remain discipline free while

9   incarcerated is self evident.  While Petitioner contends that

10  he has learned several trades or businesses while incarcerated,

11  the fact is that Petitioner's plan as presented at the parole

12  hearing was to work in a restaurant and perform human resource

13  functions, wait tables or wash dishes (Transcript p. 81:6-13.)

14  The board also specifically found that Petitioner lacked

15  remorse for the victim. (Transcript at p. 81:17-21.)

16   The Board also found that the underlying offense was

17  committed in an especially cruel manner, demonstrating

18  "exceptionally callous disregard for human suffering" in that

19  the victim was left bound for several days with duct tape over

20  his eyes and fearing that he might be killed at any time.

21  (Transcript at 82:11-83:7.)  The Board found that the motive

22  for the crime was inexplicable and very trivial in relation to

23  the offense. (Transcript at 82:25-83:2.) It was appropriate for

24  the Board to consider these matters and the findings are

25  supported by some evidence.

26

27

28

1

2

CONCLUSION

3

4       The record establishes that there existed "some evidence"

supporting each of the Board's findings, each of which

5

independently sufficed as grounds supporting the finding that

6

Petitioner would present a threat to society, and therefore

7

justifying the denial of parole.

DATED:   OCT 16 2006

8

9                                        Craig L. Parsons
                                         Presiding Judge, Criminal

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13

MC-275

Name  La Merle R. Johnson

Address  P.O. 409060

   (C15-208L)

   Ione, CA 95640-9060

CDC or ID Number  J-92682

SAN MATEO COUNTY

AUG 2 2 2006

Clerk of the Superior Court

By _____ DEPUTY CLERK

CMS

FOR THE COUNTY OF SAN MATEO

STATE OF CALIFORNIA

(Court)

| | |
|---|---|
| LA MERLE R. JOHNSON<br>Petitioner<br><br>         vs.<br><br>ROSANNE CAMPBELL, Warden (A)<br>Respondent | **PETITION FOR WRIT OF HABEAS CORPUS**<br><br>No.  SC 31800 B<br><br>*(To be supplied by the Clerk of the Court)* |

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

---

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

---

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Page one of six

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

This petition concerns:

- [ ] A conviction     [X] Parole
- [ ] A sentence     [ ] Credits
- [ ] Jail or prison conditions     [ ] Prison discipline
- [ ] Other *(specify):* _____

1. Your name: **La Merle R. Johnson**

2. Where are you incarcerated? **Mule Creek State Prison**

3. Why are you in custody? [X] Criminal Conviction    [ ] Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   **kidnap/ransom**

   b. Penal or other code sections: **209(a)**

   c. Name and location of sentencing or committing court: **San Mateo County Superior Court**

   d. Case number: **SC 31800**

   e. Date convicted or committed: **January 2006**

   f. Date sentenced:

   g. Length of sentence: **Life+11 years**

   h. When do you expect to be released? **When the Court releases me**

   i. Were you represented by counsel in the trial court? [X] Yes. [ ] No. If yes, state the attorney's name and address:

   **Edward Pomeroy**

4. What was the LAST plea you entered? *(check one)*

   [X] Not guilty   [ ] Guilty   [ ] Nolo Contendere   [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [X] Jury   [ ] Judge without a jury   [ ] Submitted on transcript   [ ] Awaiting trial

6. GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(if you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

'See Attached'

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: who did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

'See Attached'

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Page three of six

8. Did you appeal from the conviction, sentence, or commitment? ☐ Yes. ☐ No. If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

      n/a

   b. Result _____ c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised: (1) _____

      (2) _____

      (3) _____

   f. Were you represented by counsel on appeal? ☐ Yes. ☐ No. If yes, state the attorney's name and address, if known:

      _____

9. Did you seek review in the California Supreme Court? ☐ Yes ☐ No. If yes, give the following information:

   a. Result   n/a _____ b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised: (1) _____

      (2) _____

      (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

      n/a

      _____

      _____

11. Administrative Review:

   a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

      n/a

      _____

      _____

      _____

      _____

      _____

      _____

      _____

   b. Did you seek the highest level of administrative review available? ☐ Yes. ☐ No.

    *Attach documents that show you have exhausted your administrative remedies.*

MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☐ Yes. If yes, continue with number 13. ☐ No. If no, skip to number 15.

13. a. (1) Name of court: _____ n/a _____

   (2) Nature of proceeding (for example, "habeas corpus petition"): _____

   (3) Issues raised: (a) _____

      (b) _____

   (4) Result *(Attach order or explain why unavailable)*: _____

   (5) Date of decision: _____

   b. (1) Name of court: _____

   (2) Nature of proceeding: _____

   (3) Issues raised: (a) _____

      (b) _____

   (4) Result *(Attach order or explain why unavailable)*: _____

   (5) Date of decision: _____

   c. *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:
   n/a

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)
   n/a Timely-Filed

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court? ☒ Yes. ☐ No. If yes, explain:
   Writs in California Supreme Court seeking to protect children from predators, S142658, Writ of Error Coram Vobis, & District Court, etc.

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
   n/a

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date:   August 16, 2006        ▶ _____
                                (SIGNATURE OF PETITIONER)

MC-275 [Rev. July 1, 2005]        PETITION FOR WRIT OF HABEAS CORPUS        Page six of six

1  La Merle R. Johnson, J-92682
   P.O. 409060 (C15-208L)
2  Ione, CA 95640-9060
   www.realisticreform.com
3

4                    IN THE STATE OF CALIFORNIA

5                     COUNTY OF SAN MATEO

6  LA MERLE R. JOHNSON,    )      Case # _____
                           )
7       Petitioner,        )      WRIT OF HABEAS CORPUS DUE TO
                           )      DENIAL OF PAROLE ELIGIBILITY
8  vs.                     )
                           )
9  ROSANNE CAMPBELL,       )
                           )
10 ____Respondent._____ )

11                          FACTS

12     Petitioner is serving a Life+11 year sentence for the

13 kidnap/ransom of Ellis Foots.  On March 22, 2006, Petitioner

14 had his initial (first) parole-eligibility hearing, he was

15 denied parole for 2-years.  Prior to having the initial

16 hearing, Petitioner was informed by Board Member and other

17 State-Workers, that he would be denied parole, (See Exh. A,

18 # 1); he filed a habeas corpus in San Mateo County Superior

19 Court advising them of such, petition denied. (Exh. B.)

20     After advising Petitioner that parole was denied, the

21 Board told him, "This was the factors that we used, first of

22 all the offense was carried out in a specially cruel and

23 callous manner." (Exh. C., pg. 77, ln. 16-18)

24                          Claim I

25 STATUTE ALLOWING BOARD TO DENY PAROLE BASED ON FACTS THAT CAN
   NEVER BE CHANGED IS UNCONSTITUTIONAL, U.S.C.A 5 & 14
26

27     California Penal Code, (henceforth PC) 3041(b), enables

28 the Board to base denials on unalterable facts;

                            -7-

1        "The Panel or board **SHALL** set a release
2        date unless it determines that the gravity
3        of the current convicted offense or past
          convicted offenses, is such that consideration
4        of the public safety requires a more lengthy
          period of incarceration for this individual,
5        and that a parole date therefore, cannot be
          fixed at this meeting."

6    <u>Biggs v. Terhune</u> 2003 DJDAR 7245, stated that a life

7    prisoner does have a liberty-interest in a parole hearing,

8    also stated, "A continued reliance in the future on an

9    unchanging factor, the circumstances of the offense and

10    conduct prior to imprisonment, runs contrary to the

11    rehabilitative goals espoused by the prison system and could

12    result in a due process violation."

13    Petitioner dis-agrees with <u>Biggs</u> (supra) in part, asserting

14    that any reliance on unchangeable factors is a due process

15    violation, which would make the statute (PC 3041. (b))

16    allowing for such unconstitutional.

17    Life with the possibility of parole means just that, life

18    with the possibility of getting out one day. When the person

19    is given the sentence, the sentencing Court is already aware

20    of the persons past, which may play heavily into giving them

21    the sentence. The sentence comes with a statutory timeline

22    regarding how much time the person **SHALL** serve before parole

23    can be considered.

24    Once the person becomes eligible they are then sent

25    before the parole-board, to consider whether or not the person

26    can safely return to society. Now at this point, it is a

27    fact that the person has done something horrible warrenting

28    their need to see a parole-board, but the Boards job is not

1  to re-sentence the person, (U.S.C.A. 5), for crimes the Court

2  has already sentenced them for, but instead to assess whether

3  or not, today, that day, the person is not a threat to society.

4      With that in mind, the Board's job being to assess whether

5  or not the person is a current danger, the only factors that

6  can illuminate the potential or non-potential threat level is

7  in-prison behavior, facts occurring after the sentencing and

8  which are things the prisoner can actually do.

9      So, the logical question is this, if the only behavior

10  which the Board can use to justify release, is post-crime

11  (in-custody) behavior, how is it constitutional if the statute

12  allows them to deny parole based on things not controllable

13  by anybody, the altering of the past?

14              PC 3041(b)(2) & CCR Title 15, §2268(c)

15              When denying parole, it is statutorily
16              mandated that the Board;

17              'Board **SHALL** advise prisoner of reasoning
                for denial, and, (Penal Code), "suggest
                activities in which he or she might
18              participate that will benefit him or her
                while he or she is incarcerated." '
19

20      It seems the statutes are in conflict, on the one hand

21  PC 3041 (b) allows for the Board to deny parole based on

22  unchangeable facts, but PC 3041(b)(2), instructs the Board to

23  advise the person on what activities to involve themselves in

24  to be considered for parole, the only logical-reasoning for

25  the purpose to be before the Board.  The Board, when denying

26  parole based on crime factors, (PC 3041(b)), could not

27  possibly reasonably fulfill their statutory obligation per

28  PC 3041(b)(2), because no-thing the Board can recommend or

-9-

1  suggest will alter the past, therin lies the conflict.

2      When the Board is enabled to deny parole based on facts

3  that can not be changed, they automatically fail to adhere to

4  their statutory obligation of suggesting activities for the

5  prisoner to engage in which could make them paroleable,

6  because nothing can change the past.

7      Also, the Board's own actions further highlight the

8  constitutional-problems beforementioned. Statistically the

9  Board denies parole 99+% of the time at initial hearings, and

10 98+% at subsequent hearings, (See Exh. A., # 2, & Exh. D,

11 Public Information Request). In all of those hearings where

12 parole is denied, the crime is used as a factor. When at some

13 future date in a subsequent hearing, parole is granted, what

14 factors could the Board possibly utilize to justify release

15 after having previously utilized the unchangeable crime

16 factors as reasoning for denial?,....... the justification

17 warrenting release can only come through positive in-prison

18 behavior, accomplishments. And that is true in the rare

19 instances where parole is granted at the initial-hearing,

20 in-prison positive behavior is used to justify the granting

21 of parole.

22      Constitutionally (Due Process) speaking, if the only

23 reason the Board can justify lifer-release is positive in-

24 prison behavior, then how can it ever be fair, in respect

25 of the liberty interest that a prisoner has at a parole-

26 hearing, for the Board to be able to utilize factors that

27 can not be changed. <u>Note</u>: (The Board has never rationalized

28 to the general-public and or the reviewing Full-Board and

1   Governor that they are recommending release of a life-prisoner,
2   just-because, and not putting on the record the gains and other
3   reasoning justifying their decision, gains being from in-
4   prison behavior.)

5       As this relates to Petitioner, his Constitutional Rights
6   have been violated when his crime factors were/are utilized
7   to deny him parole; in that he is being re-sentenced by the
8   Board, twice being put in jeapordy for the same offense,
9   **U.S.C.A. 5 & 14**; his liberty interest of the parole-hearing
10  is violated when unalterable facts are used to deny parole at
11  any stage, **U.S.C.A. 14**; and the statute itself is made by
12  the writers unconstitutional, because when past crimes are
13  used to deny parole per PC 3041(b), then the Board is unable
14  to fulfill its statutory obligation of PC 3041(b)(2) because
15  nothing they can suggest the prisoner to do to make them
16  eligible, can alter/change the past, **U.S.C.A. 5 & 14**.

17                              Claim II
18      Prior to ever going before the Board, Petitioner was told
19  by several reliable sources, (Exh. A., #1), that he would
20  not be receiving a parole date at his initial hearing; not
21  for anything he did or failed to do, but simply because
22  despite the statutory language, "The Panel or board **SHALL** set
23  a release date...", (PC 3041(b)), the Boards known
24  un-spoken/underground policy was that inmates did not receive
25  parole-grants at their initial hearings.

26      This un-spoken/underground policy which clearly conflicts
27  with the mandatory language of the statute, is clearly in
28  effect when looked at in connection with the statistical

                              -11-

1   data regarding parole-grants at initial board-hearings;

2   99+% of those going to their initial hearings are denied

3   parole. (Exh. (See Exh. A. # 2, & Exh. D.)

4       PC 3041(b) contains mandatory language, "The Panel or

5   board **SHALL** set a release date...", going on to outline the

6   criteria excusing the ignoring of the mandatory language.  As

7   Petitioner pointed out in Claim I, the criteria (crime &

8   other pre-prison acts) giving cause to ignore the mandatory

9   language is in his opinion, unconstitutional.

10      But regardless of whether or not it (PC 3041(b) is

11  unconstitutional as described in Claim I, what is clear is

12  that the Board has en-acted and en-forced  an underground

13  policy that conflicts with the Statute.

14      This is easily proven by the consideration of one-

15  question;

16          In light of the fact, that every lifer-case
17          has its own unique factors, how probable,
            logical, is it, that 99+% of the time, the
18          criteria set out which excuses the Board to
            ignore the mandatory language of setting a
19          date, is warrented?

20      The setting of the date, in fact based on the statutes

21  mandatory language, should be the norm, not the exception,

22  but in the instances of the California Panel/Board practices

23  of its parole procedure, it is the norm not to set the date,

24  to ignore the mandatory language, and it is not even the

25  exception to set the date when minus 1% is found suitable at

26  initial hearings.

27      CCR. Title 15, (Board of Prison Terms), §2250, states

28  that a prisoner is entitled to an Impartial Hearing Panel,

-12-

1   a fair and impartial hearing, yet how is that possible when

2   the panel is en-forcing an illegal-policy?

3       Petitioner's parole-eligibility was pre-determined prior

4   to him ever entering the Board-Room, this is reasonably

5   stated when considering that he was told by reliable sources,

6   (A Board Member, two of his previous Counselors, one of which

7   wrote his Board-Report, and other's.), prior to the hearing

8   that he would not be receiving a date. (See Exh. A. #1);

9   he advised the Superior Court of County of committement of this

10  months in advance of the hearing through a writ of habeas,

11  which was denied, (Exh. B.);

12      But most important in the illumination of this issue, is

13  the undeniable statistical-data that clearly shows that an

14  underground/unwritten/un-spoken policy is in play which

15  mandates that a parole date not be set, ignoring the statutory

16  language which mandates that the date is set; 99+% of

17  differing case-factors prisoners are denied parole.

18      Petitioner's right to a fair and impartial hearing, his

19  liberty interest of due process (U.S.C.A. 5 & 14) innate in

20  a parole-eligibility hearing, can not possibly, reasonably,

21  be adhered to when years prior to the hearing the outcome is

22  conveyed to Petitioner; AND, when he's forced to have a

23  hearing under conditions/policies that he can not defend

24  against because there blatently illegal and not written down

25  for constitutional review by the Courts.

26                          Claim III

27      FACTS: While incarcerated in the San Mateo County Jail

28  awaiting trial on his own case, Petitioner thwarted a murder-

-13-

1 plot being hatched by detainees attempting to manipulate the

2 outcome of their individual trial-process.  As a result

3 Petitioner eventually became a witness for the San Mateo

4 County District Attorney's Office, against Frank Porterfield

5 and Bernard Knight in exchange for a plea-agreement of 17

6 years, 8 months, with half-time credits, which would have

7 released him from prison in 2001.

8      During the stage of being a witness for the prosecution,

9 the San Mateo County Sheriff's Department purposefully and

10 continuously placed Petitioner's life in danger.

11      While Petitioner slept in his cell, Sheriff Personnel

12 placed Bernard Knight in the cell with him, this after he

13 had testified against Knight in open Court at a preliminary

14 hearing. (See Exh. E., Rt. 1564-65)

15      Eventually a Court-Order was issued, ordering that

16 Petitioner be housed in a different County Jail, though

17 stating in the order that it was due to Petitioner's fears.

18 (See Exh. F.)

19      Bernard Knight and Frank Porterfield's trials were

20 severed, Porterfield going to trial first.  Petitioner

21 testified against Porterfield.  After the truth-full

22 testimony, Petitioner was beat up and threatened by Sheriff-

23 Personnel of San Mateo County, some of the comments made to

24 him were;

25          - You're going to be set up and killed for
             cooperating with the D.A.'s (San Mateo
26           County) office. (Exh. E., Rt. 1589, 1618)

27          - Your enemies will be placed with you. Rt. 1588

28

-14-

1         - You're a snitch, watch out for Pelican
       Bay. Rt. 1586-87 & Exh. G, pg. 21-22

2

     - We're going to make sure that your snitch
3           jacket follows (To-Prison) you. Rt. 1589

4         - That the D.A. was lying to him (About being
       able to protect him in prison). Rt. 1645

5

     - That there is a cop-side and an inmate-
6           side, and that he (Petitioner) had better
       choose one. Rt. 1622-23, & 1633

7

     - Petitioner was hog-tied and naked when most
8           of the threats were made. Rt. 1586-87

9    **Note:** All Rt. cites are to documents contained in Exhibit E.

10       After threats were made, Petitioner in reasonable fear

11   of threats being delivered, recanted his testimony.  In

12   investigating recantation, it was confirmed by Inspector

13   Bill Cody of the San Mateo Sheriff's Department that the

14   incident and threat(s) did take place. (Exh. G. pg. 16, 21-22)

15       In spite of the threats, and reasonable fear, Petitioner

16   eventually recanted the recantation, citing fear, in an

17   exchange he had with defense counsel of Porterfield after

18   recanting recantation, here is what he said;

19          "I don't know what happens in jails or
       penitentiary.  I know I'm safer in San
20          Francisco. Yeah. That's true. I'm not
       bothered. I'm not harassed.

21

       Sergeant Dowdy (One of those delivering
22          threats) told me that they were going to
       send a package with me regardless. (Package;
23          documentation telling prison that Petitioner
       was a snitch, inference to him that he would
24          be killed because of it.)

25          The only reason I called Dirickson (Investigator
       Petitioner had revealed murder-plot too, whom
26          when recanting out of fear he blamed his
       testimony on Dirickson, stating Dirickson had
27          fed him the murder-plot story, and whom he called
       in this instance to recant recantation and ask
28          for FBI intervention because he did not know who

1  to trust) was because I don't, when I
   walked out of here last week, (After
2  testifying truthfully, no recantations),

3  I felt good about myself. I felt that I had
   done something right. (After testifying
4  about a murderer who had confessed to him,
   and was plotting more murders to influence
5  his case, which Petitioner tried to sway him
   to abandon the plot, and only called
6  Authorities when it became clear that the
   plot was going forward when weapons were
7  obtained; upon Petitioner's information the
   weapons were confiscated and the plot was
8  foiled.)

9  The **only** reason I changed it (recanted original
   testimony) was because **I'm scared**.
10
   **And I'm still scared.** (Rt. 1649)
11

12    Petitioner later revealed that detainee Stephon Williams

13  had also threatened him on the night that Sheriff-Personnel

14  beat and threatened him. (Rt. 1663)

15    At the end of Petitioner's testimony, defense counsel

16  motioned to have Petitioner's and another witness' testimony

17  stricken due to perjury, then Deputy District Attorney (DDA)

18  Charles Smith stated;

19    "And, that it should be stricken as being
      completely unreliable regarding Lamerle
20    Johnson. Your Honor you heard his testimony:
      The first version, the second and the third.
21
      And what is **CLEAR** is that the system **FAILED**
22    him ultimately, because I'm responsible for
      any witness' safety ultimately.
23
      And, the **FAULT is MINE; NOT HIS**." Rt. 1676, Ln.
24    19-25

25    The case went to the jury, with DDA Smith using

26  Petitioner's testimony in his attempt to convict Porterfield.

27  Petitioner was told that if Porterfield trial won, that he

28  would get his plea, but that if it was lost, that Chief

-16-

1   Deputy Prosecutor Steve Wagstaff had stated that he was going

2   to fry Petitioner's ass. (Exh. H, #11).

3   **Important** Note: Steve Wagstaff was the Chief Deputy under

4   District Attorney Jim Fox, both men are still today in those

5   same positions.

6   Porterfield trial lost, San Mateo County District Attorneys

7   Office filed a motion to rescind Petitioner's plea-agreement.

8   Court then appointed Edward Pomeroy to represent Petitioner,

9   who without the record of DDA accepting responsibility for

10  Petitioner's actions, advised Petitioner to not oppose the

11  Prosecutions' motion to rescind. After the motion was granted,

12  Petitioner learned that Pomeroy was the ex-attorney for

13  Bernard Knight, the defendant whom he had testified against

14  and awoke to find being placed in his cell by Sheriff-Personnel.

15  And that if Pomeroy had succeeded in salvaging Petitoner's

16  plea, which would have called for him to still testify against

17  Knight; that Pomeroy would have been testifying on behalf of

18  Knights's defense in the same murder trial Petitioner was

19  scheduled    to testify against Knight.

20  Pomeroy avoided the conflict with Knight, by advising

21  Petitioner to not fight for his plea, thus creating a conflict

22  with Petitioner. (Exh. H., #8-10, &12; Court was aware of the

23  conflict, #10, **never** acted on it.)

24  Despite Pomeroy acting in accordance with the conflict and

25  not in the best interest of his client at the rescission

26  hearing, some interesting exchanges were had in the Court

27  room as it related to Petitioner's safety in the San Mateo

28  County Jail, brought up by the DDA motioning for rescinsion.

-17-

| | | |
|---|---|---|
| 1 | | <u>Discussion After Rescinsion-Motion Granted</u> |
| 2 | DDA: | "There is an order for housing Mr. Johnson in |
| 3 | | San Francisco and the conditions underlying that order have not changed. We ask the remain-- however, I will do an order of return, given the |
| 4 | | problems we had in this matter." |
| 5 | Court: | "Mr. Pomeroy, you are aware of that order?" |
| 6 | Pomeroy: | "Yes." |
| 7 | Court: | "In fairness to Mr. Johnson, I think he should |
| 8 | | be housed in San Francisco, but if that's going to impinge upon your preparation for trial and |
| 9 | | so forth, that issue will have to be addressed at some point." |
| 10 | Pomeroy: | "No, your Honor. It will just give me an |
| 11 | | opportunity to go to San Francisco and sample some better restaraunts." |
| 12 | DDA: | "Just for the record, this was Mr. Pomeroy's |
| 13 | | request when we discussed it off the record." |
| 14 | Court: | "I **understand** the reasons for it. In **fairness** to Mr. Johnson, I think it's **CRITICAL** to **order** that |
| 15 | | he be housed in San Francisco." (Exh. I, pg. 7) |

In an earlier exchange between the Porterfield Court

prior to Petitioner's recantation on the record, the same

Court who issued the protective-housing order citing that

Petitioner believed his life was in danger if he stayed in

the San Mateo County Jail;

| | | |
|---|---|---|
| 21 | Counsel: | "He (Petitioner) also requested me to ask the |
| 22 | | Court that he be immediately transferred back to San Francisco after his testimony. |
| 23 | | Based on **police problems** he had in the jail |
| 24 | | when he was here testifying last week. And, **again**, part of the **errors** that occurred this afternoon, |
| 25 | | in having him placed (By San Mateo County Sheriff-Personnel) in the same cell with the defendant |
| 26 | | (Frank Porterfield) just a few moments ago. |
| 27 | Court: | I'm not going to make any specific orders to the Sheriff's Office regarding transportation. I don't |
| 28 | | know if we will even be through with his testimony this afternoon. |

1  
2    But, I certainly will **express** the **HOPE**, and will ask the bailiff in this department to convey to the transportation officials that, obviously, Mr. Johnson is an in custody witness in a criminal case.

3  

4    And that he **ought** to be both housed and transported accordingly. (Rt. 1505)

5  

6    Petitioner's case was taken to trial, prosecuted by then

7    DDA Stephen Hall, he predictably lost and was sentenced to

8    Life+11 years in prison. After the conviction, per the Penal

9    Code 1203.01, 'Statement of Views', Stephen Hall in

10   representation of the San Mateo County District Attorney's

11   Office, recommended that I never be released from prison,

12   and in that statement failed to advise the prison of any

13   danger to Petitioner's life.

14   **Important NOTE**: Stephen Hall is now the Presiding Judge

15   of San Mateo County.

16   Upon arriving in prison, every threat made to Petitioner

17   by San mateo County Sheriff Personnel came    true, he was

18   placed with his enemies and eventually slashed/stabbed by

19   Stephon Williams, the same Williams who threatened Petitioner

20   on the night that Sheriff Personnel did, (Rt. 1663), and the

21   same Williams who was known by Prison-Personnel as being

22   Petitioner's enemy. (Exh. H., #13)

23   No charges were ever brought against any Sheriff-Personnel

24   or inmates in regards to the threats and assaults Petitioner

25   suffered.  State Attorney General's Office was made aware of

26   all of the above-mentioned, and provided with the documentation

27   (And more) accompanying this writ as exhibits, as of today,

28   no action was taken by the Chief Law Officer of the State.

1    On March 22, 2006, at Petitioner's Board Hearing, San

2    Mateo County, through Deputy District Attorney Sean Gallagher,

3    opposed Petitioner's request for parole.

4                              Argument

5    CCR Title 15, (supra), §2030, 'Prosecutor Participation',

6    §2030(3), "..if the district attorney cannot appear because

7    of a conflict."

8    It should go without saying that to have a fair and

9    impartial parole hearing, the prosecutions' office opposing

10   or requesting parole should be unbiased.

11   In this instance, an instance where San Mateo County

12   Sheriff Personnnel continously set Petitioner up to be

13   killed in relation to him cooperating with the District

14   Attorney's Office, DDA admitted the system (San Mateo

15   County) had failed Petitioenr, (Rt. 1676), and the Chief

16   Deputy Prosecutor threatened to fry Petitioner's ass if he

17   lost a case, (Exh. G., #11), that just maybe San Mateo

18   County should not be allowed to make a recommendation

19   regarding Petioner's Parole-Eligibility.

20   Not to mention the fact that the key-players mentioned

21   throughout the before facts, Steve Wagstaff, James/Jim Fox,

22   and Stephen Hall, (San Mateo Counties, Chief Deputy

23   Prosecutor, Elected District Attorney, and Presiding Judge,

24   top three law-officers of County), are still in place

25   today.

26   Petitioner can not possibly receive a fair or impartial

27   parole-hearing with San Mateo County being allowed to make

28   a recommendation, U.S.C.A. 5 & 14; Petitioner and his

-20-

1   counsel at the Board hearing made this objection. (Exh. C.,

2   pg. 11-12)

3       The County of San Mateo, Judges, D.A.'s, and Defnese

4   Counselors, knew that Petitioner's life was in danger by

5   San Mateo County Sheriff Personel, that danger followed him

6   to prison as the threat stated it would, yet not one sworn

7   Fiduciary Officer of the Court advised Prison-Personnel of

8   the reasonably-predictable danger to Petitioener's life;

9   no one stood up to protect Petitioner's plea, despite the

10  fact that everyone knew police-duress had caused it to be

11  in jeopardy, and despite the fact that the San Mateo County

12  District Attorney's Office was okay while knowing the same

13  facts it knows now, with Petitioner going home in 2001 if

14  they won the Porterfield/Knight case, that same office now

15  recommends that Petitioner in essence never be released

16  from prison, die in prison, because as their DDA Smith put

17  it;

18          "...What is clear is that the system **failed**
19          him ultimately.

20          And, the **fault** is mine (San Mateo County);
            not his."

21      Constitutionally, it would be a slap in the face of

22  justice, to not order that San Mateo County never again take

23  any role in the current instance surrounding Petitioner's

24  incarceration.

25      Another un-known factor of how this effected Petitioner's

26  parole hearing is this; off the record, the Presiding

27  Commissioner Archie "Joe" Biggers, asked San Mateo County

28  Deputy District Attorney Sean Gallagher about the plea-

-21-

1    agreement. (See Exh. A., # 3)  Defense counsel conveyed this

2    to Petitioner during the intermission/deliberation, stating

3    that Commissioner Biggers asked DDA Gallagher this after he

4    left the room and before deliberations began; counsel did not

5    hear exactly how DDA Gallagher responded.

6        Petitioner can not state with any degree of certainty how

7    DDA Gallagher responded to the Commissioner's question, but

8    he can reasonably state that he did not go into the detail

9    outlined in the facts of this writ.

10        And whatever DDA Gallagher said in response, it did not

11   stop the Commissioner from stating;

12           "We also noted that the District Attorney
             from San Mateo County in accordance with 3042
13           notices communicated opposition to a finding
             of parole suitability." (Exh. C., pg. 81, Ln. 13-17)
14

15       So, in this instance, a District Attorney's Office

16   with a **clear** conflict of interest recommendation to oppose

17   parole-suitability was cited in the reasoning justifying

18   denial. An office, which for arbitrary and capricious reasons

19   are requesting denial of parole; (Wagstaffe sought maximum

20   sentence for revenge purposes, not out of justice, Exh. H.,

21   # 11).  In speaking on what a miscarriage of justice can

22   entail in, Sawyer v. Whitley 505 U.S. 333, 112 S.Ct 2514,

23   stated;

24           "The accusatorial system of justice adopted
             by the Founders affords a defendant certain
25           process-based protections that do not have
             accuracy of truth finding as their primary
26           goal. These protections--including,...the
             Eighth Amendment right against the imposition
27           of an arbitrary and capricious sentence."
             at 2528
28

1    Now, parole-board case-precedent has given the Board wide-

2   discretion, yet that does not trump the fundamental-rights

3   protecting prisoner's at the hearings.

4    In this matter the District Attorney had a clear conflict

5   which the Board ignored, and an opinion/request for parole-

6   denial which the Board utilized in its explaination of denial.

7    When opposing parole, the San Mateo County District

8   Attorney's Office continued to perpetrate the system's

9   failing Petitioner, (Rt. 1676), it continued to impose a

10   cruel and unusual punishment-sentence, which was sought out of

11   revenge (arbitrary and capricious reasoning) and is now

12   utilizing the Board of Parole Hearings to seek a slow-death

13   sentence where the actual death-threats-attempts on Petitioner's

14   life actually failed. (Exh. H., #13, Exh. G., pg. 16, 21-22,

15   and all threats outlined in Rt's.)

16    Constitutional Violations, U.S.C.A. 5, 8, & 14; prosecution

17   presence and recommendation made hearing unfair and **partial**.

18                              Claim IV

19    Board of Parole Hearings, denied parole, for as they

20   stated per PC 3041(b);

21           "This was the factors that we used, **first** of
             all the offense was carried out in a
22           specially cruel and callous manner."
             (Exh. C., pg. 77, Ln. 16-18)
23

24           Maximum 2-year denail given, reasoning;

25           "In a seperate decision the panel finds that
             it's not reasonable to expect that parole be
26           granted at a hearing during the following
             two years.
27
             And that was done **primarily** because again the
28           offense was committed in an especially cruel
             manner..." (Exh. C., pg. 82, Ln. 8-13)

                              -23-

1    Per PC 3041(b)(2), the Board following the denial then

2 outlined its recommendations; stay disciplinary free, get more

3 self-help, and get another trade. (Exh. C. pg. 83-84, and Exh.

4 J.)

5    In Claims I & II Petitioner pointed out his disagreements

6 with the Statute(s), so he will re-assert them here without

7 rehashing them in full.

8    Regarding the Boards recommendations Petitioner has a few

9 things he would like to point out.  The Board stated;

10       "We feel you should get some self help to
          furthur assist you in understanding what
11        your commitment offense is or was."
          (Exh. C., pg. 83, Ln. 19-21)

12

13       Earlier having stated;

14       "We also want to commend you for your work
          while you have been here in prison."
          Exh. C., pg. 82, Ln. 1-3
15

16       What work?  Answer, starting self-help Groups, etc.

17       "You have several chronos. You just completed,
          there is a chrono 1/31/06 that you completed
18        the Victim Awareness Offender Program and you
          were **instrumental** in **requesting** the program for
19        Mule Creek." (Exh. C., pg. 39-40, Ln. 26-4)
          www.realisticreform.com (Exh. Q.)

20    In recommending get some self help, Petitioner's logical

21 question would be, what self help?  The Board did not state

22 what kind to get, just to get some.  After the denial was

23 read, explaining the why's of denial and what he should do,

24 he said, "Can I respond to any of that?", his lawyer told

25 him no. (Exh. C. pg. 84, Ln. 19-21)

26    Society is being scammed, yes, **scammed**, and this Petitioner

27 and other prisoner's Due Process Rights are being trampled

28 over when told to participate in Self Help groups offered in

1  California and this reasoning being used to justify parole-

2  denials.

3      Scammed, strong language, what justifies its use?  Inmate

4  Richard Mejico, the founder of Criminal Gangs Anonymous (CGA),

5  the same CGA cited in Petitioner's Board Hearing, (Exh. C.

6      pg. 38), the same CGA currently functioning in several

7  prisons and allowed inter-national news coverage by California

8  Prison-Personnel as a unique self help group;

9      Yet      Richard Mejico, was told by a Board/Panel, that

10  he needed, more self help; went to Board, August 26, 2005.

11  (See Exh. A., # 4, & Exh. D.), that proves the scam.

12      Richard Mejico was allowed to start the re-entry program

13  at Mule Creek State Prison, the prison Petitioner is in.  The

14  re-entry programs mission is to prepare paroling inmates to

15  reintegrate safely back into society.  If Sacramento, Mule

16  Creek State Prison, can en-trust a prisoner with initiating

17  the re-entry program to protect society, then how can Richard

18  Mejico be in need of self help?

19      Richard Mejico's CGA program was embraced because nothing

20  else offered by the prisons seem to be working; 70+%

21  recidivism rate in spite of self-help offered by prisons.

22      This Petitioner since 2005 has been trying to get the

23  prisons to re-habilitate sex-offenders, a true danger to

24  society.  Submitting-proposals, (Exh. K), which were ignored,

25  filing prison-appeals to protect children from child-

26  predators in visiting-rooms, appeal denied, writ currently

27  pending in California Supreme Court, #S142658, (Exh. L);

28  another pending writ which was filed after prison-appeal was

1  denied is one seeking that **all** persons convicted of sex-crimes

2  be re-habilitated prior to release. (Exh. M.)

3      Through legal-filings, prison appeals and proposals, and

4  through a web-site, www.realisticreform.com, Petitioner is

5  seeking reform of the prison system and implementation of

6  realistic rehabilitative measures.(See Exh. Q.)

7      Even the current acting Secretary of Corrections, concedes

8  that re-habilitation (self-help) is not possible under current

9  prison-conditions. (Exh. N.)  He blames it on overcrowding,

10  but even before it became "overcrowded", California still had

11  the highest recedivism rate (70+%) in the nation, despite the

12  fact it spends the most money on prisons.

13                    Get Another Trade

14      Petitioner has gotten two-trades while incarcerated, one

15  his family paid for, Paralegal Certification, and the computer

16  Vocations course he completed in prison. (Exh. C. pg. 82,

17  Ln. 3-8).

18      Petitioner was told to get a trade that does not involve

19  and or surround his current training, administrative

20  management, just in case his career choice does not pan out.

21  (Exh. C. pg. 83, Ln. 12-19)

22      Again, the public is getting **scammed** and Life-Prisoner's

23  going before the Board are having their Due-Process rights

24  ignored/trampled.

25      Why?  California is spending 100's of millions in offering

26  Prisoner's educational/vocational opportunities, but what

27  overall effect is it having on improving public-safety?  This

28  Petitioner in an information request posed that and other

1    questions, (Exh. D.); requesting specific information, data-

2    analysis, as to how much money prisons spend on offering

3    Vocations, how many prisoner's get out and secure employment

4    in the trained fields, what type of tax-revenue was being

5    realized from inmates released and securing employment in the

6    trained field, and did the numbers (money-spent) prove that

7    the expended revenues (tax-dollars) were cost-effective.

8         Public Information request was filed in January of 2006,

9    2-months prior to Petitioner's parole hearing.  In early

10   March, Sacramento sent the request to MCSP Facility 'C'

11   Captain Robinson, and told him to respond to Petitioner.

12   Robinson stated clearly to Petitioner that he could not

13   respond to the request, and doubted if the California

14   Department of Corrections and Rehabilitation was even in

15   possession of such data. (Exh. A., # 5)  The information

16   request has still not been responded to, 8-months later.

17        Petitioner even filed a prison-appeal on this issue,

18   (Exh. O.), the prison told him he had no standing to file

19   such an appeal; so Petitioner listed that and other ignored

20   appeals on his website, www.realisticreform.com, requesting

21   the public to demand action on such, in his opinion, common-

22   sense issues.

23        Petitioner's constitutional point is this, he's doing

24   more to re-habilitate himself in Vocational training and in

25   other areas then the prisons are, and even their head-person

26   states he can't do it, (Exh. N.), the recidivism rate

27   reflects that the prison can not do it and this was before the

28   "overcrowding", so it seems the only solution is for the

1   Courts (State/Federal) to step in and assess parole-eligibility

2   and in Petitioner's **opinion**, to re-structure the prisons to

3   trully bring about public-safety.

### Know More About Job

5   Petitioner was criticized in the denial for his parole-

6   plans, Board stating;

> "Your parole plans was not a total package as
> well.  You sat here and you could stay with your
> sister or you could stay with your brother and
> when the Deputy Commissioner asked you about
> your employment plans well you said that you
> were going to work with your brother in a
> restaurant and you didn't know what type of
> restaurant it was.  You said you thought it was
> something like a Denny's okay.  If your going to
> be employed, then we go furthur into the finding
> out about the restaurant,

> what you would do there, well he initially
> wanted me to be the Human Resources person
> but I need furthur training, then you said
> that I'll do dishwashing, I'll do anything
> but then you need to find out what type and
> pin down as to what job you are going to have."
> (Exh. C., pg. 80-81, Ln. 24-13)

17   This Petitioner took the Board three parole-plans, one

18   with his brother Du Shawn Johnson who is a Detective for the

19   Visalia Police Department and owns several business';

20   when offered the job, Petitioner reasonably did not request

21   every business-detail of his brother's business, conveyed to

22   the Board;

> "He owns kind of like a Denny's or something
> like it, it's not a Denny's but it's something
> along those lines.  Some **chain** of restaurants
> that he bought into so it's that type of
> restaurant and go to school."

26   When asked what he would do.

> "What ever he assigned me.  He wanted me to be
> a Human Resource Manager, **I think** I would need
> some more training to do that but wash dishes,

1    what ever he needed me to do."
    (Exh. C., pg. 50, Ln. 13-26)

2

3    When asked about his other parole-plans.

4    "The next plan is to go either to my grandparents
    house who live in San Francisco and or go to my
    sister's house who lives in Oakland."

5

6    "I don't have any employment plans for either
    residence but there was a parole officer who came
    up here and he was informing us (those who
7    volunteered to go talk to him)    about PAC,
    you know when a person paroles and they go and
8    PAC would advise them of where the jobs are located
    and just some things like that so I would be at
9    PAC meeting the very next day and try to get
    a job." (Exh. C. pg. 51, Ln. 2-15)

10

11    <u>Note</u>: PAC is a mandatory-program for all parolees,
    where they go to a work-shop, job-fair, with jobs
    that specifically hire parolees.

12

13    Petitioner had also been approved for Federal-Financial

14 Aid for College, providing the documentation to the Board,

15 (Exh. C., pg. 8, Ln. 13-25).

16    With all of the beforementioned in mind, Petitioner finds

17 it hard to comprehend how his parole-plans were incomplete?

18 And how his actual-responses to the Boards questions about

19 his brother's restaurant, could be mis-construed in the denial

20 as Petitioner being confused as to what his role would be;

21 Petitioner was to be the Human Resource Manager, but felt he

22 needed more training and was willing to do whatever his

23 brother needed him to do while he got it, yet the Board told

24 him to pin down what he was going to do. (Exh. C., pg. 50,

25 Ln. 13-26, & pg. 80-81, Ln. 24-13).

26    <u>Lack of Remorse</u>

27    In denial my remorse was questioned, yet Board

28 acknowledged that Doctor who gave Petitioner his psyche-

1  evaluation, that his report was great considering it came from

2  that particular Doctor. (Exh. C., pg. 47-49), and the Doctor

3  stated that Petitioner's remorse was real, that he accepted

4  responsibility for his crimes, but the Board described his

5  remorse and acceptance in this manner;

6      "I don't really think that you understand
    the magnitude of what you did by this kidnap
7      for money, so you need to take a look at that
    because I don't think in here, just in the
8      way that you talked to us today, we didn't get a
    sense that you really understood the nature
9      of your crime, or your commitment offense.

10      Yeah you said okay I know what I did **blah, blah,
    blah** but do you know what you did to the victim
11      or how it impacted that particular victim."
    (Exh. C. pg. 83-84, Ln. 21-5)

12      Later stating;

13

14      And your plan, we talked a little bit about you
    going to LA, you had testimony and the record
15      there from your crime partners who said yeah
    he did this and yes he did that.

16      There was some inconstancies on what took place,
    who was involved in the conversations and we
17      just feel that you need to take a little self
    help, analyze and come to the realization as to
18      what actually took place."
    (Exh. C., pg. 84, Ln. 5-13)

19

20      Just another point of why in Claim I & II Petitioner

21  contends past crimes should not be cause to deny parole, but

22  the Commissioner's closing statement is even more egrigious

23  because it directly conflicts with an earlier one he made;

24      "Nothing that happens here today will change
    the finding of the court."
25

26      Okay, Petitioner was not charged nor convicted
    of going to LA, which was alleged by his crime
27      partners.

28      "We are not here to re-try your case, we are here
    to determine if you are suitable for parole."
    (Exh. C., pg. 7, Ln. 1-5)

-30-

1    If nothing that happens in the hearing will change the

2    finding of the Court, and the point of the hearing is not to

3    re-try the case, then how can the Board Constitutionally

4    state that Petitioner needs self help because he failed to

5    admit to committing acts his crime-partners stated he did,

6    which he hadn't been charged or convicted of?

### Claim V & Conclusion

8    Blah, Blah, Blah, is what Petitioner's initial-parole

9    hearing turned out to be in regards to the Board respecting

10   the Constitutionally protected liberty interest of the

11   process. Simply put, the fix was in, Claim II, and they did

12   want they wanted to do instead of what the Constitution

13   mandated they do.

14   The cumulative effect of all of the beforementioned

15   violations rendered Petitioner's entire parole-hearing

16   process, unconstitutionally sound.

17   Petitioner's continued incarceration and being forced

18   to go through the California Parole Hearing Process (Farce);

19   will exacerbate and indefinently prolong a 'Miscarriage of

20   Justice'.

21   Although not a miscarriage of justice in the conventional

22   sense of actual/factual innocence, the United States Supreme

23   Court has made the following comments on the subject;

24           "Most important, however, the focus on innocence
25           assumes erroneously, that the only value worth
             protecting through federal (State) habeas review
26           is the accuracy and reliability of the guilt
             determination.

27           But "[o]ur criminal justice system, and our
28           Constitution protect other values in addition to
             the reliability of the guilt or innocence

-31-

1      determination, and the statutory duty to serve
    **'law and justice'** should similarly reflect
2      those values.  Sawyer v. Whitley (supra) 112,
    at 2528, quoting, Smith v. Murray 106 S.Ct. 2661,
3      at 2672

4      Later stating;

5      "While the conviction of an innocent person may
    be the archetypal case of a manifest miscarriage
6      of justice, it is not the only case.  There is no
    reason why "actual innocence" must be both an
7      animating and the limiting principle of the work
    of federal (State) courts in furthering the "ends
8      of justice."  As Judge Friendly emphasized, there
    are contexts in which, irrespective of guilt or
9      innocence, constitutional errors violate
    fundamental fairness.  Friendly, is innocence
10      irrelevant?

11      Fundamental fairness is more than accuracy at
    trial (Parole-Hearings); justice is more than
12      guilt or innocence."
    Sawyer at 2530
13

14    In another Opinion, having nothing to do with Parole-

15  Hearings, but addressing Miscarriages, Dretke v. Haley (2004)

16  124 S.Ct 1847, at 1854, Justice Stevens dissent,

17      "The unending search for symmetry in the law
    can cause judges to forget about justice.  This
18      should be a simple case."

19      Symmetry in the law will tempt Courts to limit
    the re-view of this case to only Board issues,
20      and not consider the overall effect that all
    the Claims have had on making the process a
21      Farce on Justice.

22  at 1855      "...when cause and prejudice standard is
    inadequate to protect against fundamental
23      miscarriages of justice, the cause and prejudice
    requirement must yield to the imperative of
24      correcting a fundamentally, unjust incarceration.
    (Quoting Engles v. Isaac 456 U.S. 107, 135)
25

26      "That the State has decided to oppose (Parole) the
    grant of habeas releif in this case, ...might
27      cause some to question whether the State (County
    of San Mateo) has forgotten its overriding
28      "obligation to serve the cause of justice."
    United States v. Agurss 427 U.S. 91, 111

-32-

1

2    "But this Court is surely no less at fault.
     ... "the Court has lost sight of the **basic**
     reason why the writ of habeas corpus indisputably
3    holds an honored position in our jurisprudence.
     <u>Engle</u> 456 U.S., at 126

4    Habeas corpus is, and has for centuries been, a
     "bulwark against convictions (continued
5    incarcerations) that violate fundamental
     [541 U.S. 399] fairness", fundamental fairness
6    should dictate the outcome of this unusually
     simple case."
7

8  at 1856, Justice Kennedy's dissent;

9    "The law must serve the cause of justice."

10   "[Judicial] discretion can inspire little
     confidence if Officials sworn to fight injustice
11   choose to ignore it."

12   San Mateo County Officials almost literally cost
     Petitioner his life, and despite the obvious
13   dangers/threats recognized by the Court, admitted
     to by police-officials, everyone in the County
14   with a Fiduciary duty to intercede, failed to
     do so.

15   State Attorney General Office, Deputy Attorney
16   General Morris Lenk and other's with Authority
     over San Mateo County, has and continues to
17   ignore the over-all constitutional violations
     suffered by Petitioner.

18 Fundamental fairness should dictate the outcome of this

19 unusually simple but convoluted case, in which;

20   "And what is **clear** is that the **system**
     **FAILED** him (Petitioner) ultimately,... (Rt. 1676)
21

22 And similar to Judicial-Precedent set in the Rosenkrantz's

23 case, Petitioner should be released by the Court. (Exh. P.)

24 Respectfully Submitted,

25

26 La Merle R. Johnson, Petitioner.  Dated: 8/16/06

27

28