# EXHIBIT G

MC-275

Name   La Merle R. Johnson

Address   P.O. 409060

        (C15-208L)

        Ione, CA 95640-9060

CDC or ID Number   J-92682

# DIVISION THREE

# ORIGINAL

FIRST APPELLATE DISTRICT COURT

STATE OF CALIFORNIA
(Court)

# A115885

| | |
|---|---|
| LA MERLE RONNIE JOHNSON | PETITION FOR WRIT OF HABEAS CORPUS |
| Petitioner | **FILED** |
| vs. | No. _____ |
| ROSANNE CAMPBELL, Warden (A) | *(To be supplied by the Clerk of the Court)* |
| Respondent | NOV 2 0 2006 |

Court of Appeal - First App. Dist.
DIANA HERBERT
By _____
DEPUTY

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

A11887

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

Page one of six

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

**This petition concerns:**

- [ ] A conviction
- [X] Parole
- [ ] A sentence
- [ ] Credits
- [ ] Jail or prison conditions
- [ ] Prison discipline
- [ ] Other *(specify):* _____

1. Your name:  La Merle R. Johnson

2. Where are you incarcerated?  Mule Creek State Prison

3. Why are you in custody?  [X] Criminal Conviction   [ ] Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

      kidnap/ransom

   b. Penal or other code sections:  209(a)

   c. Name and location of sentencing or committing court:  San Mateo County Superior Court

   d. Case number:  SC 31800

   e. Date convicted or committed:  January 2006

   f. Date sentenced:

   g. Length of sentence:  Life+11 years

   h. When do you expect to be released?  When the Court releases me

   i. Were you represented by counsel in the trial court?  [X] Yes.   [ ] No.  If yes, state the attorney's name and address:

      Edward Pomeroy

4. What was the LAST plea you entered? *(check one)*

   [X] Not guilty   [ ] Guilty   [ ] Nolo Contendere   [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [X] Jury   [ ] Judge without a jury   [ ] Submitted on transcript   [ ] Awaiting trial

---

6. GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(if you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

'See Attached'

a.  Supporting facts:
Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)

'See Attached'

b.  Supporting cases, rules, or other authority (optional):
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

# ORIGINAL WRIT FILED IN SAN MATEO COUNTY SUPERIOR COURT

**FOLLOWS IS SUPERIOR COURT DENIAL**
**&**
**PETITIONER'S RESPONSE TO SUPERIOR COURT DENIAL**

1 | La Merle R. Johnson, J-92682
P.O. 409060 (C15-208L)
2 | Ione, CA 95640-9060
www.realisticreform.com
3

4 | IN THE STATE OF CALIFORNIA

5 | COUNTY OF SAN MATEO

6 | LA MERLE R. JOHNSON,    )    Case # _____
                           )
7 |        Petitioner,      )    WRIT OF HABEAS CORPUS DUE TO
                           )    DENIAL OF PAROLE ELIGIBILITY
8 | vs.                      )
                           )
9 | ROSANNE CAMPBELL,        )
                           )
10 |        Respondent.       )

11 | FACTS

12 |     Petitioner is serving a Life+11 year sentence for the

13 | kidnap/ransom of Ellis Foots.  On March 22, 2006, Petitioner

14 | had his initial (first) parole-eligibility hearing, he was

15 | denied parole for 2-years.  Prior to having the initial

16 | hearing, Petitioner was informed by Board Member and other

17 | State-Workers, that he would be denied parole, (See Exh. A,

18 | # 1); he filed a habeas corpus in San Mateo County Superior

19 | Court advising them of such, petition denied. (Exh. B.)

20 |     After advising Petitioner that parole was denied, the

21 | Board told him, "This was the factors that we used, first of

22 | all the offense was carried out in a specially cruel and

23 | callous manner." (Exh. C., pg. 77, ln. 16-18)

24 | Claim I

25 | STATUTE ALLOWING BOARD TO DENY PAROLE BASED ON FACTS THAT CAN
NEVER BE CHANGED IS UNCONSTITUTIONAL, U.S.C.A 5 & 14
26

27 |     California Penal Code, (henceforth PC) 3041(b), enables

28 | the Board to base denials on unalterable facts;

-7-

1    "The Panel or board **SHALL** set a release
2    date unless it determines that the gravity
     of the current convicted offense or past
3    convicted offenses, is such that consideration
     of the public safety requires a more lengthy
     period of incarceration for this individual,
4    and that a parole date therefore, cannot be
     fixed at this meeting."
5

6    <u>Biggs v. Terhune</u> 2003 DJDAR 7245, stated that a life

7    prisoner does have a liberty-interest in a parole hearing,

8    also stated, "A continued reliance in the future on an

9    unchanging factor, the circumstances of the offense and

10   conduct prior to imprisonment, runs contrary to the

11   rehabilitative goals espoused by the prison system and could

12   result in a due process violation."

13       Petitioner dis-agrees with <u>Biggs</u> (supra) in part, asserting

14   that any reliance on unchangeable factors is a due process

15   violation, which would make the statute (PC 3041. (b))

16   allowing for such unconstitutional.

17       Life with the possibility of parole means just that, life

18   with the possibility of getting out one day. When the person

19   is given the sentence, the sentencing Court is already aware

20   of the persons past, which may play heavily into giving them

21   the sentence. The sentence comes with a statutory timeline

22   regarding how much time the person **SHALL** serve before parole

23   can be considered.

24       Once the person becomes eligible they are then sent

25   before the parole-board, to consider whether or not the person

26   can safely return to society. Now at this point, it is a

27   fact that the person has done something horrible warrenting

28   their need to see a parole-board, but the Boards job is not

-8-

1   to re-sentence the person, (U.S.C.A. 5), for crimes the Court

2   has already sentenced them for, but instead to assess whether

3   or not, today, that day, the person is not a threat to society.

4        With that in mind, the Board's job being to assess whether

5   or not the person is a current danger, the only factors that

6   can illuminate the potential or non-potential threat level is

7   in-prison behavior, facts occurring after the sentencing and

8   which are things the prisoner can actually do.

9        So, the logical question is this, if the only behavior

10  which the Board can use to justify release, is post-crime

11  (in-custody) behavior, how is it constitutional if the statute

12  allows them to deny parole based on things not controllable

13  by anybody, the altering of the past?

14           PC 3041.5 (2) & CCR Title 15, §2268(c)

15           When denying parole, it is statutorily
             mandated that the Board;
16
             'Board **SHALL** advise prisoner of reasoning
17           for denial, and, (Penal Code), "suggest
             activities in which he or she might
18           participate that will benefit him or her
             while he or she is incarcerated." '
19

20       It seems the statutes are in conflict, on the one hand

21  PC 3041 (b) allows for the Board to deny parole based on

22  unchangeable facts, but PC 3041.5 (2), instructs the Board to

23  advise the person on what activities to involve themselves in

24  to be considered for parole, the only logical-reasoning for

25  the purpose to be before the Board.  The Board, when denying

26  parole based on crime factors, (PC 3041(b)), could not

27  possibly reasonably fulfill their statutory obligation per

28  PC 3041.5 (2), because no-thing the Board can recommend or

1  suggest will alter the past, therin lies the conflict.

2      When the Board is enabled to deny parole based on facts

3  that can not be changed, they automatically fail to adhere to

4  their statutory obligation of suggesting activities for the

5  prisoner to engage in which could make them paroleable,

6  because nothing can change the past.

7      Also, the Board's own actions further highlight the

8  constitutional-problems beforementioned.  Statistically the

9  Board denies parole 99+% of the time at initial hearings, and

10  98+% at subsequent hearings, (See Exh. A., # 2, & Exh. D,

11  Public Information Request).  In all of those hearings where

12  parole is denied, the crime is used as a factor.  When at some

13  future date in a subsequent hearing, parole is granted, what

14  factors could the Board possibly utilize to justify release

15  after having previously utilized the unchangeable crime

16  factors as reasoning for denial?,....... the justification

17  warrenting release can only come through positive in-prison

18  behavior, accomplishments.  And that is true in the rare

19  instances where parole is granted at the initial-hearing,

20  in-prison positive behavior is used to justify the granting

21  of parole.

22      Constitutionally (Due Process) speaking, if the only

23  reason the Board can justify lifer-release is positive in-

24  prison behavior, then how can it ever be fair, in respect

25  of the liberty interest that a prisoner has at a parole-

26  hearing, for the Board to be able to utilize factors that

27  can not be changed. Note: (The Board has never rationalized

28  to the general-public and or the reviewing Full-Board and

1  Governor that they are recommending release of a life-prisoner,

2  just-because, and not putting on the record the gains and other

3  reasoning justifying their decision, gains being from in-

4  prison behavior.)

5      As this relates to Petitioner, his Constitutional Rights

6  have been violated when his crime factors were/are utilized

7  to deny him parole; in that he is being re-sentenced by the

8  Board, twice being put in jeapordy for the same offense,

9  **U.S.C.A. 5 & 14**; his liberty interest of the parole-hearing

10  is violated when unalterable facts are used to deny parole at

11  any stage, **U.S.C.A. 14**; and the statute itself is made by

12  the writers unconstitutional, because when past crimes are

13  used to deny parole per PC 3041(b), then the Board is unable

14  to fulfill its statutory obligation of PC 3041 (2) because

15  nothing they can suggest the prisoner to do to make them

16  eligible, can alter/change the past, **U.S.C.A. 5 & 14**.

17                              Claim II

18      Prior to ever going before the Board, Petitioner was told

19  by several reliable sources, (Exh. A., #1), that he would

20  not be receiving a parole date at his initial hearing; not

21  for anything he did or failed to do, but simply because

22  despite the statutory language, "The Panel or board **SHALL** set

23  a release date...", (PC 3041(b)), the Boards known

24  un-spoken/underground policy was that inmates did not receive

25  parole-grants at their initial hearings.

26      This un-spoken/underground policy which clearly conflicts

27  with the mandatory language of the statute, is clearly in

28  effect when looked at in connection with the statistical

-11-

1   data regarding parole-grants at initial board-hearings;
2   99+% of those going to their initial hearings are denied
3   parole. (Exh. (See Exh. A. # 2, & Exh. D.)
4       PC 3041(b) contains mandatory language, "The Panel or
5   board **SHALL** set a release date...", going on to outline the
6   criteria excusing the ignoring of the mandatory language. As
7   Petitioner pointed out in <u>Claim I</u>, the criteria (crime &
8   other pre-prison acts) giving cause to ignore the mandatory
9   language is in his opinion, unconstitutional.
10      But regardless of whether or not it (PC 3041(b) is
11  unconstitutional as described in <u>Claim I</u>, what is clear is
12  that the Board has en-acted and en-forced  an underground
13  policy that conflicts with the Statute.
14      This is easily proven by the consideration of one-
15  question;

        In light of the fact, that every lifer-case
16      has its own unique factors, how probable,
17      logical, is it, that 99+% of the time, the
        criteria set out which excuses the Board to
18      ignore the mandatory language of setting a
        date, is warrented?
19

20      The setting of the date, in fact based on the statutes
21  mandatory language, should be the norm, not the exception,
22  but in the instances of the California Panel/Board practices
23  of its parole procedure, it is the norm not to set the date,
24  to ignore the mandatory language, and it is not even the
25  exception to set the date when minus 1% is found suitable at
26  initial hearings.
27      CCR. Title 15, (Board of Prison Terms), §2250, states
28  that a prisoner is entitled to an Impartial Hearing Panel,

1  a fair and impartial hearing, yet how is that possible when

2  the panel is en-forcing an illegal-policy?

3      Petitioner's parole-eligibility was pre-determined prior

4  to him ever entering the Board-Room, this is reasonably

5  stated when considering that he was told by reliable sources,

6  (A Board Member, two of his previous Counselors, one of which

7  wrote his Board-Report, and other's.), prior to the hearing

8  that he would not be receiving a date. (See Exh. A. #1);

9  he advised the Superior Court of County of committement of this

10  months in advance of the hearing through a writ of habeas,

11  which was denied, (Exh. B.);

12      But most important in the illumination of this issue, is

13  the undeniable statistical-data that clearly shows that an

14  underground/unwritten/un-spoken policy is in play which

15  mandates that a parole date not be set, ignoring the statutory

16  language which mandates that the date is set; 99+% of

17  differing case-factors prisoners are denied parole.

18      Petitioner's right to a fair and impartial hearing, his

19  liberty interest of due process (U.S.C.A. 5 & 14) innate in

20  a parole-eligibility hearing, can not possibly, reasonably,

21  be adhered to when years prior to the hearing the outcome is

22  conveyed to Petitioner; AND, when he's forced to have a

23  hearing under conditions/policies that he can not defend

24  against because there blatently illegal and not written down

25  for constitutional review by the Courts.

26              Claim III

27  FACTS: While incarcerated in the San Mateo County Jail

28  awaiting trial on his own case, Petitioner thwarted a murder-

-13-

1   plot being hatched by detainees attempting to manipulate the

2   outcome of their individual trial-process.  As a result

3   Petitioner eventually became a witness for the San Mateo

4   County District Attorney's Office, against Frank Porterfield

5   and Bernard Knight in exchange for a plea-agreement of 17

6   years, 8 months, with half-time credits, which would have

7   released him from prison in 2001.

8       During the stage of being a witness for the prosecution,

9   the San Mateo County Sheriff's Department purposefully and

10  continuously placed Petitioner's life in danger.

11      While Petitioner slept in his cell, Sheriff Personnel

12  placed Bernard Knight in the cell with him, this after he

13  had testified against Knight in open Court at a preliminary

14  hearing. (See Exh. E., Rt. 1564-65)

15      Eventually a Court-Order was issued, ordering that

16  Petitioner be housed in a different County Jail, though

17  stating in the order that it was due to Petitioner's fears.

18  (See Exh. F.)

19      Bernard Knight and Frank Porterfield's trials were

20  severed, Porterfield going to trial first.  Petitioner

21  testified against Porterfield.  After the truth-full

22  testimony, Petitioner was beat up and threatened by Sheriff-

23  Personnel of San Mateo County, some of the comments made to

24  him were;

25          - You're going to be set up and killed for
            cooperating with the D.A.'s (San Mateo
26          County) office. (Exh. E., Rt. 1589, 1618)

27          - Your enemies will be placed with you. Rt. 1588

28

-14-

1    - You're a snitch, watch out for Pelican
      Bay. Rt. 1586-87 & Exh. G, pg. 21-22

2

3    - We're going to make sure that your snitch
      jacket follows (To-Prison) you. Rt. 1589

4    - That the D.A. was lying to him (About being
      able to protect him in prison). Rt. 1645

5

6    - That there is a cop-side and an inmate-
      side, and that he (Petitioner) had better
      choose one. Rt. 1622-23, & 1633

7

8    - Petitioner was hog-tied and naked when most
      of the threats were made. Rt. 1586-87

9    **Note:** All Rt. cites are to documents contained in Exhibit E.

10        After threats were made, Petitioner in reasonable fear

11   of threats being delivered, recanted his testimony. In

12   investigating recantation, it was confirmed by Inspector

13   Bill Cody of the San Mateo Sheriff's Department that the

14   incident and threat(s) did take place. (Exh. G. pg. 16, 21-22)

15        In spite of the threats, and reasonable fear, Petitioner

16   eventually recanted the recantation, citing fear, in an

17   exchange he had with defense counsel of Porterfield after

18   recanting recantation, here is what he said;

19            "I don't know what happens in jails or
           penitentiary.  I know I'm safer in San
20           Francisco. Yeah. That's true. I'm not
           bothered. I'm not harassed.
21

22           Sergeant Dowdy (One of those delivering
           threats) told me that they were going to
23           send a package with me regardless. (Package;
           documentation telling prison that Petitioner
24           was a snitch, inference to him that he would
           be killed because of it.)

25           The only reason I called Dirickson (Investigator
           Petitioner had revealed murder-plot too, whom
26           when recanting out of fear he blamed his
           testimony on Dirickson, stating Dirickson had
27           fed him the murder-plot story, and whom he called
           in this instance to recant recantation and ask
28           for FBI intervention because he did not know who

-15-

1    to trust) was because I don't, when I
2    walked out of here last week, (After
     testifying truthfully, no recantations),

3    I felt good about myself. I felt that I had
     done something right. (After testifying
4    about a murderer who had confessed to him,
     and was plotting more murders to influence
5    his case, which Petitioner tried to sway him
     to abandon the plot, and only called
6    Authorities when it became clear that the
     plot was going forward when weapons were
7    obtained; upon Petitioner's information the
     weapons were confiscated and the plot was
8    foiled.)

9    The **only** reason I changed it (recanted original
     testimony) was because **I'm scared.**
10
     **And I'm still scared.** (Rt. 1649)
11

12   Petitioner later revealed that detainee Stephon Williams

13  had also threatened him on the night that Sheriff-Personnel

14  beat and threatened him. (Rt. 1663)

15   At the end of Petitioner's testimony, defense counsel

16  motioned to have Petitioner's and another witness' testimony

17  stricken due to perjury, then Deputy District Attorney (DDA)

18  Charles Smith stated;

19       "And, that it should be stricken as being
          completely unreliable regarding Lamerle
20        Johnson. Your Honor you heard his testimony:
          The first version, the second and the third.
21
          And what is **CLEAR** is that the system **FAILED**
22        him ultimately, because I'm responsible for
          any witness' safety ultimately.
23
          And, the **FAULT is MINE; NOT HIS.**" Rt. 1676, Ln.
24        19-25

25   The case went to the jury, with DDA Smith using

26  Petitioner's testimony in his attempt to convict Porterfield.

27  Petitioner was told that if Porterfield trial won, that he

28  would get his plea, but that if it was lost, that Chief

-16-

1    Deputy Prosecutor Steve Wagstaff had stated that he was going
2    to fry Petitioner's ass. (Exh. H, #11).
3        Important Note: Steve Wagstaff was the Chief Deputy under
4    District Attorney Jim Fox, both men are still today in those
5    same positions.
6        Porterfield trial lost, San Mateo County District Attorneys
7    Office filed a motion to rescind Petitioner's plea-agreement.
8    Court then appointed Edward Pomeroy to represent Petitioner,
9    who without the record of DDA accepting responsibility for
10   Petitioner's actions, advised Petitioner to not oppose the
11   Prosecutions' motion to rescind.  After the motion was granted,
12   Petitioner learned that Pomeroy was the ex-attorney for
13   Bernard Knight, the defendant whom he had testified against
14   and awoke to find being placed in his cell by Sheriff-Personnel.
15   And that if Pomeroy had succeeded in salvaging Petitoner's
16   plea, which would have called for him to still testify against
17   Knight; that Pomeroy would have been testifying on behalf of
18   Knights's defense in the same murder trial Petitioner was
19   scheduled     to testify against Knight.
20       Pomeroy avoided the conflict with Knight, by advising
21   Petitioner to not fight for his plea, thus creating a conflict
22   with Petitioner. (Exh. H., #8-10, &12; Court was aware of the
23   conflict, #10, never acted on it.)
24       Despite Pomeroy acting in accordance with the conflict and
25   not in the best interest of his client at the rescission
26   hearing, some interesting exchanges were had in the Court
27   room as it related to Petitioner's safety in the San Mateo
28   County Jail, brought up by the DDA motioning for rescission.

<u>Discussion After Rescision-Motion Granted</u>

1

2  DDA:        "There is an order for housing Mr. Johnson in
            San Francisco and the conditions underlying
3            that order have not changed. We ask he remain--
            however, I will do an order of return, given the
4            problems we had in this matter."

5  Court:      "Mr. Pomeroy, you are aware of that order?"

6  Pomeroy:    "Yes."

7  Court:      "In fairness to Mr. Johnson, I think he should
            be housed in San Francisco, but if that's going
8            to impinge upon your preparation for trial and
            so forth, that issue will have to be addressed at
9            some point."

10 Pomeroy:    "No, your Honor.  It will just give me an
            opportunity to go to San Francisco and sample
11            some better restaraunts."

12 DDA:        "Just for the record, this was Mr. Pomeroy's
            request when we discussed it off the record."
13
14 Court:      "I <u>understand</u> the reasons for it. In <u>fairness</u> to
            Mr. Johnson, I think it's <u>CRITICAL</u> to <u>order</u> that
            he be housed in San Francisco." (Exh. I, pg. 7)
15

16      In an earlier exchange between the Porterfield Court

17 prior to Petitioner's recantation on the record, the same

18 Court who issued the protective-housing order citing that

19 Petitioner believed his life was in danger if he stayed in

20 the San Mateo County Jail;

21 Counsel:    "He (Petitioner) also requested me to ask the
            Court that he be immediately transferred back
22            to San Francisco after his testimony.

23            Based on <b>police problems</b> he had in the jail
            when he was here testifying last week. And, <b>again</b>,
24            part of the <b>errors</b> that occurred this afternoon,
            in having him placed (By San Mateo County Sheriff-
25            Personnel) in the same cell with the defendant
            (Frank Porterfield) just a few moments ago.
26

27 Court:      I'm not going to make any specific orders to the
            Sheriff's Office regarding transportation. I don't
28            know if we will even be through with his testimony
            this afternoon.

But, I certainly will **express** the **HOPE**, and will ask the bailiff in this department to convey to the transportation officials that, obviously, Mr. Johnson is an in custody witness in a criminal case.

And that he **ought** to be both housed and transported accordingly. (Rt. 1505)

Petitioner's case was taken to trial, prosecuted by then DDA Stephen Hall, he predictably lost and was sentenced to Life+11 years in prison.  After the conviction, per the Penal Code 1203.01, 'Statement of Views', Stephen Hall in representation of the San Mateo County District Attorney's Office, recommended that I never be released from prison, and in that statement failed to advise the prison of any danger to Petitioner's life.

**Important NOTE**: Stephen Hall is now the Presiding Judge of San Mateo County.

Upon arriving in prison, every threat made to Petitioner by San mateo County Sheriff Personnel came   true, he was placed with his enemies and eventually slashed/stabbed by Stephon Williams, the same Williams who threatened Petitioner on the night that Sheriff Personnel did, (Rt. 1663), and the same Williams who was known by Prison-Personnel as being Petitioner's enemy. (Exh. H., #13)

No charges were ever brought against any Sheriff-Personnel or inmates in regards to the threats and assaults Petitioner suffered.  State Attorney General's Office was made aware of all of the above-mentioned, and provided with the documentation (And more) accompanying this writ as exhibits, as of today, no action was taken by the Chief Law Officer of the State.

1    On March 22, 2006, at Petitioner's Board Hearing, San

2   Mateo County, through Deputy District Attorney Sean Gallagher,

3   opposed Petitioner's request for parole.

4                              Argument

5       CCR Title 15, (supra), §2030, 'Prosecutor Participation',

6   §2030(3), "..if the district attorney cannot appear because

7   of a conflict."

8       It should go without saying that to have a fair and

9   impartial parole hearing, the prosecutions' office opposing

10  or requesting parole should be unbiased.

11      In this instance, an instance where San Mateo County

12  Sheriff Personnnel continously set Petitioner up to be

13  killed in relation to him cooperating with the District

14  Attorney's Office, DDA admitted the system (San Mateo

15  County) had failed Petitioenr, (Rt. 1676), and the Chief

16  Deputy Prosecutor threatened to fry Petitioner's ass if he

17  lost a case, (Exh. G., #11), that just maybe San Mateo

18  County should not be allowed to make a recommendation

19  regarding Petioner's Parole-Eligibility.

20      Not to mention the fact that the key-players mentioned

21  throughout the before facts, Steve Wagstaff, James/Jim Fox,

22  and Stephen Hall, (San Mateo Counties, Chief Deputy

23  Prosecutor, Elected District Attorney, and Presiding Judge,

24  top three law-officers of County), are still in place

25  today.

26      Petitioner can not possibly receive a fair or impartial

27  parole-hearing with San Mateo County being allowed to make

28  a recommendation, U.S.C.A. 5 & 14; Petitioner and his

                              -20-

1    counsel at the Board hearing made this objection. (Exh. C.,

2    pg. 11-12)

3    The County of San Mateo, Judges, D.A.'s, and Defnese

4    Counselors, knew that Petitioner's life was in danger by

5    San Mateo County Sheriff Personnel, that danger followed him

6    to prison as the threat stated it would, yet not one sworn

7    Fiduciary Officer of the Court advised Prison-Personnel of

8    the reasonably-predictable danger to Petitioener's life;

9    no one stood up to protect Petitioner's plea, despite the

10    fact that everyone knew police-duress had caused it to be

11    in jeopardy, and despite the fact that the San Mateo County

12    District Attorney's Office was okay while knowing the same

13    facts it knows now, with Petitioner going home in 2001 if

14    they won the Porterfield/Knight case, that same office now

15    recommends that Petitioner in essence never be released

16    from prison, die in prison, because as their DDA Smith put

17    it;

18    "...What is clear is that the system **failed**
      him ultimately.

19

20    And, the **fault** is mine (San Mateo County);
      not his."

21    Constitutionally, it would be a slap in the face of

22    justice, to not order that San Mateo County never again take

23    any role in the current instance surrounding Petitioner's

24    incarceration.

25    Another un-known factor of how this effected Petitioner's

26    parole hearing is this; off the record, the Presiding

27    Commissioner Archie "Joe" Biggers, asked San Mateo County

28    Deputy District Attorney Sean Gallagher about the plea-

1   agreement. (See Exh. A., # 3)  Defense counsel conveyed this

2   to Petitioner during the intermission/deliberation, stating

3   that Commissioner Biggers asked DDA Gallagher this after he

4   left the room and before deliberations began; counsel did not

5   hear exactly how DDA Gallagher responded.

6       Petitioner can not state with any degree of certainty how

7   DDA Gallagher responded to the Commissioner's question, but

8   he can reasonably state that he did not go into the detail

9   outlined in the facts of this writ.

10      And whatever DDA Gallagher said in response, it did not

11  stop the Commissioner from stating;

12          "We also noted that the District Attorney
            from San Mateo County in accordance with 3042
13          notices communicated opposition to a finding
            of parole suitability." (Exh. C., pg. 81, Ln. 13-17)
14

15      So, in this instance, a District Attorney's Office

16  with a **clear** conflict of interest recommendation to oppose

17  parole-suitability was cited in the reasoning justifying

18  denial. An office, which for arbitrary and capricious reasons

19  are requesting denial of parole; (Wagstaffe sought maximum

20  sentence for revenge purposes, not out of justice, Exh. H.,

21  # 11).  In speaking on what a miscarriage of justice can

22  entail in, Sawyer v. Whitley 505 U.S. 333, 112 S.Ct 2514,

23  stated;

24          "The accusatorial system of justice adopted
            by the Founders affords a defendant certain
25          process-based protections that do not have
            accuracy of truth finding as their primary
26          goal. These protections--including,...the
            Eighth Amendment right against the imposition
27          of an arbitrary and capricious sentence."
            at 2528
28

-22-

1    Now, parole-board case-precedent has given the Board wide-

2    discretion, yet that does not trump the fundamental-rights

3    protecting prisoner's at the hearings.

4    In this matter the District Attorney had a clear conflict

5    which the Board ignored, and an opinion/request for parole-

6    denial which the Board utilized in its explaination of denial.

7    When opposing parole, the San Mateo County District

8    Attorney's Office continued to perpetrate the system's

9    failing Petitioner, (Rt. 1676), it continued to impose a

10   cruel and unusual punishment-sentence, which was sought out of

11   revenge (arbitrary and capricious reasoning) and is now

12   utilizing the Board of Parole Hearings to seek a slow-death

13   sentence where the actual death-threats-attempts on Petitioner's

14   life actually failed. (Exh. H., #13, Exh. G., pg. 16, 21-22,

15   and all threats outlined in Rt's.)

16   Constitutional Violations, U.S.C.A. 5, 8, & 14; prosecution

17   presence and recommendation made hearing unfair and **partial**.

18                          Claim IV

19   Board of Parole Hearings, denied parole, for as they

20   stated per PC 3041(b);

21           "This was the factors that we used, **first** of
             all the offense was carried out in a
22           specially cruel and callous manner."
             (Exh. C., pg. 77, Ln. 16-18)
23

24       Maximum 2-year denail given, reasoning;

25           "In a seperate decision the panel finds that
             it's not reasonable to expect that parole be
26           granted at a hearing during the following
             two years.
27
             And that was done **primarily** because again the
28           offense was committed in an especially cruel
             manner..." (Exh. C., pg. 82, Ln. 8-13)

1    Per PC 3041.5 (2), the Board following the denial then

2 outlined its recommendations; stay disciplinary free, get more

3 self-help, and get another trade. (Exh. C. pg. 83-84, and Exh.

4 J.)

5    In Claims I & II Petitioner pointed out his disagreements

6 with the Statute(s), so he will re-assert them here without

7 rehashing them in full.

8    Regarding the Boards recommendations Petitioner has a few

9 things he would like to point out.  The Board stated;

10        "We feel you should get some self help to
         furthur assist you in understanding what
11        your commitment offense is or was."
         (Exh. C., pg. 83, Ln. 19-21)
12
         Earlier having stated;
13
         "We also want to commend you for your work
14       while you have been here in prison."
         Exh. C., pg. 82, Ln. 1-3
15
         What work?  Answer, starting self-help Groups, etc.
16
         "You have several chronos. You just completed,
17       there is a chrono 1/31/06 that you completed
         the Victim Awareness Program and you
18       were instrumental in requesting the program for
         Mule Creek." (Exh. C., pg. 39-40, Ln. 26-4)
19       www.realisticreform.com (Exh. Q.)

20    In recommending get some self help, Petitioner's logical

21 question would be, what self help?  The Board did not state

22 what kind to get, just to get some.  After the denial was

23 read, explaining the why's of denial and what he should do,

24 he said, "Can I respond to any of that?", his lawyer told

25 him no. (Exh. C. pg. 84, Ln. 19-21)

26    Society is being scammed, yes, scammed, and this Petitioner

27 and other prisoner's Due Process Rights are being trampled

28 over when told to participate in Self Help groups offered in

1  California and this reasoning being used to justify parole-

2  denials.

3  **Scammed**, strong language, what justifies its use?  Inmate

4  Richard Mejico, the founder of Criminal Gangs Anonymous (CGA),

5  the same CGA cited in Petitioner's Board Hearing, (Exh. C.

6  pg. 38), the same CGA currently functioning in several

7  prisons and allowed inter-national news coverage by California

8  Prison-Personnel as a unique self help group;

9  Yet      Richard Mejico, was told by a Board/Panel, that

10 he needed, more self help; went to Board, August 26, 2005.

11 (See Exh. A., # 4, & Exh. D.), that proves the **scam**.

12 Richard Mejico was allowed to start the re-entry program

13 at Mule Creek State Prison, the prison Petitioner is in.  The

14 re-entry programs mission is to prepare paroling inmates to

15 reintegrate safely back into society.  If Sacramento, Mule

16 Creek State Prison, can en-trust a prisoner with initiating

17 the re-entry program to protect society, then how can Richard

18 Mejico be in need of self help?

19 Richard Mejico's CGA program was embraced because nothing

20 else offered by the prisons seem to be working; 70+% 

21 recidivism rate in spite of self-help offered by prisons.

22 This Petitioner since 2005 has been trying to get the

23 prisons to re-habilitate sex-offenders, a true danger to

24 society.  Submitting-proposals, (Exh. K), which were ignored,

25 filing prison-appeals to protect children from child-

26 predators in visiting-rooms, appeal denied, writ currently

27 pending in California Supreme Court, #S142658, (Exh. L);

28 another pending writ which was filed after prison-appeal was

1   denied is one seeking that **all** persons convicted of sex-crimes

2   be re-habilitated prior to release. (Exh. M.)

3       Through legal-filings, prison appeals and proposals, and

4   through a web-site, www.realisticreform.com, Petitioner is

5   seeking reform of the prison system and implementation of

6   realistic rehabilitative measures.(See Exh. Q.)

7       Even the current acting Secretary of Corrections, concedes

8   that re-habilitation (self-help) is not possible under current

9   prison-conditions. (Exh. N.)  He blames it on overcrowding,

10  but even before it became "overcrowded", California still had

11  the highest recidivism rate (70+%) in the nation, despite the

12  fact it spends the most money on prisons.

13                      Get Another Trade

14      Petitioner has gotten two-trades while incarcerated, one

15  his family paid for, Paralegal Certification, and the computer

16  Vocations course he completed in prison. (Exh. C. pg. 82,

17  Ln. 3-8).

18      Petitioner was told to get a trade that does not involve

19  and or surround his current training, administrative

20  management, just in case his career choice does not pan out.

21  (Exh. C. pg. 83, Ln. 12-19)

22      Again, the public is getting **scammed** and Life-Prisoner's

23  going before the Board are having their Due-Process rights

24  ignored/trampled.

25      Why?  California is spending 100's of millions in offering

26  Prisoner's educational/vocational opportunities, but what

27  overall effect is it having on improving public-safety?  This

28  Petitioner in an information request posed that and other

1  questions, (Exh. D.); requesting specific information, data-
2  analysis, as to how much money prisons spend on offering
3  Vocations, how many prisoner's get out and secure employment
4  in the trained fields, what type of tax-revenue was being
5  realized from inmates released and securing employment in the
6  trained field, and did the numbers (money-spent) prove that
7  the expended revenues (tax-dollars) were cost-effective.
8      Public Information request was filed in January of 2006,
9  2-months prior to Petitioner's parole hearing.  In early
10 March, Sacramento sent the request to MCSP Facility 'C'
11 Captain Robinson, and told him to respond to Petitioner.
12 Robinson stated clearly to Petitioner that he could not
13 respond to the request, and doubted if the California
14 Department of Corrections and Rehabilitation was even in
15 possession of such data. (Exh. A., # 5)  The information
16 request has still not been responded to, 8-months later.
17     Petitioner even filed a prison-appeal on this issue,
18 (Exh. O.), the prison told him he had no standing to file
19 such an appeal; so Petitioner listed that and other ignored
20 appeals on his website, www.realisticreform.com, requesting
21 the public to demand action on such, in his opinion, common-
22 sense issues.
23     Petitioner's constitutional point is this, he's doing
24 more to re-habilitate himself in Vocational training and in
25 other areas then the prisons are, and even their head-person
26 states he can't do it, (Exh. N.), the recidivism rate
27 reflects that the prison can not do it and this was before the
28 "overcrowding", so it seems the only solution is for the

-27-

1   Courts (State/Federal) to step in and assess parole-eligibility

2   and in Petitioner's **opinion**, to re-structure the prisons to

3   trully bring about public-safety.

4                           Know More About Job

5       Petitioner was criticized in the denial for his parole-

6   plans, Board stating;

7           "Your parole plans was not a total package as
            well.  You sat here and you could stay with your
8           sister or you could stay with your brother and
            when the Deputy Commissioner asked you about
9           your employment plans well you said that you
            were going to work with your brother in a
10          restaurant and you didn't know what type of
            restaurant it was.  You said you thought it was
11          something like a Denny's okay.  If your going to
            be employed, then we go furthur into the finding
12          out about the restaurant,

13          what you would do there, well he initially
            wanted me to be the Human Resources person
14          but I need furthur training, then you said
            that I'll do dishwashing, I'll do anything
15          but then you need to find out what type and
            pin down as to what job you are going to have."
16          (Exh. C., pg. 80-81, Ln. 24-13)

17      This Petitioner took the Board three parole-plans, one

18  with his brother Du Shawn Johnson who is a Detective for the

19  Visalia Police Department and owns several business';

20  when offered the job, Petitioner reasonably did not request

21  every business-detail of his brother's business, conveyed to

22  the Board;

23          "He owns kind of like a Denny's or something
            like it, it's not a Denny's but it's something
24          along those lines.  Some **chain** of restaurants
            that he bought into so it's that type of
25          restaurant and go to school."

26      When asked what he would do.

27          "What ever he assigned me.  He wanted me to be
            a Human Resource Manager, **I think** I would need
28          some more training to do that but wash dishes,

                                    -28-

1    what ever he needed me to do."
     (Exh. C., pg. 50, Ln. 13-26)

2    When asked about his other parole-plans.

3    "The next plan is to go either to my grandparents
4    house who live in San Francisco and or go to my
     sister's house who lives in Oakland."

5    "I don't have any employment plans for either
6    residence but there was a parole officer who came
     up here and he was informing us (those who
7    volunteered to go talk to him)    about PAC,
     you know when a person paroles and they go and
8    PAC would advise them of where the jobs are located
     and just some things like that so I would be at
9    PAC meeting the very next day and try to get
     a job." (Exh. C. pg. 51, Ln. 2-15)

10   Note: PAC is a mandatory-program for all parolees,
11   where they go to a work-shop, job-fair, with jobs
     that specifically hire parolees.

12

13       Petitioner had also been approved for Federal-Financial

14   Aid for College, providing the documentation to the Board,

15   (Exh. C., pg. 8, Ln. 13-25).

16       With all of the beforementioned in mind, Petitioner finds

17   it hard to comprehend how his parole-plans were incomplete?

18   And how his actual-responses to the Boards questions about

19   his brother's restaurant, could be mis-construed in the denial

20   as Petitioner being confused as to what his role would be;

21   Petitioner was to be the Human Resource Manager, but felt he

22   needed more training and was willing to do whatever his

23   brother needed him to do while he got it, yet the Board told

24   him to pin down what he was going to do. (Exh. C., pg. 50,

25   Ln. 13-26, & pg. 80-81, Ln. 24-13).

26                          Lack of Remorse

27       In denial my remorse was questioned, yet Board

28   acknowledged that Doctor who gave Petitioner his psyche-

-29-

1  evaluation, that his report was great considering it came from

2  that particular Doctor. (Exh. C., pg. 47-49), and the Doctor

3  stated that Petitioner's remorse was real, that he accepted

4  responsibility for his crimes, but the Board described his

5  remorse and acceptance in this manner;

6          "I don't really think that you understand
           the magnitude of what you did by this kidnap
7          for money, so you need to take a look at that
           because I don't think in here, just in the
8          way that you talked to us today, we didn't get a
           sense that you really understood the nature
9          of your crime, or your commitment offense.

10         Yeah you said okay I know what I did **blah, blah,
           blah** but do you know what you did to the victim
11         or how it impacted that particular victim."
           (Exh. C. pg. 83-84, Ln. 21-5)

12
13         Later stating;

           And your plan, we talked a little bit about you
14         going to LA, you had testimony and the record
           there from your crime partners who said yeah
15         he did this and yes he did that.

16         There was some inconstancies on what took place,
           who was involved in the conversations and we
17         just feel that you need to take a little self
           help, analyze and come to the realization as to
18         what actually took place."
           (Exh. C., pg. 84, Ln. 5-13)

19

20     Just another point of why in Claim I & II Petitioner

21  contends past crimes should not be cause to deny parole, but

22  the Commissioner's closing statement is even more egrigious

23  because it directly conflicts with an earlier one he made;

24         "Nothing that happens here today will change
           the finding of the court."
25
           Okay, Petitioner was not charged nor convicted
26         of going to LA, which was alleged by his crime
           partners.
27
           "We are not here to re-try your case, we are here
28         to determine if you are suitable for parole."
           (Exh. C., pg. 7, Ln. 1-5)

1   If nothing that happens in the hearing will change the

2   finding of the Court, and the point of the hearing is not to

3   re-try the case, then how can the Board Constitutionally

4   state that Petitioner needs self help because he failed to

5   admit to committing acts his crime-partners stated he did,

6   which he hadn't been charged or convicted of?

### Claim V & Conclusion

8   Blah, Blah, Blah, is what Petitioner's initial-parole

9   hearing turned out to be in regards to the Board respecting

10  the Constitutionally protected liberty interest of the

11  process. Simply put, the fix was in, Claim II, and they did

12  what they wanted to do instead of what the Constitution

13  mandated they do.

14  The cumulative effect of all of the beforementioned

15  violations rendered Petitioner's entire parole-hearing

16  process, unconstitutionally sound.

17  Petitioner's continued incarceration and being forced

18  to go through the California Parole Hearing Process (Farce);

19  will exacerbate and indefinently prolong a 'Miscarriage of

20  Justice'.

21  Although not a miscarriage of justice in the conventional

22  sense of actual/factual innocence, the United States Supreme

23  Court has made the following comments on the subject;

24          "Most important, however, the focus on innocence
25          assumes erroneously, that the only value worth
            protecting through federal (State) habeas review
26          is the accuracy and reliability of the guilt
            determination.

27          But "[o]ur criminal justice system, and our
            Constitution protect other values in addition to
28          the reliability of the guilt or innocence

1   determination, and the statutory duty to serve
    'law and justice' should similarly reflect
2   those values.  Sawyer v. Whitley (supra) 112,
    at 2528, quoting, Smith v. Murray 106 S.Ct. 2661,
3   at 2672

4   Later stating;

5   "While the conviction of an innocent person may
    be the archetypal case of a manifest miscarriage
6   of justice, it is not the only case.  There is no
    reason why "actual innocence" must be both an
7   animating and the limiting principle of the work
    of federal (State) courts in furthering the "ends
8   of justice."  As Judge Friendly emphasized, there
    are contexts in which, irrespective of guilt or
9   innocence, constitutional errors violate
    fundamental fairness.  Friendly, is innocence
10  irrelevant?

11  Fundamental fairness is more than accuracy at
    trial (Parole-Hearings); justice is more than
12  guilt or innocence."
    Sawyer at 2530
13

14     In another Opinion, having nothing to do with Parole-

15  Hearings, but addressing Miscarriages, Dretke v. Haley (2004)

16  124 S.Ct 1847, at 1854, Justice Stevens dissent,

17  "The unending search for symmetry in the law
    can cause judges to forget about justice.  This
18  should be a simple case."

19  Symmetry in the law will tempt Courts to limit
    the re-view of this case to only Board issues,
20  and not consider the overall effect that all
    the Claims have had on making the process a
21  Farce on Justice.

22  at 1855   "...when cause and prejudice standard is
    inadequate to protect against fundamental
23  miscarriages of justice, the cause and prejudice
    requirement must yield to the imperative of
24  correcting a fundamentally, unjust incarceration.
    (Quoting Engles v. Isaac 456 U.S. 107, 135)
25

26  "That the State has decided to oppose (Parole) the
    grant of habeas releif in this case, ...might
27  cause some to question whether the State (County
    of San Mateo) has forgotten its overriding
28  "obligation to serve the cause of justice."
    United States v. Agurss 427 U.S. 91, 111

                        -32-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> "But this Court is surely no less at fault.
> ... "the Court has lost sight of the **basic**
> reason why the writ of habeas corpus indisputably
> holds an honored position in our jurisprudence.
> Engle 456 U.S., at 126

> Habeas corpus is, and has for centuries been, a
> "bulwark against convictions (continued
> incarcerations) that violate fundamental
> [541 U.S. 399] fairness", fundamental fairness
> should dictate the outcome of this unusually
> simple case."

at 1856, Justice Kennedy's dissent;

> "The law must serve the cause of justice."

> "[Judicial] discretion can inspire little
> confidence if Officials sworn to fight injustice
> choose to ignore it."

> San Mateo County Officials almost literally cost
> Petitioner his life, and despite the obvious
> dangers/threats recognized by the Court, admitted
> to by police-officials, everyone in the County
> with a Fiduciary duty to intercede, failed to
> do so.

> State Attorney General Office, Deputy Attorney
> General Morris Lenk and other's with Authority
> over San Mateo County, has and continues to
> ignore the over-all constitutional violations
> suffered by Petitioner.

Fundamental fairness should dictate the outcome of this

unusually simple but convoluted case, in which;

> "And what is **clear** is that the **system**
> FAILED him (Petitioner) ultimately,... (Rt. 1676)

And similar to Judicial-Precedent set in the Rosenkrantz's

case, Petitioner should be released by the Court. (Exh. P.)

Respectfully Submitted,

La Merle R. Johnson, Petitioner.  Dated: _____

# SAN MATEO COUNTY SUPERIOR COURT DENIAL OF WRIT

1

2

3

4

5

6

(ENDORSED)

**FILED**

SAN MATEO COUNTY

OCT 18 2006

Clerk of the Superior Court

By ___GRACE LACEY___

DEPUTY CLERK

7        IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

8             IN AND FOR THE COUNTY OF SAN MATEO

9

10    In re:                              )    Case No. SC-31800B
                                          )             HC-1811
11      LA MERLE R. JOHNSON               )
                                          )
12    On Habeas Corpus.                   )    ORDER OF DENIAL
                                          )
13    _____  )

14

15        The Court has received and reviewed the Petition for Writ

16    of Habeas Corpus filed by Petitioner, La Merle R. Johnson, on

17    August 22, 2006. For the following reasons his writ petition is

18    denied.

19                            BACKGROUND

20        The following facts are taken from the Unpublished Opinion

21    of the Court of Appeal for the First Appellate District

22    affirming Petitioner's conviction, filed in this action on

23    August 8, 1997.  On the afternoon of July 6, 1993, Petitioner

24    contacted co-defendant Ardie James Moreland ("Moreland"),

25    arranged a meeting, and told Moreland to bring guns.

26        Petitioner, Moreland, and Lashon Brown ("Brown") drove to

27    a restaurant and discussed a plan to rob Aasa Knowles

28    ("Knowles") on the theory that her boyfriend, Ellis Foots

1

1   ("Foots"), a drug dealer, would keep some of his cash at her

2   apartment.  The three drove to Knowles' apartment, parked

3   nearby, and waited.  When Foots arrived at Knowles apartment

4   around 7 p.m., the three decided to rob him as well.

5       Petitioner and Moreland determined that they should take

6   Foots to various places where he kept cash and that they needed

7   additional help.  Petitioner called, picked up, and returned

8   with co-defendant Taryn Washington ("Washington") joining

9   Moreland and a man known as Mike or "Pookie."  Petitioner

10  proposed that they approach Foots, posing as police officers,

11  and "arrest" him.

12      At about 9:30 p.m., as Foots, Knowles, and a man named

13  Thomas left Knowles's apartment, two cars approached them and

14  disgorged armed men. Knowles fled and called police.  Foots

15  started running and threw a bag of cocaine over a fence.

16  Yelling that they were police officers, Petitioner and Moreland

17  ordered Foot to lie down on the ground.  When Foots complied,

18  Petitioner held a gun on Foots while Moreland restrained Foots

19  using handcuffs Petitioner had given him. Moreland put Foots in

20  the back of one of the cars, and Petitioner told Moreland to

21  "Get him out of there, away from the scene."  Moreland and

22  Washington took Foots to the apartment of co-defendant Marion

23  Bonds ("Bonds") in Oakland.

24      Back in Daly City, a police officer responding to a call

25  about the incident saw defendant walking away from the scene

26  wearing clothing that matched the description of a possible

27  suspect.  When the officer asked defendant to stop, Defendant

28  became verbally abusive.  Other officers arrived and arrested

1   defendant for obstructing and resisting a police officer (PC §

2   148). Petitioner was taken to Redwood City Jail and released

3   around 2:00 a.m. the next morning.

4       Meanwhile at the Bond apartment in Oakland, Moreland and

5   Washington had taken Foot's wallet, gold chain, cellular phone,

6   and keys, used duct tape to blindfold Foots, removed the

7   handcuffs and bound Foots' hands and feet with ropes.  When

8   Foots tried to loosen the ropes, one of the men shot him with a

9   stun gun and replaced the handcuffs.  Moreland became nervous

10  when Petitioner did not page him as promised, made a plan to

11  kill Foots, drove into the Oakland hills to find a place to

12  dispose of the body, returned, and decided to kill Foots if

13  they did not hear from Petitioner within the hour.

14      Petitioner arrived at the Bond apartment in Oakland about

15  4:30 a.m.  Petitioner and Moreland discussed how to get Foots'

16  money and asked Foots how much his people would pay "for his

17  safety."  When Foots told them he had $8,000 in his house,

18  Petitioner drove to the house, but upon seeing Foots'

19  "soldiers" there, returned without having gone inside.

20      Petitioner and Moreland decided to hold Foots for ransom,

21  had Foots call his friend, Louis Aterberry ("Aterberry") to

22  raise ransom money, and told Foots they would kill him if their

23  ransom demand was not met.

24      Petitioner and Moreland decided that since Petitioner

25  resembled Foots, they could use Foots' credit cards to get cash

26  and make purchases.  The obtained the "PIN" numbers, credit

27  limits, and other information from Foots, flew to Los Angeles,

28  and used Foots' cards to obtain cash, jewelry, clothing, and

3

1  other items.   The next morning, while Petitioner was loading

2  the purchases into a rented van, Moreland was arrested trying

3  to use one of Foots' credit cards.

4       Petitioner returned to Bonds' apartment.   Washington made

5  the telephone calls to arrange the ransom and Petitioner and

6  Bonds told Washington what to say.   On the evening of July 8,

7  Petitioner and Bonds went to pick up the ransom, Petitioner

8  retrieved the backpack containing the money, and then returned

9  to the apartment to count the money.

10       While in custody in Los Angeles, Moreland disclosed the

11  location of the Bond apartment.   A tactical team forced the

12  apartment door, found ransom money strewn about; found Foots,

13  still handcuffed, bound, and blindfolded with duct tape; found

14  loaded semiautomatic handguns; and found Petitioner, Bonds and

15  Washington trying to hide in a bedroom closet. Foots was held

16  captive, bound and blindfolded from July 6, 1993 to July 8,

17  1993.

18       Prior to Trial, on December 23, 1994, the People brought a

19  motion to deem Petitioner's plea agreement breached. The

20  People's motion and supporting declarations establish that

21  Petitioner entered into a plea agreement whereby Petitioner

22  would be permitted to plead to charges carrying a maximum

23  possible punishment of 17 years, eight months in prison, and in

24  exchange, Petitioner agreed to testify truthfully in the future

25  trials of People v. Porterfield and Knight.

26       In the motion to deem Petitioner's plea agreement

27  breached, the People asserted that at the Porterfield trial,

28  Petitioner changed his testimony mid-trial, stating that his

1 previous testimony was told to him by the District Attorney's
2 investigator and was false.  Petitioner subsequently admitted
3 under oath that the story about false or planted testimony was
4 a lie. The Porterfield trial did not result in a conviction.
5 The court granted the People's motion and Petitioner's plea
6 agreement became null and void.
7      A jury found Petitioner guilty of kidnapping for ransom,
8 second degree robbery, and assault with a firearm, and found
9 true enhancements for personal use of a firearm in connection
10 with the kidnapping and assault charges. On January 19, 1996,
11 Petitioner was sentenced to life plus 11 years in prison.  The
12 Court of Appeal affirmed Petitioner's conviction on August 8,
13 1997.
14      In the instant petition, Petitioner asserts (1) That it is
15 unconstitutional to deny parole based on facts that can never be
16 changed; (2) That Petitioner was told by several sources that he
17 would not be receiving a parole date at his initial hearing
18 because, contrary to the Penal Code § 3041(d) requirement that a
19 release date be set, the Board had an unspoken/underground policy
20 that inmates do not receive parole grants at their initial
21 hearings; (3) That the San Mateo District Attorney has a conflict
22 of interest when making parole suitability recommendations
23 because a prior Assistant District Attorney had threatened to
24 "fry Petitioner's ass" and revoke Petitioner's plea agreement if
25 the Assistant District Attorney failed to get a conviction based
26 in part on Petitioner's testimony in People v. Porterfield; and
27 (4) that the Parole Board was not justified in recommending that
28 petitioner (a) get self-help (b) stay discipline free, and (c)

1    learn a trade or in basing the decision to deny parole on the

2    cruel manner of the offense or Petitioner's perceived lack of

3    remorse.

4

5    **THE DECISION OF THE BOARD OF PRISON TERMS TO DENY PETITIONER A PAROLE RELEASE DATE WAS PROPER.**

6    **A. Habeas Corpus Is An Appropriate Means of Challenging the**

7    **Denial of Parole.**

8      A petition for writ of habeas corpus is proper to

9    challenge a denial of parole by the Board of Prison Terms.  (*In*

10    *re Sena* (2001) 94 Cal.App.4th 836, 840.)

11

12        Penal Code section 3040 gives the Board the power to
allow prisoners sentenced to indeterminate terms to go
on parole outside the prison walls and enclosures. The

13        Legislature has specified that one year prior to the
inmate's minimum eligible release date, a panel of at

14        least two commissioners of the Board shall meet with
the inmate and shall normally set a parole release

15        date. (Pen. Code, § 3041, subd. (a).) However, the
panel or the Board need not set a release date if "it

16        determines that the gravity of the current convicted
offense or offenses, or the timing and gravity of

17        current or past convicted offense or offenses, is such
that consideration of the public safety requires a more

18        lengthy period of incarceration for this individual,
and that a parole date, therefore, cannot be fixed at

19        this meeting." (Pen. Code, § 3041, subd. (b).)

20

21    (*In Re Morral* (2002) 102 Cal.App.4th 280, 289, see also *In Re*

22    *Dannenberg* (2005) 34 Cal.4th 1061, 1079.)

23    **B. Criteria For Granting or Denial Of Parole And Standard of**

24    **Review.**

25      "The factor statutorily required to be considered and the

26    overarching consideration is 'public safety.' As stated in

27    subdivision (b) of Penal Code section 3041, the Board 'shall

28    set a release date unless it determines that the gravity of the

1  current convicted offense or offenses, or the timing and

2  gravity or past convicted offense or offenses, is such that

3  *consideration of public safety* requires a more lengthy period

4  of incarceration for this individual." (*In re George Scott*

5  (2005) 133 Cal.App.4[th] 573, 591 [italics added by court].) Title

6  15 of the  California Code of Regulations § 2402 provides:

7  "…regardless of the length of time served, a life prisoner

8  shall be found unsuitable for and denied parole if in the

9  judgment of the panel, the prisoner will pose an unreasonable

10  risk of danger to society if released from prison." (*In re*

11  *George Scott* (2005) 133 Cal.App.4[th] 573, 591 [quoting 15 Cal.

12  Code of Reg. § 2402].)

13      The standard of review for a Denial of Parole following a

14  parole hearing was established by the California Supreme Court

15  as follows: "Accordingly, we conclude that the judicial branch

16  is authorized to review the factual basis of a declaration of

17  the Board denying parole in order to ensure that the decision

18  comports with the requirements of due process of law, but that

19  in conducting such a review, the court may inquire only whether

20  some evidence in the record before the Board supports the

21  decision to deny parole, based on the factors specifically

22  specified by statute and regulation." (*In re Rosenkrantz* (2002)

23  29 Cal.4[th] 616, 658.)

24    C. The Board's Reliance On Petitioner's Callous Disregard For

25      The Victim When The Crime Was Committed, Plus His Current

26      Lack Of Sincerity and Remorse, Plus The Incomplete Nature of

27      His Work Plans Constitute Some Evidence Supporting The

28      Finding that Petitioner Posed A Risk to Public Safety.

1    Petitioner quotes Penal Code § 3041(b) for the proposition
2   that the Parole Board **shall** set a release date unless it
3   determines that the gravity of the current convicted offense or
4   past convicted offenses is such that consideration of the
5   public safety requires a more lengthy period of incarceration.
6   However, while this section mandates that a date be sent when
7   there is no perceived risk to public safety, it also precludes
8   the setting of a release date when release is perceived to
9   threaten public safety.  '[T]he gravity of the commitment
10  offense or offenses alone *may* be a sufficient basis for denying
11  a parole application, so long as the Board does not fail to
12  consider other relevant factors.'  (*In re Ramirez* (2001) 94
13  Cal.App.4th 549, 569 overruled on other grounds in *In re*
14  *Dannenberg* (2005) 34 Cal.4th 1061, 1100; citing *In Re Seabock*
15  (1983) 140 Cal.App.3d 29, 37-38.)
16      In *In re Dannenberg* (2005) 34 Cal.4th 1061, 1071, the
17  California Supreme Court held: "Accordingly, we conclude that
18  the Board, exercising its traditional broad discretion, may
19  protect public safety *in each discrete case* by considering the
20  dangerous implications of a life-maximum prisoner's crime
21  individually.  While the Board must point to factors beyond the
22  minimum elements of the crime for which the inmate was
23  committed, it need engage in no further comparative analysis
24  before concluding that the particular facts of the offense make
25  it unsafe at that time, to fix a date for the prisoner's
26  release." (Id.)
27      Petitioner quotes *Biggs v. Terhune* (9th Cir. 2003) 3134
28  F.3d 910, 917 for the proposition that "A continued reliance in

1  the future on an unchanging factor, the circumstances of the
2  offense and conduct prior to imprisonment, runs contrary to the
3  rehabilitative goals espoused by the prison system and could
4  result in a due process violation." (Id.)
5      In contrast to the situation in Biggs, however, the
6  transcript of the instant hearing, although missing a number of
7  pages, discloses that the Board didn't feel that Petitioner was
8  being particularly honest at the time of the hearing
9  (Transcript Page 80:13-23), a finding subject to change that
10 would tend to support the conclusion that Petitioner's release
11 presented a potential danger to society; that his Parole
12 employment plans were an incomplete package (Transcript Page
13 80:23-81:13), a factor subject to change that increases the
14 likelihood that Petitioner would return to criminal activity in
15 order to earn a suitable living; and that Petitioner did not
16 exhibit remorse (Transcript Page 81:17-82:1), a factor subject
17 to change that increases the likelihood that Petitioner will
18 commit further crimes. These mutable findings, in addition to
19 the findings regarding the nature of the offense itself,
20 constitute "some evidence" supporting the finding that the
21 parole of Petitioner "would pose an unreasonable risk of danger
22 to society or a threat to public safety."
23     D. Petitioner's Assertion Of An Underground Policy Not To
24        Grant Parole On The First Hearing Or That Petitioner Was
25        Advised In Advance That Parole Would Be Denied Is
26        Irrelevant Because The Instant Board Made Specific
27        Findings Justifying A Denial of Parole to Petitioner At
28        This Time.

1    Petitioner asserts that there exists an underground policy
2  in which parole is always denied at the first hearing and that
3  he was told in advance that his parole would be denied.  There
4  is no evidence that this board made a decision to deny
5  Petitioner parole before reviewing the file or considering the
6  facts.  The fact that other individuals predicted the outcome
7  of Petitioner's hearing suggests that the board followed
8  predictable guidelines.  Even if one or more boards have acted
9  arbitrarily in other cases, such actions are irrelevant in the
10 instant case because the record reflects that the board made
11 multiple findings of fact, each of which are independently more
12 than sufficient to justify denial of parole.

13    Under Penal Code § 3041 and Title 15 of the California
14 Code of Reg. §2402, there is no presumption that a life inmate
15 is entitled to parole or that he/she is automatically suitable
16 for parole based on the amount of time served. (*In re Honesto*,
17 (2005) 139 Cal.App.4th 81, 92-93, see also *Dannenberg*, *supra*, 34
18 Cal.4th at 1093.) Here, the Board's decision was not an abuse of
19 discretion. The record of Petitioner's parole hearing indicates
20 that there was some evidence to support the Board's decision to
21 deny him parole and their statement of reasons for the denial
22 was adequate. The Board considered the relevant factors under
23 Title 15 of the California Code of Regulations §§ 2401, 2402
24 and 2281. Based on these factors including the gravity of the
25 commitment offense, Petitioner's institutional behavior, and
26 his psychological evaluations, the Board's decision to deny
27 Petitioner a parole release date was proper. (*Dannenberg*,
28 *supra*, 34 Cal.4th at 1094-1096.)

1    E. While The District Attorney Objected To Parole There Is

2    No Evidence Of An Unreasonable Bias Arising Out of The

3    Porterfield Trial.

4    Petitioner asserts that the San Mateo District Attorney

5  has a conflict of interest when making parole suitability

6  recommendations because a prior Assistant District Attorney had

7  threatened to "fry Petitioner's ass" and revoke Petitioner's

8  plea agreement if the Assistant District Attorney failed to get

9  a conviction in People v. Porterfield.  While the District

10  Attorney did oppose Petitioner's parole, there is no evidence

11  that the opposition was a function of bias.

12    Petitioner has made several collateral attacks on his

13  conviction where the claim of error related to the

14  prosecution's rescission of the plea agreement, including two

15  prior habeas petitions filed in this court on July 30, 1999 and

16  March 29, 2000.  Each petition was denied.  It has long been

17  the rule that, absent a change in law or fact, courts will not

18  reconsider previously rejected claims. (*In re Clark* (1993) 5

19  Cal.4th 750, 767.)

20    F. There Is Some Evidence Demonstrating That The Board Did

21    Not Act Arbitrarily In Recommending That Petitioner (1)

22    Get Self Help; (2) Stay Discipline Free; (3) Learn A

23    Trade;    (4) Perceiving That Petitioner Lacked Remorse; or

24    (5) Considering the Cruel Manner of Petitioner's Offense.

25    Petitioner takes exception to the fact that the Parole

26  Board recommended that he get self help, stay discipline free,

27  learn a trade, found him to lack remorse, or that the Board

28  considered the nature of his crime.

1    It is not clear what the Board based its recommendation
2  concerning self help because Pages 78-79 of the Decision are
3  missing from the Transcript.  Petitioner must (i) state fully
4  and with particularity the facts on which relief is sought  and
5  (ii) include copies of reasonably available documentary
6  evidence supporting the claim. (*People v. Duvall* (1995) 9
7  Cal.4th 464, 474.) Moreover, the logic of the recommendation
8  that a petitioner seeking parole remain discipline free while
9  incarcerated is self evident.  While Petitioner contends that
10  he has learned several trades or businesses while incarcerated,
11  the fact is that Petitioner's plan as presented at the parole
12  hearing was to work in a restaurant and perform human resource
13  functions, wait tables or wash dishes (Transcript p. 81:6-13.)
14  The board also specifically found that Petitioner lacked
15  remorse for the victim. (Transcript at p. 81:17-21.)
16    The Board also found that the underlying offense was
17  committed in an especially cruel manner, demonstrating
18  "exceptionally callous disregard for human suffering" in that
19  the victim was left bound for several days with duct tape over
20  his eyes and fearing that he might be killed at any time.
21  (Transcript at 82:11-83:7.)  The Board found that the motive
22  for the crime was inexplicable and very trivial in relation to
23  the offense. (Transcript at 82:25-83:2.) It was appropriate for
24  the Board to consider these matters and the findings are
25  supported by some evidence.
26
27
28

1

## CONCLUSION

2

3     The record establishes that there existed "some evidence"

supporting each of the Board's findings, each of which

4

independently sufficed as grounds supporting the finding that

5

Petitioner would present a threat to society, and therefore

6

justifying the denial of parole.

7  DATED:  _OCT 16 2006_          _____

8

9                               Craig L. Parsons
                                Presiding Judge, Criminal

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PETITIONER'S RESPONSE TO SUPERIOR COURT DENIAL

## PETITIONER'S REPLY TO SUPERIOR COURT DENIAL

1
2    As in most life-crimes, the FACTS are ugly, and this

3    Petitioner acknowledges his guilt, and the FACT, that this crime

4    does not show him in his best light.  Yet, the law/constitution

5    recognizes certain rights (liberty-interest) in a parole-hearing

6    setting, and Petitioner asserts that those interests recognized

7    by the law have been violated in this instance.

8    STATUTE ALLOWING BOARD TO DENY PAROLE BASED ON FACTS THAT CAN
     NEVER BE CHANGED IS UNCONSTITUTIONAL, CALIFORNIA CONSTITUTION,
9    ART. I, § 7(a), 15, 17, 24, & 29, U.S.C.A. 5,  , 8, & 14

10    Superior Court in its denial, failed to address the heart

11    of Petitioner's claims as to why the Statute is unconstitutional,

12    and <u>or</u> address the conflict raised;

13            P.C. 3041(b), allows for denial based on
14            facts of crime(s).

15            P.C. 3041.5(2), states, "...where a parole date
              has not been set for the reasons stated in
16            subdivision (b) of section (3041), the board
              shall send the prisoner a written statement
17            setting forth the reason or reasons for refusal
              to set a parole date, <u>and</u> suggest activities in
18            which he or she might participate that will
              benefit him or her while he or she is
19            incarcerated."

20    **Conflict;** Board that is enabled to deny parole in any part

21    based on the unchangeable facts of past-crimes, can not fulfill

22    their statutory obligation to suggest activities to a prisoner

23    that will benefit them; benefit them towards a release date,

24    the only reasonable-interpretation; <u>because</u>, nothing the Board

25    could suggest can change the past.

26    Since the past is unalterable, and as stated in the

27    earlier sections of this writ, Parole-Board releases are

28    rationalized to the public and on record as having to do with

1    in-prison positive behavior (pages 9-11 of writ), it is only

2    logical that statutorily allowing for past-crimes FACT-reasoning

3    to justify denial of parole, will lead to constitutional abuses;

4                    - Cal. Const. Art. I, §15, U.S.C.A. 5, A person
5                      **SHALL** not be twice in jeopardy for the same
                       offense.  Yet, when it is statutorily allowed
                       for Liberty-interest to be denied based on
6                      matters not subject to change, then that person
                       is twice being put in jeopardy; which leads to
7                      other constitutional offenses.,

8                    - Cal. Const. Art. I, §17, U.S.C.A. 8, A person
9                      **SHALL** not be subjected to cruel and unusual
                       punishment.  Yet, the statute opens the door to
10                     just that, **why**?;

11                   - Cal. Const. Art. I, §7, 24, 29, U.S.C.A., 5 & 14,
                       A person **SHALL** not be denied 'Due Process', or,
12                     'EQUAL PROTECTION' of the laws.

13                     Yet that is not possible when Boards can take
                       similarily situated (Lifer's) inmates, and treat
14                     them in an unequal fashion..  How is this done?;

15    All life-crimes contain FACTS that the Public through its

16    criminal-process has deemed horrific enough to warrent life in

17    prison, which inherently contains the possibility that the

18    convicted may never be released.  But, as the Court(s) have

19    recognized, In re: Dannenberg 23 Cal.Rptr.3d 417 (2005),

20    Biggs v. Terhune (supra) 334 F.3d 910, there is a Liberty-

21    interest in Life-sentences with the possibility of parole;

22        In allowing Parole-Boards the ability to deny parole based

23    on unalterable facts, the Legislators have **Statutorily**

24    positioned them (Board) to violate the 'Equal Protection' clause

25    of the Constitution.  Horrific-FACTS never change, in that **all**

26    Lifer-inmates are equal, yet in statutorily allowing for any

27    Board to at any time decide that Horrific-FACTS are no longer

28                                    35

1    so horrific as to warrent continued incarceration, OR, to allow

2    them the ability to at any time state that the Horrific-FACTS

3    remain so horrible as to warrent the continued incarceration of

4    someone, is to allow for a system of 'ARBITRARY & CAPRICIOUS'

5    parole grants or denial, with no real threshhold for Judiciary

6    review; which opens the door for the subjection of Lifer-Inmates

7    to 'Cruel & Unusual Punishment' and to be continuously (Twice &

8    Many Times More) be put in jeapordy for the same offense.

9         As earlier stated, Parole-Boards rationalization for parole-

10   grants, ALLWAYS, center around in-prison positive behavior and

11   FACTS, (job, family-support, etc.), that have nothing to do with

12   unchangeable facts of the past, strictly and specifically

13   dealing with matters related to the future.  With this being the

14   case, the only way to ensure that inmates rights are not

15   constitutionally violated as previously listed, is to strike the

16   Boards ability to deny parole based on the unchanging factors of

17   committement offenses.

18   'SOME EVIDENCE' STANDARD OF REVIEW IS CONSTITUTIONALLY VAGUE,
19   NOT AFFORDING MEANINGFUL STANDARD OF 'JUDICIARY-REVIEW'

20        Superior Court cited the 'Some Evidence' standard of

21   review, in denying writ.  The Board when denying parole is

22   given a checklist of things to cite in order to ensure that

23   Judicial-Review will find that 'Some Evidence' was present to

24   justify the Boards findings.  There is never NOT 'Some Evidence'

25   present if a Board wants to deny parole, yet does that mean

26   denial was warrented; Petitioner reasonably asserts, many times

27   no, but what meaningful review can a petitioner receive if the

28

1 Court's review continues to be limited ('Some Evidence') in this

2 fashion?;, Petitioner believes none.

3 ## SUPERIOR COURTS FINDING OF SOME EVIDENCE IS DEBATEABLE AMONGST REASONABLE JURISTS

4

5 The Board stated that Petitioner lacked remorse, despite

6 the fact that several times throughout the hearing he expressed

7 it. (Full Hearing Transcript Included For This Court To Make Its

8 Own Assessment). Superior Court cited this as justification for

9 denial, and that such an attitude was indicative of potential

10 future criminality.

11 Prior to going to Board, a Psychological Evaluation is

12 mandated, where the trained Psychologist evaluates the inmate

13 for hours, and then writes a report. (Exh. C. pg. 47-49;

14 Board described Psychological-Evaluation of Petitioner, good,

15 especially in light of Psychologist it came from. Yet Board

16 ignored the Psychologist's trained/educated opinion of remorse

17 being real, of Petitioner accepting his responsibility for crime,

18 of him no longer posing a threat to society, and instead

19 replaced it for their own in justifying denial.) (Exh. R pg. 7-8)

20 The legal-question then is, how can an untrained Board

21 ignore the findings of the Statutorily-Mandated psychological

22 evaluation, replace the Psychologist's opinion with their own,

23 and then the Petitioner receive meaningful review (Calif. Const.

24 Art. I, §7(a), 15, 24, 29, U.S.C.A. 5 & 14, 'DUE PROCESS') if

25 the Court, is limited to re-citing the Boards Findings/statements

26 indicative of 'Some Evidence'? And if the Boards opinions

27 surrounding 'Remorse' supersede the Psychologist, then why is

28

1  the psychological evaluation mandated?; Board does not like the

2  evaluation, in spite of complimenting it as in this instance,

3  and then they ignore it, not only ignore it, but again in this

4  instance, recommend 'Self-Help', which the evaluation stated was

5  not needed. (Exh. R, pg. 8)

6      Boards finding that Petitioner lacked remorse, conflicts

7  with Psychological-evaluation; as such there is **serious** question

8  as to the validity of that finding, warrenting Judicial-Review

9  to determine is the 'Some Evidence' standard met, when that

10  'Some Evidence' is conflicted by unbiased (Psychologist's)

11  evidence duly trained/able to deliver opinion on question

12  (Lack of Remorse) at issue?

13  **REMORSE, REASONABLY NOT NECESSARY FOR PAROLE GRANT, REQUIREMENT**
14  **OF SUCH CONFLICTS WITH PENAL CODE 5011(b)**

15          "The Board of Prison Terms **SHALL NOT** require,
          when setting parole dates, an admission of
16          guilt to any crime for which an inmate was
          committed."

17

18      If an inmate does not have to admit the crime, meaning they

19  can deny and or refuse to discuss it, then it reasons that he

20  or she is not required to exhibit and or express remorse.

21      In this instance Petitioner **chose** to discuss the crime,

22  conceded his involvement, and expressed his remorse, with the

23  full knowledge that legally he was not required to do so; (this

24  act reasonably indicates remorse and acceptance of responsibility)

25  Both the Psychologist and the Board, per the law, advised

26  Petitioner that he was not obligated to discuss the crime in any

27  fashion.

28

1

## LEGAL QUESTIONS RAISED BY P.C. 5011(b)

2     1:  Does the Body of California Law, indicating that lack
         of remorse cited by Board or other's, (Psychologist,
3        etc.), meets the standard of 'Some Evidence' to
         justify denial of parole, violate the Constitutional
4        protections of 'Due Process' due to the inherent
         conflict it has with P.C. 5011(b)?

5

6     2:  Does the Body of California Law, indicating that
         the presence of remorse is indicative of rehabilitation,
         violate the Constitution in its inherent conflict with
7        P.C. 5011(b);

8        Does that Body of Law create a different class of
         inmates, whom if they exercise their right **not** to
9        discuss the crime, admit guilt but fail to display
         remorse, or deny any culpability, how can they satisfy
10       the precedent of remorse being necessary in order to
         secure a parole date?; (Due Process, Equal Protection)

11

12       Petitioner reasonably asserts that the 'Remorse' questions

13   raised above, do violate the Constitution and the uncertainty

14   of it prejudiced him when going before the Board; how?, what

15   standard of review is present when the Board can base denial

16   on the lack of something, remorse, that per the Statute a

17   inmate/Petitioner is not required to have?  Petitioner's

18   constitutional rights in this instance have been violated; Due

19   Process not reasonably obtainable under the currently accepted

20   standards.

21   ## PETITIONER'S PAROLE PLAN AND JOB WERE REASONABLY
22   ## A FULL PACKAGE

23       Petitioner has a job-offer, a housing offer, a support

24   offer, from an Officer of the Law, yet the Board found that that

25   was an incomplete package because Petitioner was unable to

26   provide more personal details of his brother's business'; where

27   if they trully had questions about it, they could have called

28   the Police-Detective and asked them.

1       On 09/23/05, Petitioner had his Psychological-Evaluation,

2   where he told the Psychologist the exact same thing he told the

3   Board about his parole-plans; work for his brother and go to

4   school.  By the time he saw the Board 6-months later on March

5   22, 2006, he had secured Federal Funding for college.

6       The Board critisized Petitioner for not knowing the exact

7   Job-Description he would have, yet, he told them what his job

8   description would be; his brother wanted him to be the Human

9   Resource Manager, but he felt he needed more education to

10  fulfill that role, so he would do whatever his brother wanted

11  him to.

12      Reasonably speaking, when a company is offering a potential

13  parollee a job, with **no** clear indication when that person will

14  be available to fill it, then the job-duties are subject to

15  change because the business must reasonably fill vacant spots.

16      Constitutionally speaking, in this instance, what then is

17  a reasonable standard of review?

18  <u>IT IS UNCONSTITUTIONAL FOR BOARD TO SUGGEST MORE SELF-HELP, WHEN</u>
19  <u>BOARD UNABLE TO SPECIFY WHAT TYPE OF HELP</u>

20      Psychological evaluation was clear, Psychologist, Frank D.

21  Weber, stated, "I do **not** recommend any treatment for either

22  mental health or substance abuse issues."

23      In suggesting self-help, Board did not and could not

24  specify which type to get, yet used it in its reasoning to

25  justify denial.

26      Petitioner admitted his crimes, but failed to admit and

27  has always denied certain allegations his codefendants said he

28  did, in particular go to LA as listed in the Statement of FACTS

1   outlined in the Superior Courts denial, and which was based off
2   of Appellate Courts unpublished Opinion on Direct Appeal.
3   Despite being in the Statement of Facts of the Courts, Petitioner
4   was never charged with going to LA, despite the voluminous
5   evidence against him in his case, no evidence corroborated his
6   codefendants claims of him being in LA.

7       As stated earlier, P.C. 5011(b), states that the Board can
8   not deny parole based on an inmate failing to admit the crimes
9   he was committed for, so reasonably speaking this would also
10  apply to crimes the inmate was accused of yet never charged with.

11      In this instance, this portion of the denial and suggestion
12  to take self-help to come to terms with it, clearly violates the
13  statute; P.C. 5011(b). And careful review of the full record
14  will show that the self-help suggestion by the Board, entail
15  him admitting to things his codefendants said he did in/during
16  the crime.

17      Constitutionally speaking, in this instance where the denial
18  and subsequent/related Board-suggestions, are in violation of
19  the Penal Code (Due Process), what then is the standard of
20  review?

21      Superior Court also failed to address Petitioners assertions
22  regarding self-help recommendations, in consideration to Richard
23  Mejico's CGA & Re-Entry programs, (This writ, pg. 25).

24                      VOCATIONAL TRADES
25      (This writ, pg. 26-28), Superior Court failed to address
26  these claims.
27  //
28

1  <u>SAN MATEO COUNTY HAS A CLEARLY RECOGNIZABLE CONFLICT IN REGARDS</u>

2  <u>TO MAKING PAROLE RECOMMENDATIONS</u>

3         Superior Court misstated FACTS & LAW, regarding this issue.

4  One, it was not an Assistant District Attorney who made the

5  threat of frying Petitioner's Ass, it was the Chief Prosecuting

6  Attorney, the second in command in the District Attorney's

7  Office; who today, is still the second in command.

8         There are two Presiding Judges in San Mateo County, the

9  Honorable Craig L. Parsons, who responded to this writ and

10  presides over criminal matters.  And the other is the Honorable

11  Stephen Hall, who prosecuted Petitioner's case when he then

12  was a Deputy District Attorney for the San Mateo County District

13  Attorney's Office, who's immediate boss at the time was the

14  Chief Prosecuting Attorney, Steve Wagstaffe.  In this Petitioner

15  asserts, that reasonably speaking, the Hon. Craig L. Parsons had

16  a conflict ruling on whether or not his Superior and or

17  similarly ranked colleague (Presiding Judge Hall) aided in the

18  creation of a conflict between Petitioner and San Mateo County,

19  as outlined in pages 13-23; this in addition to the fact that

20  two other Senior Judges, colleagues and those whom are

21  Supervised by Presiding Judge Parsons if they still do criminal

22  matters, Judge Forcum and Judge Hahn, are both outlined in the

23  writ and on record of making damaging statements clearly

24  indicative that reasonably a conflict exists.

25         Finally on this issue; Superior Court implies to

26  reviewing Courts that the issue of conflict has been resolved

27  in other collateral attacks, this is a false impression.  While

28

1   it is true that Petitioner has filed several writs in the San

2   Mateo County Court attacking his conviction, it is irrelevant

3   that those writs were denied in this instance.  Why?  This is

4   not a collateral attack on the conviction, as the denial

5   pointed out; page 6, writ petition is properly before the Court

6   regarding attack on parole-denial, and issue before the Court is

7   whether or not activities between Petitioner and San Mateo

8   County have resulted in a conflict revolving around the County

9   District Attorney giving a parole-recommendation.

10      So for the Superior Court to indicate to reviewing Courts

11   that they are procedurally barred from reviewing this issue, is

12   in its simplest and politest terms, misleading and an inaccurate

13   statement of law.

14   FACT THAT PAROLE BOARD ALLEGEDLY SATISFIED THE 'SOME EVIDENCE'
     STANDARD, DOES NOT MAKE IT IRRELEVANT THAT BOARD OPERATING AN
15   ILLEGAL POLICY OF DENYING PAROLE, JUST BECAUSE, AT INITIAL
     PAROLE BOARD HEARINGS
16

17      Superior Court stated that <u>since</u> the Board had made specific

18   findings justifying the instant denial, that the assertion by

19   Petitioner of an underground policy is irrelevant; Petitioner

20   respectfully disagrees.

21      Reasonably speaking, if in fact an underground policy

22   exists, then the Board will be wise enough to go through their

23   checklist of things to put on the record, 'Specific Findings',

24   satisfying the 'Some Evidence' standard, to ensure that

25   the policy is not exposed.

26      Petitioner was told by a Board Member, at his documentation

27   hearing in 2003, that he would not be receiving a date, and by

28

1  other State Employees in a position to know the exact same thing.

2  Superior Court stated, page 10, Line 6-8, "The fact that other

3  individuals predicted the outcome of Petitioner's hearing

4  suggests that the board followed predictable guidelines."

5  Reasonably speaking, the Court's statement/view raises more

6  questions then it answers; how could someone three years prior

7  to the hearing, know that the Board would say Petitioners parole

8  plan was incomplete, or that he lacked remorse despite the

9  Psychologist stating that he had it, or that he lacked remorse

10  when statutorily, P.C. 5011(b), he was not mandated to admit or

11  in any way discuss the crime in order to receive a parole-date,

12  and or that he was told to seek self-help in order to come to

13  term with what really happened, again when P.C. 5011(b) states

14  that he need not admit his crimes in order to receive a date?

15      In addition to the statistical data spoken of in the

16  earlier portions of this writ, Petitioner provides the Court

17  with the Declaration of Albert M. Leddy,    an ex-District

18  Attorney, ex-Chairman of the Board of Prison Terms, amongst

19  other things, in which he gives statements & opinions that there

20  is indeed underground policies. (Exh. S)

21      Petitioner has an **absolute** right to a fair and impartial

22  Board Hearing, that was not possible when the Board was

23  functioning on an underground policy.

24      Reasonable consideration of the individual and cumulative

25  effect of all of the beforementioned issues indicate that

26  Petitioner's Board Hearing was constitutionally unsound, added

27  to that is this;

28

1  BOARD'S REGULATORY/ADMINISTRATIVE RULES CLEARLY CONFLICT WITH
2  PENAL CODE 5011(b)

3      Title 15, 'INFORMATION CONSIDERED', Art. 2, §2236

4              "The facts of the crime **shall** be discussed
5              with the prisoner to assist in determining
               the extent of personal culpability.  The
6              Board **shall** not require an admission of
               guilt to **any** crime for which the prisoner
7              was committed.  A prisoner may refuse to
               discuss the facts of the crime in which
8              instance a decision shall be made based on
               the other information available **AND THE
9              REFUSAL SHALL NOT BE HELD AGAINST THE
               PRISONER.**"

10      Shall is mandatory language, Art. 2, §2236, states that the

11  facts of the crime shall be discussed to determine culpability;

12  then it states that the Board **shall** not require an admission of

13  guilt to any crime for which the prisoner was committed, similar

14  language to P.C. 5011(b), and it states that the prisoner does

15  not have to discuss the facts of the crime, that a decision shall

16  be made based on other information available and the refusal

17  **SHALL** not be held against the prisoner.

18      Prisoner is committed for a Life-Sentence, so some degree

19  of culpability is apparent; the Board shall not require an

20  admission of guilt; as Petitioner was told specifically by the

21  Board, (Exh. C. pg 9, Ln. 22-26);

22              "Okay you **are not** required to admit your
23              offense or discuss your offense however
               the panel does accept the findings of the
24              court to be true."

25      The Board stated that it would accept the findings of the

26  (Trial) court to be true;    the trial Court did not find

27  Petitioner guilty of going to LA, yet the Board recommended

28  self-help for his refusal to admit it.

1    Board also called into question Petitioner's veracity for

2   his failure to admit going to LA and or concede that his co-

3   defendants statements as to his specific words/actions were

4   correct; yet, the Board's actions **clearly** conflict with their own

5   regulatory rules, §2236, which states that the prisoner's refusal

6   to discuss and or admit to crimes, **SHALL** not be held against them.

7        Regulatory Authority/Rules, shall align with the Penal Code

8   it enacts.    §2236 appears consistent with Penal Code 5011(b),

9   that is until you review §2281 which outlines what the Board is

10   to consider for parole purposes;

> Title 15, §2281(b) "past and present attitude
> toward the crime."

13   **Reasonably** speaking, attitude towards the crime conflicts

14   with the prisoner not having to admit and or discuss it; yet the

15   Board is allowed to consider past and present attitude toward

16   the crime.  So, if as in this instance, a prisoner denies a

17   act, the Board can deem he is dishonest, lacks remorse, and needs

18   self-help to come to grips with it?

> Title 15, §2281(d) "Circumstances tending to
> show suitability:
>
> (3) "Signs of remorse.  The prisoner performed
> acts which tend to indicate the presence of
> remorse, such as attempting to repair the
> damage, seeking help for or relieving suffering
> of the victim , **OR THE PRISONER HAS GIVEN
> INDICATION THAT HE UNDERSTANDS THE NATURE AND
> MAGNITUDE OF THE OFFENSE.**"

25   Petitioner reasonably states, that the Board of Prison Terms

26   and or the current name, Board of Parole Hearings, has **NEVER**

27   paroled an inmate who failed to express remorse, **which** IS one of

28   the justifications it can cite for paroling.  **BUT**, if by statute

1  the prisoner does not have to admit and or discuss the facts of
2  the crime, how can past or present attitude towards the crime and
3  or **current** signs of remorse be legally applicable to determining
4  parole suitability? It can not.

5      Furthermore, "...the prisoner has given indication that he
6  understands the nature and magnitude of the offense.", **clearly**
7  and **reasonably** calls for an admission of guilt. Petitioner
8  reasonably states this, not one inmate has ever been paroled by
9  the Board who failed to acknowledge guilt and remorse, not one,
10 yet the law **clearly** states that that is not necessary.

11     The Board has enacted and enforced regulations that conflict
12 with the Penal Code, and in this instance that enforcement is
13 clearly prejudicing Petitioner because it calls for him to do
14 something, (admit to his codefendants statements of his actions,
15 some of which he was never charged nor convicted of), that the
16 Penal Code and the Board's own regulations does not require him
17 to do. P.C. 5011(b), Title 15, §2236, 'No admission of guilt
18 necessary, nor shall it be held against prisoner.' So, not only
19 is the Boards regulations in its entirety (§2236 & 2281(b) & (d)
20 (3)), in conflict with the Penal Code, but in this instance the
21 Board violated its own regulations when holding it against
22 Petitioner for failing to admit to things he had never been
23 charged and or convicted of; and even if he had been charged
24 and convicted, the Board shall not hold a refusal to discuss it
25 against him.

26     The Board is en-acting its own policies, some of which are
27 underground, in addition other questions have now arisen;

28

1 | BOARD CONSTITUTIONALLY UNABLE TO CARRY OUT ITS DUTIES OF ASSESSING
REHABILITATION OF LIFE PRISONERS, WHEN SECRETARY OF CORRECTIONS
2 | AND CALIFORNIA GOVERNOR ON RECORD STATING THAT UNDER CURRENT
PRISON CONDITIONS, REHABILITATION NOT POSSIBLE

3

4          James Tilton, Secretary of Corrections, in a Sacramento
5          Bee Newspaper Article, August 01, 2006, Exh. N, stated;

6          "The Department of Corrections owns the
           responsibility to assist inmates who are
           willing to change their ways with basic tools,
7          of education, life skills, drug treatment,
           and mental health, so they can be better
8          when they leave corrections, not worse."

9          "BUT until I get overcrowding reduced...then
           I don't have the opportunity to provide the
10         program that I believe is my charge."

11         Governor Arnold Schwarzenegger, on 9/21/06, told
           the Sacramento Bee Newspaper during an Editorial
12         Staff meeting, Exh. T)

13         "Gov. Arnold Schwarzenegger said Wednesday that
           California needs more prison beds before it can
14         run a successful rehabilitation program,..."

15         Federal Judge Thelton Henderson, told Sacramento
           Bee Reporter Andy Furillo, that California had
16         only added the name Rehabilitation, not implemented
           it. (Exh. U)

17
           And the California Lifer Newsletter Reported in its
18         February/2006 release, that they are in possession
           of a letter by the Boards P.I. Officer, Bill Cessa,
19         which states,

20         "[u]ltimately, the Board of Prison Terms only grants
           parole for lifers when it is convinced that the inmate
21         has served a suitable amount of time in custody..."
           (Exh. V)
22

23         The Boards P.I. Officer has allegedly made statements

24 indicative of an underground policy, ex-Commissioner Albert

25 M. Leddy in a sworn Declaration stated that undergound policies

26 exist, Governor and Secretary of Corrections on record saying

27 that under current conditions rehabilitation not possible,

28

1   ex-Secretary of Corrections Jeanne S. Woodford outlined a very

2   bleak picture of the State of Corrections in California in an

3   Editorial, Exh. W, and Federal Judge Henderson who is considering

4   taking the entire California Corrections system into Receivership

5   has stated Rehabilitation is just an added name, not a reality.

6       With that said, constitutionally speaking, if the Boards

7   bosses, Secretary of Corrections and the Governor are on the

8   record stating that until conditions change, rehabilitation not

9   possible, how then can the Board assess whether or not Lifer

10  Inmates are rehabilitated?

11      And if under these conditions they can assess whether or

12  not Lifers are rehabilitated, wouldn't such rehabilitation be

13  indicative of the Lifer's efforts, not the prisons?; and that

14  goes to support Petitioner's contentions that he has taken

15  the steps to rehabilitate himself.

16      At this time, the Board can not fulfill its statutory

17  duties in light of the Governor and Secretary of Corrections

18  being on the record stating that under current conditions,

19  rehabilitation, (which is only required for Lifers), is not

20  possible; and as such, Court intervention is constitutionally

21  necessary in order to assure Lifers Rights to Fair-Hearings.

                              CLOSING

23      The cumulative effect of all of the beforementioned issues,

24  and the meritable individual issues in and by themself, warrent

25  Court-Intervention and an issuance of an 'Order To Show Cause'

26  because a Prima Facie case has been shown.  In accordance with

27  law, if Order To Show Cause issues, appointment of Counsel is

28  requested.

Respectfully Submitted,

La Merle R. Johnson, Petitioner                    Date: November 16, 2006

La Merle R. Johnson, J-92682
P.O. 409060 (C15-208L)
Ione, CA 95640-9060

November 16, 2006

Dear Clerk & Justices:

First I would like to apologize for the length of the enclosed documents, unfortunately all of them were needed in order to substantiate the raised points.

Enclosed writ deals with Lifer-Parole issues, and raises present-day (*Unique*) questions that Petitioner believes have never been raised. One of which; Governor Schwarzenegger & Secretary of Corrections James Tilton are on record stating that under present prison conditions, (overcrowding, etc.), rehabilitation is not possible. Realistically speaking the Board of Parole Hearings (previously Board of Prison Terms 'BPT') job is to assess whether or not Lifer-inmates are rehabilitated. So if what the Governor & Secretary are stating is true, and their the overseer's of the Board, how is that the Board is carrying out its duties if their Boss' do not believe it (Rehabilitation) is possible under present conditions? Amongst other raised constitutionally-interesting claims, is one dealing with the body of law indicative that remorse is necessary for parole, which conflicts with the Penal Code because it states that the prisoner need not admit to the crime and or discuss it at the parole-hearing. (And the only way to realistically gage remorse, is if and when the prisoner admits to the crime.)

A SASE included with a copy of the face-page of the writ, please stamp filed and return. Due to bulk, documents sent in two separate envelopes; #1 envelope contains Original (Writ) and bound documents, #2 contains 4-copies of writ. Please excuse any inconvenience.

Sincerely,

La Merle R. Johnson